**Leticia Camacho**

| | |
|---|---|
| **From:** | William Kiendl <wkiendl@gordonrees.com> |
| **Sent:** | Tuesday, November 01, 2016 10:27 AM |
| **To:** | Allyson O'Malley-Jones; Jeffrey Bilanko; Leticia Camacho |
| **Cc:** | Stephanie Hosey; Norma Butler |
| **Subject:** | RE: Thompson v. On-Site Manager, Inc. |

Allyson,

Thank you for your voice message.

Short answers:

1. On-Site requests that the document you sent me yesterday be filed under seal.
2. On-Site does not agree to the filing of the First Amended Complaint.

Please advise as to the hearing date you will be setting on the motion for leave to amend.  Thank you.


William R. Kiendl
Associate

Gordon & Rees
Scully Mansukhani

701 Fifth Avenue, Suite 2100
Seattle, WA 98104

Main Phone: 206-695-5100
Fax: 206-689-2822
email: wkiendl@gordonrees.com

Alabama - Arizona - California - Colorado - Connecticut - Florida - Georgia Illinois - Maryland - Massachusetts - Missouri - Nevada - New Jersey - New York North Carolina - Ohio - Oregon - Pennsylvania - South Carolina - South Dakota Texas - Virginia - Washington - Washington, D.C. - West Virginia

http://www.gordonrees.com



-----Original Message-----
From: Allyson O'Malley-Jones [mailto:Allysono@nwjustice.org]
Sent: Tuesday, November 01, 2016 9:18 AM
To: Jeffrey Bilanko; William Kiendl; Leticia Camacho
Cc: Stephanie Hosey; Norma Butler
Subject: RE: Thompson v. On-Site Manager, Inc.

Dear Mr. Kiendl,

EXHIBIT 1 - PAGE 1 OF 5

I just left you a voice mail message but am following up with this email.

1. As to the document On-Site provided to Plaintiffs on September 29, 2016, we need to know whether On-Site will allow us to file the document unsealed (if On-Site agrees we can redact the document if there is a way to do so that would be acceptable to On-Site).  If we do not hear from you by noon today we will assume that you will require us to file the document under seal.

2. As to Plaintiffs proposed First Amended Complaint, the primary changes to the complaint relate to a claim that On-Site failed to consider the Thompsons' Section 8 voucher when making their recommendation as to whether to accept the Thompsons' applications for tenancy and On-Site's failure to properly consider the Thompsons' income to rent ratio. Additionally we address On-Site's failure to exclude Mr. Thompson Jr.'s medical debt pursuant to the admission criteria. As with above, unless you inform us otherwise, we will assume that On-Site does not agree to allow us to file the proposed First Amended Complaint on behalf of the Thompsons.  Please inform us by noon today if you agree to allow us to file the proposed First Amended Complaint.

Thank you,

Allyson O'Malley-Jones
Staff Attorney
Northwest Justice Project
401 Second Ave. S., Ste. #407
Seattle, WA 98104
(206) 464-1519 (tel) (206) 624-7501 (fax)

The information in this e-mail message is privileged and confidential.  It is intended only for the use of the recipient named above (or the employee or agent responsible to deliver it to the intended recipient). If you are not the intended recipient or have received this message in error, please notify the sender and promptly delete this message. Thank you.

---

Alabama * Arizona * California * Colorado * Connecticut * Florida * Georgia * Illinois * Maryland * Massachusetts * Missouri * Nevada * New Jersey * New York * North Carolina * Ohio * Oregon * Pennsylvania * South Carolina * South Dakota * Texas * Virginia * Washington * Washington, DC * West Virginia

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

GORDON & REES LLP
http://www.gordonrees.com

EXHIBIT 1 - PAGE 2 OF 5

**Leticia Camacho**

| | |
|---|---|
| **From:** | Leticia Camacho |
| **Sent:** | Thursday, October 27, 2016 12:43 PM |
| **To:** | 'Jeffrey Bilanko'; William Kiendl |
| **Cc:** | Allyson O'Malley-Jones; Norma Butler; Stephanie Hosey |
| **Subject:** | RE: Thompson v. On-Site |

Good afternoon, Mr. Bilanko:

If you are available right now, it will only take a couple of minutes. There are two issues:  First, I need to know your client's position regarding our  First Amended Complaint.  Secondly, assuming that On-Site opposes the Amended Complaint, pursuant to LCR 5(g), we would like to discuss the issue of filing documents designated by On-Site as confidential.

If we could have a couple of minutes of your time today, we would appreciate it.  I will be out of town tomorrow and am not available for a call tomorrow for that reason.

Thank you,

**Leticia Camacho**
**Staff Attorney**
**Northwest Justice Project**
**401 Second Ave S, Suite 407**
**Seattle, WA  98104**
**(206) 464-1519/(206) 624-7501 (Fax)**
**leticiac@nwjustice.org**

**From:** Jeffrey Bilanko [mailto:JBilanko@gordonrees.com]
**Sent:** Thursday, October 27, 2016 12:32 PM
**To:** Leticia Camacho; William Kiendl
**Cc:** Allyson O'Malley-Jones; Norma Butler; Stephanie Hosey
**Subject:** RE: Thompson v. On-Site

Ms. Camacho-

What is the topic of our conference call?  I can try to find some time tomorrow am.

**JEFFREY E. BILANKO**  | Partner
**GORDON & REES**
**SCULLY MANSUKHANI**

701 Fifth Avenue, Suite 2100
Seattle, WA  98104
D: 206-695-5117  |  P: 206-695-5100  |  F: 877-304-9883  |  F: 206-689-2822
jbilanko@gordonrees.com

Alabama • Arizona • California • Colorado • Connecticut • Florida • Georgia
Illinois • Maryland • Massachusetts • Missouri • Nevada • New Jersey • New York
North Carolina  • Ohio • Oregon • Pennsylvania • South Carolina • South Dakota
Texas • Virginia • Washington • Washington, D.C. • West Virginia
www.gordonrees.com
 Please consider the environment before printing this email.

1

**EXHIBIT 1 - PAGE 3 OF 5**

**From:** Leticia Camacho [mailto:Leticiac@nwjustice.org]
**Sent:** Wednesday, October 26, 2016 4:46 PM
**To:** Jeffrey Bilanko; William Kiendl
**Cc:** Allyson O'Malley-Jones; Norma Butler; Stephanie Hosey
**Subject:** RE: Thompson v. On-Site

Mr. Bilanko:

Are you available for a conference call tomorrow, sometime between 12:30 p.m. and 3:00 p.m.? If that time doesn't work, let me know if there is a time in the morning when you are available and I'll try to reschedule my morning appointments so that we can talk.

Thank you,

**Leticia Camacho**
**Staff Attorney**
**Northwest Justice Project**
**401 Second Ave S, Suite 407**
**Seattle, WA  98104**
**(206) 464-1519/(206) 624-7501 (Fax)**
**leticiac@nwjustice.org**

**From:** Jeffrey Bilanko [mailto:JBilanko@gordonrees.com]
**Sent:** Tuesday, October 25, 2016 1:49 PM
**To:** Leticia Camacho; William Kiendl
**Cc:** Allyson O'Malley-Jones; Norma Butler; Stephanie Hosey
**Subject:** RE: Thompson v. On-Site

Thank you. I will confer with my client and get back to you as quickly as possible.

**JEFFREY E. BILANKO**  | Partner
**GORDON & REES**
SCULLY MANSUKHANI

701 Fifth Avenue, Suite 2100
Seattle, WA 98104
D: 206-695-5117  |  P: 206-695-5100  |  F: 877-304-9883  |  F: 206-689-2822
jbilanko@gordonrees.com

Alabama • Arizona • California • Colorado • Connecticut • Florida • Georgia
Illinois • Maryland • Massachusetts • Missouri • Nevada • New Jersey • New York
North Carolina  • Ohio • Oregon • Pennsylvania • South Carolina • South Dakota
Texas • Virginia • Washington • Washington, D.C. • West Virginia
www.gordonrees.com
Please consider the environment before printing this email.

**From:** Leticia Camacho [mailto:Leticiac@nwjustice.org]
**Sent:** Tuesday, October 25, 2016 12:30 PM
**To:** Jeffrey Bilanko; William Kiendl
**Cc:** Allyson O'Malley-Jones; Norma Butler; Stephanie Hosey
**Subject:** Thompson v. On-Site

EXHIBIT 1 - PAGE 4 OF 5

Mr. Bilanko:

Pursuant to our conversation last week, I have attached our proposed First Amended Complaint.  Our proposed amendments should be clear for you to see but if you have any questions, please let me know.   Otherwise, please let me know whether your client consents to or opposes our proposed First Amended Complaint.

Thank you,

**Leticia Camacho**
**Staff Attorney**
**Northwest Justice Project**
**401 Second Ave S, Suite 407**
**Seattle, WA  98104**
**(206) 464-1519/(206) 624-7501 (Fax)**
**leticiac@nwjustice.org**

Alabama * Arizona * California * Colorado * Connecticut * Florida * Georgia * Illinois * Maryland * Massachusetts * Missouri * Nevada * New Jersey * New York * North Carolina * Ohio * Oregon * Pennsylvania * South Carolina * South Dakota * Texas * Virginia * Washington * Washington, DC * West Virginia

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGIALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON & REES LLP**
http://www.gordonrees.com

**EXHIBIT 1 - PAGE 5 OF 5**

08/18/2015 12:22 FAX                    NWJUSTICE-SEATTLE                          @001

```
                            *********************
                            ***   TX REPORT   ***
                            *********************

            TRANSMISSION OK

            TX/RX NO            3951
            RECIPIENT ADDRESS   18887740144
            DESTINATION ID
            ST. TIME            08/18 12:21
            TIME USE            01'06
            PAGES SENT          5
            RESULT              OK
```

401 Second Ave S. Suite 407<br>
Seattle, WA 98104<br>
Tel. (206) 464-1519<br>
Fax (206) 624-7501<br><br>
Toll Free 1-888-201-1012<br>
www.nwjustice.org<br><br>
César E. Torres<br>
Executive Director

# Northwest Justice Project

## FAX

To:      On-Site Manager, Inc.                    Fax #:   (888) 774-0144

From:    Eric Dunn

Date:    August 18, 2015

Re:      <u>Glenn Thompson Sr., DOB:</u>  <u>AND</u>
         <u>Glenn Thompson Jr., DOB:</u>

# Pages:  5        (incl. cover)

☐ Urgent            ☐ Reply ASAP            ☐ Original to be mailed

**Message:**

Please see attached letter dated same with enclosures.

**EXHIBIT 2 - PAGE 1 OF 6**

401 Second Ave S. Suite 407
Seattle, WA 98104
Tel. (206) 464-1519
Fax (206) 624-7501

Toll Free 1-888-201-1012
www.nwjustice.org

César E. Torres
Executive Director

**FAX**

To:    On-Site Manager, Inc.        Fax #:   (888) 774-0144

From:  Eric Dunn

Date:   August 18, 2015

Re:     <u>Glenn Thompson Sr.</u> ███████ <u>AND</u>
       <u>Glenn Thompson Jr.</u> ███████

\# Pages:  5        (incl. cover)

☐ Urgent       ☐ Reply ASAP       ☐ Original to be mailed

**Message:**

Please see attached letter dated same with enclosures.



If you do not receive all pages, or have problems in transmission, telephone the number listed above. The information in this fax message is privileged and confidential. It is intended only for the use of the recipient named above (or the employee or agent responsible to deliver it to the intended recipient). If you received this in error, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this message in error, please notify us by telephone immediately, and return the original message to us at the above address via U.S. Postal Service. We will, of course, be happy to reimburse you for any costs. Thank you.

**EXHIBIT 2 - PAGE 2 OF 6**

401 Second Ave S. Suite 407
Seattle, WA 98104
Tel. (206) 464-1519
Fax (206) 624-7501

 Northwest Justice Project

Toll Free 1-888-201-1012
www.nwjustice.org

César E. Torres
Executive Director

August 18, 2015

On-Site Manager, Inc.
307 Orchard City Dr., Ste. 110
Campbell, CA 95008

      Re: Glenn Thompson Sr., d.o.b. ███████ and Glenn Thompson Jr., d.o.b. ███████

Dear Sir or Madam:

This is a dispute, under the Fair Credit Reporting Act, concerning information you reported on or about July 28, 2015, to FPI Management regarding our clients, Glenn Thompson Sr. and Glenn Thompson Jr., in connection with their application for rental housing at Club Palisades Apartments, 2211 S. Star Lake Rd., Federal Way, WA 98003.

Your reports indicated that our clients were involved a civil action for possession concerning 2917 – 12th Ave S. Seattle, WA 98144. This is false. Neither Mr. Thompson Sr. nor Mr. Thompson Jr. ever lived at that address. Neither knows the "Patricia A. Thompson" listed as the defendant in that case.

Your reports also listed a collection judgment for $4,532.00 against Mr. Thompson Jr., owed to a "Ray Klein Inc." This report is incomplete, as it does not make clear that the judgment is related to a medical debt.

We request that you immediately reinvestigate this matter, delete the landlord-tenant court records you have falsely attributed to our clients, and revise your report to make clear that the amount Mr. Thompson owes on the Ray Klein Inc. account is a medical debt. Please revise all rental scores and recommendations accordingly. After doing so, please promptly report all corrections both to me and FPI Management. Please also provide me a copy of your reinvestigation procedures.

I would prefer to receive these materials by e-mail to: EricD@nwjustice.org. If that is not possible, you may send them by fax to: (206) 624-7501. If you must use regular mail, my address in the top right corner. Mr. Smith's authorization for the release of private records is enclosed. Thank you.

Sincerely,

*EGD*

Eric Dunn
Staff Attorney

cc: Glenn Thompson Sr., Glenn Thompson Jr.


THE ALLIANCE
for Equal Justice
MEMBER

 LSC

**EXHIBIT 2 - PAGE 3 OF 6**

## NORTHWEST JUSTICE PROJECT
### Authorization to Release Confidential Information
Разрешение на передачу конфиденциальной информации

Patient/Resident/Client's Name: _Glenn Thompson, Sr._
Имя пациента/жителя/клиента:

Social Security Number: _____
Номер социального обеспечения:

Date of Birth: ███████
Дата рождения:

I request and authorize: _On-Site Manager, Inc_
Я прошу и даю разрешение:

to release confidential information and/or records to:
передать конфиденциальную информацию и (или) записи (кому):

Name: _Eric Dunn_
Имя, фамилия:
(or his/her representative)
(или его (её) представителю)

Organization:   **NORTHWEST JUSTICE PROJECT**
Организация:

Address:   401 2nd Avenue South, Suite 407
Адрес:      Seattle, Washington  98104

This authorization applies to:
Это разрешение касается:

☒ all records relating to health care and health assessments since _____
любых записей, относящихся к лечению и оценке здоровья, начиная с _____

☒ financial information and records
финансовой информации и записей

☒ legal information and records
судебной информации и записей

I also consent to the release of health care information and records relating to the testing, diagnosis and treatment of:
Я также даю согласие на передачу медицинской информации и записей о результатах анализов, диагнозов и лечения

☒ mental health and/or psychiatric disorders
психических заболеваний и (или) психиатрических расстройств

☒ HIPPA protected psychotherapy notes
записей о психотерапии, защищённых HIPAA (Акт о портативности и подотчётности медицинского страхования)

☒ alcohol and/or drug abuse
алкоголизма и (или) наркомании

☒ sexually transmitted diseases (STD) including HIV (AIDS)
венерических заболеваниях, включая ВИЧ (СПИД)

Need for disclosure:      Legal advice and/or representation.
Причина для передачи информации     юридическая консультация и (или) представительство

This authorization expires in 90 days or until _CASE IS CLOSED_ (date or event).  I understand I may revoke or withdraw my permission in writing at any time, except to the extent the holder of information/records has already taken substantial action in reliance on the authorization.  Any further disclosure may be made only as provided by law.  A photocopy of this form is as valid as the original.

Данное разрешение действительно в течение 90 дней или до _____ (дата или событие).  Я знаю о том, что в любой момент я могу в письменном виде отменить или забрать своё разрешение, за исключением тех случаев, когда хранитель информации (архивов) уже предпринял значительные шаги, основываясь на данном разрешении.  Любое дальнейшее раскрытие информации может быть произведено только согласно закона. Фотокопия данного документа действительна также, как и оригинал.

The covered entity may not condition treatment, payment, enrollment or eligibility for benefits on whether the individual signs the authorization.  The potential for information disclosed pursuant to the authorization is subject to re-disclosure by the recipient and is no longer protected by the HIPAA Privacy Rule.

Указанная организация не может обусловливать лечение, оплату, запись или льготы тем, подписал ли клиент данное разрешение.  Возможно, что переданная информация будет передана дальше получателем и не будет больше защищена правилом о защите конфиденциальности по HIPAA.

_____           _____
Signature of patient/resident/client or authorized representative                 Date
Подпись пациента/жителя/клиента или полномочного представителя                    Дата

_____
Relationship or Authority of Personal Representative  (if applicable)
Кем приходится или какими правами обладает личный представитель (если имеется)

**EXHIBIT 2 - PAGE 4 OF 6**

NORTHWEST JUSTICE PROJECT
Authorization to Release Confidential Information
Autorización para Proveer Información Confidencial

Patient/Resident/Client's Name: _Glenn Thompson, Jr._
Nombre del paciente/residente/cliente:

Social Security Number: _____
Número de Seguro Social:

Date of Birth: ██████████
Fecha de Nacimiento:

I request and authorize: _On-Site Manager, Inc._
Pido y autorizo a:
to release confidential information and/or records to:
a que provean información y archivos confidenciales a:

Name: _Eric Dunn_
Nombre:
(or his/her representative)
(o su representante)

Organization: **NORTHWEST JUSTICE PROJECT**
Organización:

Address:     401 2nd Avenue South, Suite 407
Dirección:   Seattle, Washington  98104

This authorization applies to:
Esta autorización incumbe:

☒   all records relating to health care and health assessments since _____
     toda información e archivos sobre cuidado médico u evaluaciones  médicas desde _____

☒   financial information and records
     archivos e información financiera

☒   legal information and records
     archivos e información legal

I also consent to the release of health care information and records relating to the testing, diagnosis and treatment of:
También autorizo a que provean información de cuidado médico y archivos relacionados con exámenes, diagnóstico y tratamiento de:

☒   mental health and/or psychiatric disorders
     enfermedad mental y/or desórdenes psicológicos

☒   HIPPA protected psychotherapy notes
     notas de psicoterapia protegidas por HIPAA (Ley de Portabilidad y Responsabilidad de Seguros de Salud)

☒   alcohol and/or drug abuse
     abuso de alcohol y/o droga

☒   sexually transmitted diseases (STD) including HIV (AIDS)
     enfemedades venéreas, incluyendo el virus de immunodeficiencia humana (SIDA)

Need for disclosure:     Legal advice and/or representation.
Razón para esta revelación

This authorization expires in 90 days or until _CASE IS CLOSED_ (date or event).  I understand I may revoke or withdraw my permission in writing at any time, except to the extent the holder of information/records has already taken substantial action in reliance on the authorization.  Any further disclosure may be made only as provided by law.  A photocopy of this form is as valid as the original.
Esta autorización vence en 90 días o hasta _____ (fecha o evento).  Entiendo que puedo anular o retirar mi permiso por escrito en cualquier momento, excepto en la medida en que el proveedor de información o archivos ya haya efectuado gestiones para conformar esta autorización.  Cualquier revelación adicional podrá ser hecha solamente bajo las provisiones de la ley.  Una fotocopia de este documento tiene el mismo valor que el original.

The covered entity may not condition treatment, payment, enrollment or eligibility for benefits on whether the individual signs the authorization.  The potential for information disclosed pursuant to the authorization is subject to re-disclosure by the recipient and is no longer protected by the HIPAA Privacy Rule.

_____
Signature of patient/resident/client or authorized representative
Firma del paciente/residente/cliente o su representante autorizado

Date
Fecha

_____
Relationship or Authority of Personal Representative  (if applicable)
Relación u  Autoridad del Representante (si se aplica)

**EXHIBIT 2 - PAGE 5 OF 6**





EXHIBIT 2 - PAGE 6 OF 6

Rental Report for GLENN P. THOMPSON, Sr., 7/2......15 for 69-103 at Club Palisades

# Rental Report for GLENN P. THOMPSON, Sr.

This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An applicant who is the subject of this report may obtain a free copy at any time by contacting On-Site Renter Relations.
*El solicitante que es objeto de este informe puede obtener una copia gratuita por contactar On-Site Renter Relations.*

| Identity | From Application | From Experian |
|---|---|---|
| Name: | GLENN P. THOMPSON, Sr. | GLENN THOMPSON<br>PATRICK THOMPSON |
| SSN: | ███████ | ██████ |
| Birth Date: | ███961 | ███961 |

| Addresses | From Application | From Experian |
|---|---|---|
| | 9681 54TH AVE S<br>SEATTLE, WA 98118 - US | 6105 S 124TH ST.<br>SEATTLE, WA 98178-3543 (Applicant)<br>Reported 5/2010<br><br>59TH AVE S<br>SEATTLE, WA 98178 (Applicant)<br>Reported 11/2006<br><br>11273 59TH AVE S<br>SEATTLE, WA 98178-2943 (Applicant)<br>Reported 3/2006 |

| Employment | From Application | From Experian |
|---|---|---|
| Applicant: | SSI<br>SSI<br>$920.00/Mo. Total monthly income: $1,118.00 | T I ENTERPRISE |

## Verifications

### Address: 9681 54TH AVE S

| Requested For | Landlord from Application | Address | Prior Rent |
|---|---|---|---|
| GLENN P. THOMPSON, Sr.<br>Requested Date<br>7/28/2015 | FRANCES CANNON<br>(206) 721-3584 | 9681 54TH AVE S<br>SEATTLE, WA 98118 - US | $300.00 |
| | Results<br>Pending | | |

### Employer: SSI

| Requested For | Position Held | Monthly Salary | Supervisor |
|---|---|---|---|
| GLENN P. THOMPSON, Sr.<br>Requested Date<br>7/28/2015 | SSI<br>SSI | $920.00 | SSI |
| | Results<br>Pending | | |

## Criminal History

### From On-Site.com

| Requested For | Location Searched | Period Searched | Requested | Returned |
|---|---|---|---|---|
| GLENN P. THOMPSON, Sr. | Multi-State: AK, AL, AR, AZ, CA, CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY | 7/28/2008 - 7/28/2015 | 7/28/2015 | 7/28/2015 |

Results
*No Records Found*





**EXHIBIT 3 - PAGE 1 OF 3**

Rental Report for GLENN P. THOMPSON, Sr., 7/2...  ...15 for 69-103 at Club Palisades

| National Sex Offender Registry History | | | |
|---|---|---|---|
| **From On-Site.com** | | | |
| Requested For | | Date Requested | Date Returned |
| GLENN P. THOMPSON, Sr. | | 7/28/2015 | 7/28/2015 |
| Results | | | |
| No Records Found | | | |

| Landlord Tenant Court Records | | | | |
|---|---|---|---|---|
| **From On-Site.com** | | | | |
| Date Filed | Case Type | Court | Case Number | Notice Type |
| 3/2011 | CIVIL ACTION FOR POSSESSION | KING | 112103773 | |
| | Judgment | Judgment Amount | Status | Amount Paid |
| | FOR PLAINTIFF 4/4/2011 | | | |
| | Defendants | | | |
| | PATRICIA A. THOMPSON | | | |
| | Address | | Comments | |
| | 2917 12TH AVE. S, SEATTLE, WA 98144 | | | |
| | Plaintiff | | Plaintiff Phone # | |
| | E A TUCCI | | | |
| *Note: A landlord tenant court record does not necessarily mean that a tenant owed rent or was evicted from an apartment.* | | | | |

| OFAC SDN/Terrorist Watchlist Search | | |
|---|---|---|
| **From On-Site.com** | | |
| Requested For | Results | Returned |
| GLENN P. THOMPSON, Sr. | No records found | 7/28/2015 |

| Collections | | | | |
|---|---|---|---|---|
| **From Experian** | | | | |
| Client Name | Date | Last Active | Orig. Amount | Balance |
| TMOBILE (Applicant) Collection Agency - ENHANCED RECOVERY CO L 8014 BAYBERRY RD, JACKSONVILLE, FL 32256 (800) 496-8941 | 3/2014 | | $301.00 | $301.00 |
| | Comments | | | |
| | ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| Client Name | Date | Last Active | Orig. Amount | Balance |
| CENTURYLINK QWEST CORPORATION (Applicant) Collection Agency - EOS CCA PO BOX 981008, BOSTON, MA 02298 | 10/2014 | | $216.00 | $216.00 |
| | Comments | | | |
| | ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| Client Name | Date | Last Active | Orig. Amount | Balance |
| KENT (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 8/2013 | | $209.00 | $209.00 |
| | Comments | | | |
| | ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| Client Name | Date | Last Active | Orig. Amount | Balance |
| SEATTLE (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 5/2010 | | $130.00 | $130.00 |
| | Comments | | | |
| | ACCOUNT ASSIGNED TO COLLECTIONS | | | |

904_645_3009

*CR47023333*
GLENN P. THOMPSON, Sr., 7/28/2015

**EXHIBIT 3 - PAGE 2 OF 3**

Rental Report for GLENN P. THOMPSON. Sr., 7/28/2016 for 69-103 at Club Palisades

| Client Name | Date | Last Active | Orig. Amount | Balance |
|---|---|---|---|---|
| SEATTLE (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 5/2009 | | $74.00 | $74.00 |
| | Comments | | | |
| | ACCOUNT ASSIGNED TO COLLECTIONS | | | |

| Client Name | Date | Last Active | Orig. Amount | Balance |
|---|---|---|---|---|
| COAST NATIONAL INSURANCE COM (Applicant) Collection Agency - LAMONT HANLEY & ASSOCI 1138 ELM ST, MANCHESTER, NH 03101 (603) 625-5547 | 9/2011 | | $51.00 | $51.00 |
| | Comments | | | |
| | ACCOUNT ASSIGNED TO COLLECTIONS | | | |

| Client Name | Date | Last Active | Orig. Amount | Balance |
|---|---|---|---|---|
| AT T (Applicant) Collection Agency - ENHANCED RECOVERY CO L 8014 BAYBERRY RD, JACKSONVILLE, FL 32256 (800) 496-8941 | 11/2014 | | $958.00 | $0.00 |
| | Comments | | | |
| | ACCOUNT LEGALLY PAID IN FULL FOR LESS THAN THE FULL BALANCE | | | |

## Legal Items
### From Experian

| Plaintiff | Date | Case Number | Comments | Satisfied | Amount |
|---|---|---|---|---|---|
| STATE OF WASHINGTON (Applicant) KING SUPERIOR CT-SEATT 516 3RD AVE STE E609, SEATTLE, WA 98104 By mail only | 7/2013 | 132250225 | Judgment | | $244.00 |

## Credit Accounts
### From Experian

| Account Name | Opened | Last Active | 30-59 | 60-89 | 90+ | Past Due | Balance |
|---|---|---|---|---|---|---|---|
| DSHS/DCS OLYMPIA (Applicant) DSHS/DCS OLYMPIA PO BOX 11520, TACOMA, WA 98411 | 3/1993 | 8/2014 | 0 | 0 | 0 | $0.00 | $0.00 |
| | Monthly Payment | High Credit | Type | Comments | | | |
| | | | INSTALLMENT | FAMILY SUPPORT | | | |

Payment History

| - * | 0 * | 0 * | 0 * | 0 * | 0 * | 0 * | 0 * | 0 * | 0 * | 0 * | 0 * |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/ 14 | 8/ 14 | 6/ 14 | 4/ 14 | 2/ 14 | 10/ 13 | 8/ 13 | 6/ 13 | 4/ 13 | 2/ 13 | 12/ 12 | |

## Previous Credit Inquiries
### From Experian

| 6/2015 | ON-SITE MANAGER INC (Applicant) |
|---|---|





**EXHIBIT 3 - PAGE 3 OF 3**

Rental Report for GLENN P. THOMPSON, Jr., 7/28/2015 for 69-103 at Club Palisades

# Rental Report for GLENN P. THOMPSON, Jr.

This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An applicant who is the subject of this report may obtain a free copy at any time by contacting On-Site Renter Relations. El solicitante que es objeto de este informe puede obtener una copia gratuita por contactar On-Site Renter Relations.

| Identity | From Application | From Experian |
|---|---|---|
| Name: | GLENN P. THOMPSON, Jr. | GLENN THOMPSON, JR GLENN THOMPSON |
| SSN: | | |
| Birth Date: | 1988 | |

| Addresses | From Application | From Experian |
|---|---|---|
| | 9681 54TH AVE S SEATTLE, WA 98118 - US | 9681 54TH AVE S SEATTLE, WA 98118-5704 (Applicant) Reported 6/2015<br><br>6105 S 124TH ST. SEATTLE, WA 98178-3543 (Applicant) Reported 7/2012<br><br>11273 29TH AVE SW SEATTLE, WA 98146-3458 (Applicant) Reported 10/2010 |

| Employment | From Application | From Experian |
|---|---|---|
| Applicant: | CASINO SILVER DOLLAR CASINO $1,614.00/Mo. Total monthly income: $1,614.00 | GOLDEN NUGGET CASINO |

## Verifications

### Address: 9681 54TH AVE S

| Requested For | Landlord from Application | Address | Prior Rent |
|---|---|---|---|
| GLENN P. THOMPSON, Jr. Requested Date 7/28/2015 | FRANCES CANNON (206) 721-3589 | 9681 54TH AVE S SEATTLE, WA 98118 - US | $300.00 |
| | Results Pending | | |

### Employer: SILVER DOLLAR CASINO

| Requested For | Position Held | Monthly Salary | Supervisor |
|---|---|---|---|
| GLENN P. THOMPSON, Jr. Requested Date 7/28/2015 | CASINO SILVER DOLLAR CASINO | $1,614.00 | GRANT (206) 830-8548 |
| | Results Pending | | |

## Criminal History
### From On-Site.com

| Requested For | Location Searched | Period Searched | Requested | Returned |
|---|---|---|---|---|
| GLENN P. THOMPSON, Jr. | Multi-State: AK, AL, AR, AZ, CA, CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY | 7/28/2008 - 7/28/2015 | 7/28/2015 | 7/28/2015 |
| Results No Records Found | | | | |

Page 1 of 2

*CR47025844*
GLENN P. THOMPSON, Jr., 7/28/2015

**EXHIBIT 4 - PAGE 1 OF 2**

Rental Report for GLENN P. THOMPSON, Jr., 7/28/2015 for 55-103 at Club Palisades

## National Sex Offender Registry History

### From On-Site.com

| Requested For | | Date Requested | Date Returned |
|---|---|---|---|
| GLENN P. THOMPSON, Jr. | | 7/28/2015 | 7/28/2015 |

Results

No Records Found

## Landlord Tenant Court Records

### From On-Site.com

| Date Filed | Case Type | Court | Case Number | Notice Type |
|---|---|---|---|---|
| 3/2011 | CIVIL ACTION FOR POSSESSION | KING | 112103773 | |
| | Judgment | Judgment Amount | Status | Amount Paid |
| | | | | |

| Defendants |
|---|
| PATRICIA A. THOMPSON |

| Address | Comments |
|---|---|
| 2917 12TH AVE. S, SEATTLE, WA 98144 | |

| Plaintiff | Plaintiff Phone # |
|---|---|
| E A TUCCI | |

*Note: A landlord tenant court record does not necessarily mean that a tenant owed rent or was evicted from an apartment.*

## OFAC SDN/Terrorist Watchlist Search

### From On-Site.com

| Requested For | Results | Returned |
|---|---|---|
| GLENN P. THOMPSON, Jr. | No records found | 7/28/2015 |

## Legal Items

### From Experian

| Plaintiff | Date | Case Number | Comments | Satisfied | Amount |
|---|---|---|---|---|---|
| RAY KLEIN INC (Applicant) KING DIST CT -RENTON 3407 NE 2ND ST, RENTON, WA 98056 By mail only | 8/2013 | 13411086 | Judgment | | $4,532.00 |

## Previous Credit Inquiries

### From Experian

| 6/2015 | ON-SITE MANAGER INC (Applicant) |
|---|---|

906-205
9200



**EXHIBIT 4 - PAGE 2 OF 2**

Rental Report for GLENN P. THOMPSON, Sr., 7/28/2015 for 69-103 at Club Palisades

# Rental Report for GLENN P. THOMPSON, Sr.

## Overall Recommendation

**DECLINE**

This application does not meet one or more of your requirements that is set to "Pass/Fail". This recommendation has been automatically set to Decline. The Overall Recommendation was derived solely from your community's leasing criteria. On-Site makes no independent assessment of an applicant's qualifications.

**Application Rejected by Yajayra Andrade on 8/4/2015**.

## Score for GLENN P. THOMPSON, Sr.: DECLINE

| | Importance | Pass | Fail |
|---|---|---|---|
| Total monthly income to rent ratio exceeds 2.5 | Pass/Fail | | ✔ |
| Gross monthly income after rent and estimated debt exceeds 0.5 times the monthly rent | Pass/Fail | ✔ | |
| Has not had an employment verification that is false, negative or unable to verify | Pass/Fail | ✔ | |
| Maximum percentage of past due negative accounts is less than 33.0% | Moderately | | ✔ |
| Unpaid collections and grossly delinquent past due balances do not exceed $2,000.00 | Very | ✔ | |
| May have been through a bankruptcy | Pass/Fail | ✔ | |
| No Landlord Tenant Court records or unpaid landlord collections | Pass/Fail | ✔ | |
| Had not had a rental history verification that is false, negative or unable to verify | Pass/Fail | ✔ | |
| Has not had any misdemeanor convictions | Pass/Fail | ✔ | |
| Has not had any felony convictions | Pass/Fail | ✔ | |
| Is not a registered sex offender | Pass/Fail | ✔ | |

This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An applicant who is the subject of this report may obtain a free copy at any time by contacting On-Site Renter Relations. *El solicitante que es objeto de este informe puede obtener una copia gratuita por contactar On-Site Renter Relations.*

## WARNINGS

**APPLICANT: Inquiry/On-File Current Address Conflict (Experian)**
The applicant's address does not match the address on record with the credit bureau. This could indicate fraudulent activity; you should verify that the address supplied is valid. Before proceeding you must verify that the information in the report relates to the actual applicant in question as required under FCRA Section 605(h). Review our bulletin for information on compliance.

**SPECIAL CONDITION: income to rent ratio**
On-Site.com identified an income to rent ratio that failed on this report. This recommendation has been automatically set to Decline.





OSMT000027

**EXHIBIT 5 - PAGE 1 OF 5**

Rental Report for GLENN P. THOMPSON, Sr., 7/28/2015 for 69-103 at Club Palisades

| Credit Quick Summary | | |
|---|---|---|
| **Custom scoring for this report:** | | |
| Payment history beyond 24 months not considered Accounts with 2 30-day late payment or less are not considered negative Do not consider mortgages in default. | Medical collections not considered Accounts with less than $100.00 past due are not considered negative | Student loans not considered Do not consider foreclosures. |
| Total monthly income (reported by Applicant) | $920.00 | |
| Total **verified** monthly income | $920.00 | |
| Total monthly income to rent ratio | 2.07 (based on rent of $1,288.00) | |
| Estimated monthly debt and rent payments | $693.05 (108% of monthly rent) | |
| Total number of accounts | 1 | |
| Accounts with no late payments | 1 (0 unpaid past due) | |
| Accounts paid 30-59 days past due | 0 (0 unpaid past due) | |
| Accounts paid 60-89 days past due | 0 (0 unpaid past due) | |
| Accounts paid more than 90 days past due | 0 (0 unpaid past due) | |
| Total outstanding balance | $0.00 ($0.00 past due) | |
| Outstanding revolving debt | $0.00 (0% of limit) ($0.00 past due) | |
| Outstanding loan balance | $0.00 ($0.00 past due) | |
| Bankruptcies, foreclosures, and legal items | 1 | |
| Collection total balance (includes past due) | $970.00 | |
| Landlord tenant court records found | 0 | |

| Identity | From Application | From Experian |
|---|---|---|
| **Name:** | GLENN P. THOMPSON, Sr. | GLENN THOMPSON PATRICK THOMPSON |
| **SSN:** | | |
| **Birth Date:** | /1961 | 1961 |

| Addresses | From Application | From Experian |
|---|---|---|
| | 9681 54TH AVE S SEATTLE, WA 98118 - US | 6105 S 124TH ST. SEATTLE, WA 98178-3543 (Applicant) Reported 5/2010<br><br>59TH AVE S SEATTLE, WA 98178 (Applicant) Reported 11/2006<br><br>11273 59TH AVE S SEATTLE, WA 98178-2943 (Applicant) Reported 3/2006 |

| Employment | From Application | From Experian |
|---|---|---|
| **Applicant:** | SSI SSI $920.00/Mo. Total monthly Income: $920.00 | T I ENTERPRISE |

Rental Report for GLENN P. THOMPSON, Sr., 7/28/2015 for 69-103 at Club Palisades

## Verifications

### Address: 9681 54TH AVE S

| Requested For | | | |
|---|---|---|---|
| GLENN P. THOMPSON, Sr. | **Landlord from Application** | **Address** | **Prior Rent** |
| Requested Date | FRANCES CANNON | 9681 54TH AVE S | $300.00 |
| 7/28/2015 | (206) 721-3584 | SEATTLE, WA 98118 - US | |
| | **Results** | **Contact** | **Verified Rent** |
| | Verified Correct | FRANCES CANNON (Owner) | $300.00/Month |
| | **Date Started Occupancy** | **Late Notices** | **NSF Checks** |
| | 3/2015 | 0 | 0 |
| | **Account Standing** | **Delinquency** | **Would Rent Again?** |
| | paid in full | Prompt Payer | Would Rent Again |
| | **Any Damages Documented?** | **Any complaints regarding noise, pets or parking?** | **Pets in the Unit?** |
| | No Damages Documented | No Complaints Documented | No |
| | **Bed Bugs?** | **Applicant's Name on the Lease?** | **Lease Expiration Date** |
| | No | Yes | Month-to-month |
| | **Applicant is a Current Resident?** | **Applicant Notice Given?** | |
| | Yes | Yes | |

Comments From On-Site.com
7/30 1:23 PM PDT (AN) - Verbally verified correct.
7/29 3:05 PM PDT (RB) - Called reference, person who answered stated office was closed today and said to call back tomorrow.
7/29 3:05 PM PDT (RB) - *Please Note: Landlord/tenant court record, housing court lawsuit, or landlord collection found*

### Employer: SSI

| Requested For | | | |
|---|---|---|---|
| GLENN P. THOMPSON, Sr. | **Position Held** | **Monthly Salary** | **Supervisor** |
| Requested Date | SSI | $920.00 | SSI |
| 7/28/2015 | SSI | | |
| | **Results** | **Contact** | **Verified Monthly Salary** |
| | Verified Correct | Social Security Award Letter (see comments) | $920.00 |

Comments From On-Site.com
7/30 1:06 PM PDT (AN) - Verified correct from Award Letter on file.
7/30 1:06 PM PDT (AN) - *Social Security Award Letter on file*
7/29 3:07 PM PDT (RB) - To verify SSI, we will need the most recent award letter or 2014 year tax return that shows income source.

## Criminal History

### From On-Site.com

| Requested For | Location Searched (Insight America) | Period Searched | Requested | Returned |
|---|---|---|---|---|
| GLENN P. THOMPSON, Sr. | Multi-State: AK, AL, AR, AZ, CA, CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY | 7/28/2008 - 7/28/2015 | 7/28/2015 | 7/28/2015 |

| Results |
|---|
| *No Records Found* |

## National Sex Offender Registry History

### From On-Site.com

| Requested For | Date Requested | Date Returned |
|---|---|---|
| GLENN P. THOMPSON, Sr. | 7/28/2015 | 7/28/2015 |

| Results |
|---|
| *No Records Found* |

## Landlord Tenant Court Records

### From On-Site.com

| |
|---|
| *There were no previous Landlord Tenant Court records found.* |





OSMT000029

**EXHIBIT 5 - PAGE 3 OF 5**

Rental Report for GLENN P. THOMPSON, Sr., 7/28/2015 for 69-103 at Club Palisades

## OFAC SDN/Terrorist Watchlist Search

### From On-Site.com

| Requested For | Results | Returned |
|---|---|---|
| GLENN P. THOMPSON, Sr. | *No records found* | 7/28/2015 |

## Collections

### From Experian

| Client Name | Date | Last Active | Orig. Amount | Balance |
|---|---|---|---|---|
| TMOBILE (Applicant) Collection Agency - ENHANCED RECOVERY CO L 8014 BAYBERRY RD, JACKSONVILLE, FL 32256 (800) 496-8941 | 3/2014 | | $301.00 | $301.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| CENTURYLINK QWEST CORPORATION (Applicant) Collection Agency - EOS CCA PO BOX 981008, BOSTON, MA 02298 | 10/2014 | | $216.00 | $216.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| KENT (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 8/2013 | | $209.00 | $209.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| SEATTLE (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 5/2010 | | $130.00 | $130.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| SEATTLE (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 5/2009 | | $74.00 | $74.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| COAST NATIONAL INSURANCE COM (Applicant) Collection Agency - LAMONT HANLEY & ASSOCI 1138 ELM ST, MANCHESTER, NH 03101 (603) 625-5547 | 9/2011 | | $51.00 | $51.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| AT T (Applicant) Collection Agency - ENHANCED RECOVERY CO L 8014 BAYBERRY RD, JACKSONVILLE, FL 32256 (800) 496-8941 | 11/2014 | | $958.00 | $0.00 |
| | **Comments** ACCOUNT LEGALLY PAID IN FULL FOR LESS THAN THE FULL BALANCE | | | |

*CR47023333*
GLENN P. THOMPSON, Sr., 7/28/2015

OSMT000030

**EXHIBIT 5 - PAGE 4 OF 5**

Rental Report for GLENN P. THOMPSON, Sr., 7/28/2015 for 69-103 at Club Palisades

## Legal Items

### From Experian

| Plaintiff | Date | Case Number | Comments | Satisfied | Amount |
|---|---|---|---|---|---|
| STATE OF WASHINGTON (Applicant) KING SUPERIOR CT-SEATT 516 3RD AVE STE E609, SEATTLE, WA 98104 By mail only | 7/2013 | 132250225 | Judgment | | $244.00 |

## Credit Accounts

### From Experian

| Account Name | Opened | Last Active | 30-59 | 60-89 | 90+ | Past Due | Balance |
|---|---|---|---|---|---|---|---|
| DSHS/DCS OLYMPIA (Applicant) DSHS/DCS OLYMPIA PO BOX 11520, TACOMA, WA 98411 | 3/1993 | 8/2014 | 0 | 0 | 0 | $0.00 | $0.00 |

| | Monthly Payment | High Credit | Type | Comments | | | |
|---|---|---|---|---|---|---|---|
| | | | INSTALLMENT | FAMILY SUPPORT | | | |

**Payment History**

| - | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/14 | | 8/14 | | 6/14 | | 4/14 | | 2/14 | | 12/13 | | 10/13 | | 8/13 | | 6/13 | | 4/13 | | 2/13 | | 12/12 |

## Previous Credit Inquiries

### From Experian

| 6/2015 | ON-SITE MANAGER INC (Applicant) |
|---|---|





OSMT000031

**EXHIBIT 5 - PAGE 5 OF 5**

Rental Report for GLENN P. THOMPSON, Jr., 7/28/2015 for 69-103 at Club Palisades

# Rental Report for GLENN P. THOMPSON, Jr.

## Overall Recommendation

**DECLINE**

This application does not meet one or more of your requirements that is set to "Pass/Fail". This recommendation has been automatically set to Decline. The Overall Recommendation was derived solely from your community's leasing criteria. On-Site makes no independent assessment of an applicant's qualifications.

**Application Rejected by Yajayra Andrade on 8/4/2015.**

## Score for GLENN P. THOMPSON, Jr.: DECLINE

|  | Importance | Pass | Fail |
|---|---|---|---|
| Total monthly income to rent ratio exceeds 2.5 | Pass/Fail |  | ✔ |
| Gross monthly income after rent and estimated debt exceeds 0.5 times the monthly rent | Pass/Fail | ✔ |  |
| Has not had an employment verification that is false, negative or unable to verify | Pass/Fail | ✔ |  |
| Maximum percentage of past due negative accounts is less than 33.0% | Moderately |  | ✔ |
| Unpaid collections and grossly delinquent past due balances do not exceed $2,000.00 | Very |  | ✔ |
| May have been through a bankruptcy | Pass/Fail | ✔ |  |
| No Landlord Tenant Court records or unpaid landlord collections | Pass/Fail | ✔ |  |
| Had not had a rental history verification that is false, negative or unable to verify | Pass/Fail | ✔ |  |
| Has not had any misdemeanor convictions | Pass/Fail | ✔ |  |
| Has not had any felony convictions | Pass/Fail | ✔ |  |
| Is not a registered sex offender | Pass/Fail | ✔ |  |

**This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An applicant who is the subject of this report may obtain a free copy at any time by contacting On-Site Renter Relations.**
*El solicitante que es objeto de este informe puede obtener una copia gratuita por contactar On-Site Renter Relations.*

## WARNINGS

**APPLICANT: Submitted Address First Reported In Last 90 Days (Experian)**
The bureau reports that the first time the applicant supplied this address was fewer than 90 days ago. This could indicate fraudulent activity, or could mean that the applicant moved recently; you should verify that the address supplied is valid.

**APPLICANT: Inquiry/On-File Current Address Conflict (Experian)**
The applicant's address does not match the address on record with the credit bureau. This could indicate fraudulent activity; you should verify that the address supplied is valid. Before proceeding you must verify that the information in the report relates to the actual applicant in question as required under FCRA Section 605(h). Review our bulletin for information on compliance.

**APPLICANT: no matching birth date found**
The name and DOB for the primary applicant does not match any records on file. Please check if you entered the name accurately and re-run the report if necessary. This warning means that the applicant fraudulently submitted incorrect information or that the record on file is incorrect. You should carefully verify the information on the application before proceeding.

**SPECIAL CONDITION: income to rent ratio**
On-Site.com identified an income to rent ratio that failed on this report. This recommendation has been automatically set to Decline.

 

Rental Report for GLENN P. THOMPSON, Jr., 7/28/2015 for 69-103 at Club Palisades

| Credit Quick Summary | | |
|---|---|---|
| **Custom scoring for this report:** | | |

| Payment history beyond 24 months not considered<br>Accounts with 2 30-day late payment or less are not considered negative<br>Do not consider mortgages in default. | Medical collections not considered<br>Accounts with less than $100.00 past due are not considered negative | Student loans not considered<br>Do not consider foreclosures. |
|---|---|---|

| | | |
|---|---|---|
| Total monthly income (reported by Applicant) | $1,749.84 | |
| Total **verified** monthly income | $1,749.84 | |
| Total monthly income to rent ratio | 2.07 (based on rent of $1,288.00) | |
| Estimated monthly debt and rent payments | $644.00 (100% of monthly rent) | |
| Total number of accounts | 0 | |
| Accounts with no late payments | 0 (0 unpaid past due) | |
| Accounts paid 30-59 days past due | 0 (0 unpaid past due) | *This applicant has no* |
| Accounts paid 60-89 days past due | 0 (0 unpaid past due) | *credit accounts on file* |
| Accounts paid more than 90 days past due | 0 (0 unpaid past due) | |
| Total outstanding balance | $0.00 ($0.00 past due) | |
| Outstanding revolving debt | $0.00 (0% of limit) ($0.00 past due) | |
| Outstanding loan balance | $0.00 ($0.00 past due) | |
| Bankruptcies, foreclosures, and legal items | 1 | |
| Collection total balance (includes past due) | $4,532.00 | |
| Landlord tenant court records found | 0 | |

| Identity | From Application | From Experian |
|---|---|---|
| **Name:** | GLENN P. THOMPSON, Jr. | GLENN THOMPSON, JR<br>GLENN THOMPSON |
| **SSN:** | ▒▒▒▒▒▒ | ▒▒▒▒▒▒ |
| **Birth Date:** | ▒▒ 1988 | |

| Addresses | From Application | From Experian |
|---|---|---|
| | 9681 54TH AVE S<br>SEATTLE, WA 98118 - US | 9681 54TH AVE S<br>SEATTLE, WA 98118-5704 (Applicant)<br>Reported 6/2015<br><br>6105 S 124TH ST.<br>SEATTLE, WA 98178-3543 (Applicant)<br>Reported 7/2012<br><br>11273 29TH AVE SW<br>SEATTLE, WA 98146-3458 (Applicant)<br>Reported 10/2010 |

| Employment | From Application | From Experian |
|---|---|---|
| **Applicant:** | CASINO<br>SILVER DOLLAR CASINO<br>$1,749.84/Mo. Total monthly Income: $1,749.84 | GOLDEN NUGGET CASINO |

*CR47025844*
GLENN P. THOMPSON, Jr., 7/28/2015

**EXHIBIT 6 - PAGE 2 OF 4**

Rental Report for GLENN P. THOMPSON, Jr., 7/28/2015 for 69-103 at Club Palisades

## Verifications

### Address: 9681 54TH AVE S

| Requested For | Landlord from Application | Address | Prior Rent |
|---|---|---|---|
| GLENN P. THOMPSON, Jr.<br>Requested Date<br>7/28/2015 | FRANCES CANNON<br>(206) 721-3589 | 9681 54TH AVE S<br>SEATTLE, WA 98118 - US | $300.00 |
| | **Results**<br>Verified Correct | **Contact**<br>FRANCES CANNON (Owner) | **Verified Rent**<br>$300.00/Month |
| | **Date Started Occupancy**<br>3/2015 | **Late Notices**<br>0 | **NSF Checks**<br>0 |
| | **Account Standing**<br>paid in full | **Delinquency**<br>Prompt Payer | **Would Rent Again?**<br>Would Rent Again |
| | **Any Damages Documented?**<br>No Damages Documented | **Any complaints regarding noise, pets or parking?**<br>No Complaints Documented | **Pets in the Unit?**<br>No |
| | **Bed Bugs?**<br>No | **Applicant's Name on the Lease?**<br>Yes | **Lease Expiration Date**<br>Month-to-month |
| | **Applicant is a Current Resident?**<br>Yes | **Applicant Notice Given?**<br>Yes | |

Comments From On-Site.com
7/30 1:21 PM PDT (AN) - Verbally verified correct.
7/29 3:06 PM PDT (RB) - *Please Note: Landlord/tenant court record, housing court lawsuit, or landlord collection found*
7/29 3:05 PM PDT (RB) - Called reference, person who answered stated office was closed today and said to call back tomorrow.

### Employer: SILVER DOLLAR CASINO

| Requested For | Position Held | Monthly Salary | Supervisor |
|---|---|---|---|
| GLENN P. THOMPSON, Jr.<br>Requested Date<br>7/28/2015 | CASINO<br>SILVER DOLLAR CASINO | $1,749.84 | GRANT<br>(425) 251-1590 |
| | **Results**<br>Verified Correct | **Contact**<br>Paystubs (see comments) | **Verified Monthly Salary**<br>$1,749.84 |

Comments From On-Site.com
7/30 1:10 PM PDT (AN) - Verified correct from pay stubs provided. Verified monthly/yearly income is $20,998.12.
7/30 1:10 PM PDT (AN) - Employer verified by:http://ir.nevadagold.com/secfiling.cfm?filingID=1144204-11-41810&CIK=277058
7/29 3:09 PM PDT (RB) - The phone number provided 206-830-8548 is for a cell phone. We need an office number or company email address to continue verification process.

## Criminal History

### From On-Site.com

| Requested For | Location Searched (Insight America) | Period Searched | Requested | Returned |
|---|---|---|---|---|
| GLENN P. THOMPSON, Jr. | Multi-State: AK, AL, AR, AZ, CA, CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY | 7/28/2008 - 7/28/2015 | 7/28/2015 | 7/28/2015 |

**Results**
*No Records Found*

## National Sex Offender Registry History

### From On-Site.com

| Requested For | Date Requested | Date Returned |
|---|---|---|
| GLENN P. THOMPSON, Jr. | 7/28/2015 | 7/28/2015 |

**Results**
*No Records Found*

## Landlord Tenant Court Records

### From On-Site.com

*There were no previous Landlord Tenant Court records found.*





OSMT000023

**EXHIBIT 6 - PAGE 3 OF 4**

Rental Report for GLENN P. THOMPSON, Jr., 7/28/2015 for 69-103 at Club Palisades

| OFAC SDN/Terrorist Watchlist Search | | |
|---|---|---|
| **From On-Site.com** | | |
| **Requested For** | **Results** | **Returned** |
| GLENN P. THOMPSON, Jr. | *No records found* | 7/28/2015 |

| Legal Items | | | | | |
|---|---|---|---|---|---|
| **From Experian** | | | | | |
| **Plaintiff** | **Date** | **Case Number** | **Comments** | **Satisfied** | **Amount** |
| RAY KLEIN INC (Applicant) KING DIST CT -RENTON 3407 NE 2ND ST, RENTON, WA 98056 By mail only | 8/2013 | 13411086 | Judgment | | $4,532.00 |

| Previous Credit Inquiries | |
|---|---|
| **From Experian** | |
| 6/2015 | ON-SITE MANAGER INC (Applicant) |

*CR47025844*
GLENN P. THOMPSON, Jr., 7/28/2015

OSMT000024

**EXHIBIT 6 - PAGE 4 OF 4**

DEPOSITION OF SHANNON DUSTIN, 8/24/16

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

GLENN THOMPSON, JR. And GLENN      )
THOMPSON, SR.,                     )
                                   )
            Plaintiffs,            )
                                   )
      vs.                          ) No. 2:15-cv-01596-TSZ
                                   )
ON-SITE MANAGER, INC.,             )
                                   )
            Defendant.             )
                                   )
_____

DEPOSITION UPON ORAL EXAMINATION OF

SHANNON DUSTIN
_____

Wednesday, August 24, 2016
1:30 p.m.
401 Second Avenue South, Suite 407
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR
Lic. No. DE-JO-NM-J498K9

MARLIS J. DeJONGH & ASSOCIATES
1400 HUBBELL, SUITE 1510, SEATTLE, WA 98101
206-583-8711

EXHIBIT 7 - PAGE 1 OF 13

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

## Page 2

APPEARANCES

For the Plaintiffs:     ERIC DUNN, Esq.
                Northwest Justice Project
                401 Second Avenue South,
                 Suite 407
                Seattle, Washington 98104

For the Defendant:     JEFFREY E. BILANKO, Esq.
                GORDON & REES
                701 Fifth Avenue, Suite 2100
                Seattle, Washington 98104
                -and-
                MICHAEL J. SALTZ, Esq.
                JACOBSON, RUSSELL, SALTZ,
                NASSIM & DE LA TORRE, LLP
                1880 Century Park East,
                 Suite 900
                Los Angeles, California 90067

Court Reporter:     MARLIS J. DeJONGH, CCR, RPR
                1400 Hubbell, Suite 1510
                Seattle, Washington 98101

## Page 3

INDEX OF EXAMINATION

Page(s)

Examination of Shannon Dustin

By Mr. Dunn                4
By Mr. Bilanko              44

INDEX OF EXHIBITS

No. Description          Marked  Identified

A. On-Site Leasing Document      44       44

## Page 4

1   SHANNON DUSTIN,     deponent herein, being first duly
2            sworn on oath, was examined and
3            testified as follows:
4
5            EXAMINATION
6   BY MR. DUNN:
7       Q. Good afternoon.  Could you state your full name,
8   please.
9       A. Shannon Dustin.
10      Q. And do you work for FPI Management?
11      A. Yes, I do.
12      Q. What's your title with the company?
13      A. Vice president.
14      Q. Thanks for coming in.
15      My name is Eric Dunn.  I'm a lawyer with the Northwest
16  Justice Project.  I represent two individuals, Glenn
17  Thompson, Junior and Glenn Thompson, Senior in a lawsuit
18  that's pending in United States District Court, and On-Site
19  Manager, Incorporated, the defendant in that case.  This is
20  a deposition being taken as part of the discovery in that
21  case.
22      Have you ever given a deposition before?
23      A. Yes.
24      Q. So you understand that I'll be asking you questions
25  and you will be answering under oath?

## Page 5

1       A. Yes.
2       Q. And the court reporter is going to record
3   everything that we say, and so partly for that reason it's
4   important that all your answers be spoken answers so that
5   they're reflected in the record.
6       A. Okay.
7       Q. If you have any -- if you need to take a break, or
8   anything like that, just let me know and we can do that.
9       If I ask you any questions you don't understand what I'm
10  asking or you're not sure you heard me correctly, so ahead
11  ask me to rephrase the question or ask it over again if you
12  need to.  Does that make sense?
13      A. Yes, it does.
14      Q. Did you receive a copy of the deposition?
15      A. I have one comment that I think should be noted, is
16  that with my role as vice president I oversee operations for
17  three states.  And the portfolio manager, who oversees the
18  day-to-day operation of the properties, there could be
19  knowledge that that person would have more so than I.  She's
20  on vacation which is why I'm here, not her.  So I don't know
21  if you would want to call her in after the fact or if I am
22  able to answer your questions sufficiently.
23      Q. What's the portfolio manager's name?
24      A. Jennifer Santiago.
25      Q. Do you know where her office is?

2 (Pages 2 to 5)

EXHIBIT 7 - PAGE 2 OF 13

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 6

1    A.  She's local.
2    Q.  In Seattle?
3    A.  Yes.
4    Q.  Is that the same office you work out of?
5    A.  Yes.
6    Q.  What's the address of that office?
7    A.  We're remote so we work out of our homes, so we're
8    just all here.
9    Q.  So she works out of her home and her home is in
10   Washington?
11   A.  Maple Valley.
12   Q.  So my understanding is that FPI Management is
13   basically a residential property management company.  Is
14   that accurate?
15   A.  Yes.
16   Q.  Does FPI actually own properties itself or does it
17   only manage properties for others?
18   A.  No, only fee management.
19   Q.  Do you know, approximately, how many properties FPI
20   manages?
21   A.  I'd say 500 properties, roughly 100,000 units.
22   Q.  Are all those properties located in Washington
23   or --
24   A.  No, multiple.
25   Q.  Multiple states.

Page 7

1    Do you know approximately how many states FPI operates
2    in?
3    A.  Thirteen.
4    Q.  Do you know approximately how many of the
5    properties are in Washington?
6    A.  Yes, we have approximately a hundred properties.
7    Q.  Is one of the properties that FPI manages called
8    Club Palisades Apartments?
9    A.  Yes.
10   Q.  Is that property in Federal Way, Washington?
11   A.  Yes.
12   Q.  Do you know approximately how long FPI has managed
13   Club Palisades?
14   A.  Since January 2011.
15   Q.  And what kind of property is that as far as one big
16   building or multiple building complexes?
17   A.  Multiple buildings.  It's 750 units.
18   Q.  And does FPI have management staff who actually
19   work on site at Club Palisades?
20   A.  Yes.
21   Q.  Is there a leasing office or management office
22   located there?
23   A.  Yes.
24   Q.  And do you know approximately how many people work
25   in that office?

Page 8

1    A.  In the office, there are seven.
2    Q.  I'm going to ask you some names that I have seen on
3    documents in the case.  I just want to know whether these
4    are people who work for FPI or have worked for FPI in the
5    past.
6    One is, I'm not sure how to pronounce this.  I think
7    it's Yajayra, Y-a-j-a-y-r-a, Andrade?
8    A.  Yes, she is employed with us.
9    Q.  And do you know what position that person has with
10   FPI?
11   A.  She currently is an assistant manager.
12   Q.  Do you know whether that's the same position that
13   she had a year ago?
14   A.  No, she was a leasing agent at Club Palisades.
15   Q.  Another name is Robert Robinson?
16   A.  I'm not familiar with that name.
17   Q.  So when you say you're not familiar, does that mean
18   you believe the person does not work for Club Palisades or
19   you just don't know one way or another?
20   A.  I don't know.
21   Q.  How about Megan Ayala?
22   A.  I know that there at least was a Megan at Club
23   Palisades.
24   Q.  But you don't know if it was Megan Ayala?
25   A.  I don't know.

Page 9

1    Q.  Crystel Tolentino?
2    A.  I don't know.
3    Q.  Andre Johnson?
4    A.  Yes, he is employed there.
5    Q.  And what's -- well, what's Andre Johnson's current
6    duties at Club Palisades?
7    A.  Assistant -- yes, he's an assistant manager.
8    Q.  Do you know whether he had the same job a year ago?
9    A.  I believe he was a leasing manager a year ago.
10   Q.  And Ms. Andrade, you said she's currently an
11   assistant manager?
12   A.  Yes.
13   Q.  Could you summarize what the basic duties of the
14   assistant manager are?
15   A.  Basically it does involve greeting prospects that
16   come in if the leasing agents are busy.  She would post rent
17   checks, perform any duties related to the occupancy of the
18   apartments, whether someone has a work order, whether
19   someone is paying rent, someone needs to sign a lease
20   renewal.  She would have her hands in kind of all aspects
21   and be a support to the community manager.
22   Q.  And then before that she was a leasing agent?
23   A.  Yes.
24   Q.  What does a leasing agent do?
25   A.  A leasing agent primarily leases apartments.  They

3  (Pages 6 to 9)

EXHIBIT 7 - PAGE 3 OF 13

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 10

1   answer telephone calls, e-mails related to someone looking
2   for an apartment.  They greet and tour prospects that come
3   in looking for an apartment and then perform the actual
4   application process with the applicant and collecting the
5   holding fees.
6       Q.  And then I think you said that Andre Johnson was a
7   leasing manager?
8       A.  So he would have -- he would help oversee and train
9   new leasing associates and have a couple elevated
10   responsibilities of the leasing agent.
11      Q.  Are there any other positions at Club Palisades'
12   management office that would be related to leasing new
13   apartments or doing applications with new prospects?
14      A.  So any office position, whether it's the manager,
15   assistant manager, bookkeeper or leasing staff would, yes.
16      Q.  Next could you describe the process that Club
17   Palisades would use when a new potential tenant wants to
18   apply for housing there?
19      A.  Let's see, they would -- basically when the leasing
20   agent solidifies that they want to rent an apartment they
21   would then select the apartment.  The prospect would select
22   which apartment they're wanting to lease.
23      The leasing agent would then advise them how to complete
24   the rental application and what, what the holding fee and
25   credit application fees are and let them know that it's

Page 11

1   typically a 24-to-72-hour turnaround for the approval for
2   the file.
3       Q.  You mentioned a rental application?
4       A.  Yes.
5       Q.  Is that a handwritten application or is it
6   submitted in some other way?
7       A.  It could be done on line or it could be
8   handwritten.  This particular file was handwritten by the
9   applicants.
10      Q.  And then once the Club Palisades' staff receives
11   that application, what do they do with it next?
12      A.  It then goes to -- this is where the PM could have
13   more knowledge on the day to day than I do.
14      I believe it's then input into the system for On-Site to
15   screen.
16      Q.  And do you know what person from Club Palisades
17   would actually enter that information in?
18      A.  More than likely the leasing agent that took the
19   holding deposit.
20      Q.  And I assume that that information would be entered
21   into a computer somehow?
22      A.  Yes.
23      Q.  Is there a particular computer program or website
24   or something that would be used to enter the information?
25      A.  We use Yardi software.

Page 12

1       Q.  I'll tell you what I'm picturing, and if this is
2   incorrect, tell me if it's wrong.
3       I'm picturing you would get a handwritten application
4   and then the leasing agent would take the information and
5   type that into the Yardi program.  Is that --
6       A.  You know, this is where each property is different
7   and has some different software components based on
8   ownership.  So I don't know what, a year ago, what they
9   did.
10      Q.  And this could be different at Club Palisades
11   versus a different FPI property?
12      A.  Yes, it could, because it's different ownership.
13      Q.  Do you know how long FPI has been using On-Site
14   Manager?
15      A.  I know since I've been employed, six years.
16      Q.  I'm sliding a set of documents in front of you.
17   And we can refer to this as Exhibit A.
18      (Exhibit A marked for identification.)
19      Q.  And then if you will notice in the lower right-hand
20   corner of the pages there's large numbering written with a
21   Sharpie.  Do you see those numbers?  And it continues
22   throughout the whole document.
23      A.  Yes.
24      Q.  If I ask you to turn to a particular page in the
25   exhibit, what I'm referring to are those large black

Page 13

1   numbers.
2       A.  Okay.
3       Q.  So I want to start with page No. 1.  This is a
4   document that we received in discovery, and it continues
5   through Page 5 of the exhibit.
6       I'm wondering if you could take a look at that and tell
7   me, is this something that would be part of the Yardi
8   program that someone from Club Palisades would see, or do
9   you know what this is?
10      A.  This is not part of Yardi.  This is On-Site
11   documents and this is the applicant's credit report.
12      Q.  So this is from, this -- when you say it's
13   On-Site's --
14      A.  This is what we receive as recommendation from
15   On-Site screening.
16      Q.  So this is then something that Club Palisades would
17   see, would come from On-Site?
18      A.  Correct.
19      Q.  And then on Page 6 there's another document
20   which -- I don't know if it's related to the one we see on
21   Page 7 or not but I want to start with Page 6.  Is this
22   document on Page 6 something you would recognize?
23      A.  Yes.
24      Q.  And what do you recognize that as being?
25      A.  These are the settings set up for Club Palisades.

4  (Pages 10 to 13)

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

EXHIBIT 7 - PAGE 4 OF 13

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 14

1     Q.  And do you know who sets up, who enters in those
2  settings?
3     A.  The portfolio manager sets these up when they --
4  with On-Site based on client recommendations, which client
5  is the ownership of the building.
6     Q.  So the portfolio manager is the FPI portfolio
7  manager?
8     A.  Correct.
9     Q.  And by client you're referring to the owner of the
10 building who hires FPI?
11    A.  Correct.
12    Q.  Then if you turn to Page 7, would you tell me if
13 you recognize what's on that page?
14    A.  Part of the settings that are set up for the
15 property for the applicant approval or denial.
16    Q.  So it's similar to Page 6, it's something that the
17 portfolio manager would enter based on the client
18 references?
19    A.  Yes.
20    Q.  So if we turn to Page 1 of the document, that runs
21 from Page 1 through Page 5, you said that this is something
22 that would be received at Club Palisades from On-Site.  Does
23 that come through a computer, through a fax machine, or how
24 does that come in?
25    A.  Comes through a computer, and only the portfolio

Page 15

1  manager has access to the actual credit report.  The site
2  only sees the recommendation.
3     Q.  When you say the site only sees the recommendation,
4  are you referring to this box kind of in the lower middle of
5  Page 1 that says overall recommendation, decline?
6     A.  Yes.  They would see basically Pages 1 and 2.
7     Q.  So underneath that box we see a -- there's a list
8  of what I think are admission criteria, and then importance,
9  and there's a pass/fail.  They would see that?
10    A.  Yes.
11    Q.  And then Page 2, at the top there's a box marked
12 Warnings with some information.  They would see that?
13    A.  Yes.
14    Q.  Then underneath that it says Renter Relations
15 Documentation.  Would that be something that would -- that
16 the --
17    A.  Yes, they would see that.
18    Q.  And underneath that it says Screening Report
19 Comments.  Would that be seen?
20    A.  Yes.
21    Q.  Then below that it says Quick Summary.  Is that
22 something that would be seen?
23    A.  Yes.
24    Q.  And then below that Identity?
25    A.  Yes.

Page 16

1     Q.  Addresses?
2     A.  Yes.
3     Q.  And then on Page 3 it says Employment.  Would that
4  be seen?
5     A.  Yes.
6     Q.  Verifications, would that be seen?
7     A.  Yes.
8     Q.  Below that, Employment SSI, would that be seen?
9     A.  Yes.
10    Q.  Below that, Criminal History, would that be seen?
11    A.  Yes.
12    Q.  And below that is National Sex Offender Registry
13 History, would that be seen?
14    A.  Yes.
15    Q.  Below that it says From On-Site dot com, and then
16 says, there were no previous landlord tenant court records
17 found.  That would be seen?
18    A.  Yes.
19    Q.  Below that it says, OFAC SDN/Terrorist Watchlist
20 Search.  That would be seen?
21    A.  Yes.
22    Q.  That's what you were saying?
23    A.  Yes.
24    Q.  Just want to make sure the record is clear.
25    Below that it says Collections.  That part would be

Page 17

1  seen?
2     A.  Yes.
3     Q.  Then there's a box, it says, From Experian.  The
4  information inside of it looks like information about a
5  Superior Court, King County Superior Court case.  Would that
6  part be visible?
7     A.  Yes.
8     Q.  And then below that it says Credit Accounts from
9  Experian.  Would that part be visible?
10    A.  No.
11    Q.  And then below that it says Previous Credit
12 Inquiries From Experian.  Would that part be visible?
13    A.  No.
14    Q.  The next line underneath where it says From
15 Experian there's an asterisk.  In italics it says, This
16 report was run on 7/28/2015 by Yajayra Andrade, and it has
17 an e-mail address in parentheses, application rejected by
18 Yajayra Andrade on 8/4/2015.
19    It seems like it would have been impossible for that
20 part to be there until after the report had already been
21 transmitted to On-Site Manager.
22    Do you know whether that's information that would be
23 visible to Club Palisades at any point?
24    A.  This part is -- so once we receive the overall
25 recommendation from On-Site to approve, deny or prove with

5 (Pages 14 to 17)

**EXHIBIT 7 - PAGE 5 OF 13**

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 18

1  conditions, that is when the site then either approves it in
2  the system for them to be able to start the whole Yardi
3  setup and process with them becoming an actual tenant.
4     So after we receive the overall recommendation for
5  decline is when the site goes in and basically declines. So
6  it stops at that moment.
7     And then the adverse notice is sent to the tenant of why
8  they were, the prospect of why they were declined.
9     Q.  So when the site is declining an application, is
10  that communicated to On-Site?
11    A.  No.
12    Q.  It's just entered in there into their own computers
13  at Club Palisades?
14    A.  Yes.
15    Q.  So when the recommendation from On-Site comes back
16  and it's -- well, in this case it looks like the
17  recommendation was a decline, right?
18    A.  Yes.
19    Q.  What are the other possible recommendations that
20  might come back?
21    A.  It could be approved or approved with conditions.
22    Q.  Those are the only three?
23    A.  Yes.
24    Q.  And if the recommendation is for approved, does
25  Club Palisades always approve the application or sometimes

Page 19

1  they approve the application?
2     A.  Always.
3     Q.  And if the recommendation is for decline, does Club
4  Palisades always decline the recommendation or do they
5  sometimes not decline it?
6     A.  They would look at the reasons and see if there
7  was -- they would see if there was anything they could
8  possibly, like if the applicant, as an example, the
9  income-to-rent ratio was less than our criteria of two and a
10  half times the rent, if the applicant said, oh, I actually
11  get additional income per month for alimony, let's say, that
12  I didn't report, they could provide that proof and the site
13  would then send it to On-Site letting them know, here's
14  proof of additional income, and the report would then be
15  rerun to see if they have -- to have it recalculated and a
16  different scoring come up.
17    Q.  And you would get basically a new recommendation
18  from On-Site?
19    A.  Yes.
20    Q.  In order for someone at Club Palisades to approve
21  an application do they have to get something from On-Site
22  saying they're approved or approved with conditions, or is
23  it possible that someone could be approved even if the
24  On-Site report says declined?
25    A.  Let me think about this.

Page 20

1     Yes, they could.  The site could --  no, I'm sorry, they
2  could not, because all of our documents are set up through
3  On-Site.  So kind of integrated, all of our forms that we
4  use for an actual tenant.
5     And so if an applicant was denied, the leasing agent and
6  the site staff would not have the ability to override that
7  and proceed.
8     Q.  So when you say all of your documents are connected
9  with the On-Site system, does that include the adverse
10  action notices?
11    A.  Yes.
12    Q.  And does it include the actual lease?
13    A.  Yes.
14    Q.  You have the people who work at Club Palisades, the
15  On-Site staff.  Is there someone that they report to at FPI
16  who can, I guess, overrule their decisions that would be
17  their superiors?
18    A.  I mean, they do have superiors to report to but we,
19  FPI has taken away the ability for anyone to override a
20  decline.
21    Q.  So there's no one at FPI that can override a
22  decline if On-Site recommends decline?
23    A.  Unless there is documentation to support a reason
24  why or that something is not accurate in the report.
25    Q.  So if someone does present documentation suggesting

Page 21

1  the information in the report is inaccurate or not a reason
2  to deny them, there is someone that they could present that
3  to who could consider it?
4     A.  Correct.  It would then again be presented
5  through -- FPI could present it and allow the documents to
6  be presented to On-Site to recalculate.
7     Q.  What I'm trying to get at is, if somebody applied
8  and the On-Site report came back and said decline and the
9  applicant said, well, I have this other information I want
10  you to consider and gave it to FPI, is there someone at FPI
11  who could look at it, and if they were convinced that the
12  person should be admitted, they could tell On-Site, we would
13  like this person to be approved, and then you could move
14  forward with the leasing process?
15    A.  They would have On-Site recalculate what the
16  documentation provided to prove that we need a score
17  recalculated.
18    Q.  You mentioned that one of the possible results from
19  the On-Site report could be, the person would be accepted
20  with conditions?
21    A.  Yes.
22    Q.  Is that where sometimes someone would be approved
23  but they would have to pay an additional security deposit?
24    A.  Yes.
25    Q.  Or sometimes someone might be approved but they

6  (Pages 18 to 21)

EXHIBIT 7 - PAGE 6 OF 13

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 22

1  would need to have a cosigner?
2      A.  Correct.
3      Q.  Are there any other conditions that would be, where
4  that type of recommendation would come back besides the
5  cosigner and the additional security deposit?
6      A.  No.
7      Q.  In this case does FPI Management agree that Glenn
8  Thompson, Junior and Senior applied to Club Palisades in
9  2015?
10     A.  Yes.
11     Q.  Do you know the exact date that they applied?
12     A.  So the manager had e-mailed me the entire file but
13  I wasn't able to print it.  So it's on my phone.  I could
14  see the application that they dated if you want me to look
15  to give you a date.  I don't have it in front of me.
16     Q.  If we look at the exhibit -- if we look at Pages 1
17  through 5, is there any information in that exhibit that
18  would give us the exact date that they applied?
19     A.  I'm not seeing a date on any of these documents.
20     Q.  How about if we look at Page 5.  That italicized
21  language that I pointed out before that said the report was
22  run on 7/28/2015, would that be the date of the application?
23     A.  Within a day, yes.
24     Q.  So it might have been a day before or --
25     A.  Day before, yes.

Page 23

1      Q.  So that's approximately the correct date?
2      A.  Correct.
3      Q.  And I think you had said earlier that it's about a
4  24 hour to 72-hour turnaround in terms of how long it takes
5  to make a decision?
6      A.  Typically, yes, unless there were -- maybe if
7  something -- sometimes if it's a common name it takes longer
8  to get it back just because of the data bases they're
9  checking for some of the information.  So, yes, on an
10  average, 24 to 72 hours.
11     Q.  I will tell you that the Thompsons say that they
12  went to the Club Palisades office and they filled out the
13  application and they were basically told in that same visit
14  that they had been turned down.  Do you know whether that
15  would be possible?
16     A.  The day they filled out the application they were
17  told or before they filled it out or while they were writing
18  it?
19     Q.  They said that they turned in the application and
20  the person ran the report and said that they had an eviction
21  record and were led to believe they were denied.
22     I'm wondering if that's something that could happen.  Or
23  it sounds like that wouldn't happen if it takes 24 to
24  72 hours?
25     MR. BILANKO:  Object to the form.

Page 24

1      A.  I mean, I don't have that information in front of
2  me so I don't know what transpired.
3      I guess if it was 9:00 a.m., an application was run
4  and -- an unlawful detainer is an automatic decline, so,
5  yes, we could get that back immediately before they check
6  any other information.
7      Q.  So is there --
8      A.  But that's not what I see in this credit report.
9      Q.  Are there any other things that might come back
10  immediately, like say a criminal record?
11     A.  Yes.
12     Q.  Do you know if there's any, like policies or
13  official ways that Club Palisades' staff are supposed to
14  handle that situation when one of these immediate decline
15  items comes back and they have the rental applicant right
16  there?
17     MR. BILANKO:  Object to the form.
18     A.  They, like I said, I doubt that it could happen
19  that immediate, the applicant being right there.  But if
20  they get the notice that the applicant has been denied due
21  to criminal activity or an unlawful detainer, they would,
22  they're able to tell the applicant that they have been
23  declined and that they would be getting notification from
24  us.
25     So that -- yes, that could happen, and at that point --

Page 25

1  it's at that point the applicant could say, I disagree, or
2  this isn't me, I've never been arrested or I was not
3  evicted, and then the process of providing documentation to
4  prove that it is not that person or that event hadn't
5  occurred take place.
6      Q.  Now if the person is declined, there's an adverse
7  action notice that's sent out at some point?
8      A.  Yes.
9      Q.  Who is responsible for actually preparing that
10  notice to send out?
11     A.  I believe it's done as soon as the denied is
12  confirmed by the site.
13     Q.  Would it be the leasing agent that would prepare
14  it?
15     A.  No, I believe it's populated through On-Site.
16     Q.  And then does someone at Club Palisades print it
17  and send it?
18     A.  I don't know.
19     Q.  Do you know whether it's actually Club Palisades
20  that physically sends it or if it's On-Site?
21     A.  I believe it's On-Site.
22     Again, this is where the On-Site team is going to know
23  better than I do.  I'm at a much higher level.  Sorry.
24     Q.  I understand.  If you don't know, I appreciate you
25  saying, I don't know.

7  (Pages 22 to 25)

EXHIBIT 7 - PAGE 7 OF 13

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

## Page 26

1  Do you know whether anyone at Club Palisades ever gave
2  the Thompsons a copy of their On-Site report or part of the
3  report or any information from the report?
4      A.  They shouldn't have.
5      Q.  They shouldn't have.
6      Is it -- does Club Palisades have a policy about
7  whether to give out copies of On-Site information to
8  applicants?
9      A.  Yeah, we don't do it, and the adverse notice
10  basically says how they can request further information.
11     Q.  Does FPI Management keep any records of On-Site --
12  excuse me.  Does FPI Management keep any records of adverse
13  action notices being sent out to rental applicants?
14     A.  Yes, we have copies.
15     Q.  So if Club Palisades -- I was confused because
16  I'm picturing Club Palisades printing out an adverse action
17  notice, putting it in the mail and sending it and keeping a
18  copy for themselves.  But then if On-Site is the one sending
19  them they wouldn't be able to do that.  I'm thinking about
20  this for a minute.
21     Does Club Palisades keep physical copies of the adverse
22  action notices or are they kept in electronic form?
23     A.  Electronic form.
24     Q.  If we could turn to Page 10 of the exhibit, and we
25  also see on Page 12 it looks like basically two different

## Page 27

1  versions of the same notice of adverse action, one to Glenn
2  Thompson, Senior and one to Glenn Thompson, Junior.  Is that
3  what you see?
4      A.  Yes.
5      Q.  Would you agree with me that both of these
6  documents are dated November 6th, 2015?
7          MR. BILANKO:  Object to form.
8      A.  Yes.
9      Q.  And we know that the Thompsons actually applied to
10  Club Palisades back on July 28, 2015.
11     A.  This is due to -- it has to do with the system and
12  the -- when you go in to possibly print it, I would get a
13  different date if I went in today to do it.  It would show
14  today's date on the form.
15     So it depends when -- maybe this was asked for on this
16  date of November 6, and so they went into the Cloud system,
17  so to speak, and pulled in this information and that's the
18  date.
19     Q.  So the Thompsons didn't go back and apply again in
20  November?
21     A.  No, not to my knowledge.
22     Q.  This would have just been a copy of the previous
23  notice but it was reprinted in November and that's why the
24  November 6 date shows?
25     A.  Yes.

## Page 28

1      Q.  Is there any way to tell whether there might have
2  been more than one notice of adverse action sent out around
3  the time that they applied?
4      A.  I'm not certain.
5      Q.  I guess the reason I'm asking is, I'm wondering if
6  it's possible that they applied and were denied for one
7  reason and then the report was rerun and they were denied
8  again for a different reason and there may have been two
9  different notices sent?
10     A.  I show the notice was sent August 4th, 2015.
11     Q.  And that's the only one that you have a record of
12  sending?
13     A.  Yeah.
14     Q.  Do you know whether anyone from FPI Management had
15  any further face-to-face or telephonic communications with
16  the Thompsons after July 28th, 2015?
17     A.  I would need to look at the file that was e-mailed
18  to me.  I know that the Thompsons signed a notice at Club
19  Palisades the day they were given their money order back
20  because they were denied and told they were denied due to
21  collections.
22     Q.  You're saying they signed something at Club
23  Palisades?
24     A.  Yes.
25     Q.  Do you know what date that was?

## Page 29

1      A.  If I could look at my e-mail, I could.
2      Q.  Please do, yeah.
3      A.  On August 4th.
4      Q.  Do you know what person they met with?
5      A.  You mean at the staff or?
6      Q.  It sounds like they went back to Club Palisades on
7  August 4th and they signed some kind of document and they
8  were given their money orders?
9      A.  Yes.
10     Q.  I'm wondering if you know who they met with?
11     A.  Yaya.  We call her Yaya.  It's that long name.
12     Q.  That's much easier to pronounce.
13     A.  And I'm sorry it can be August 6th, the date
14  Glenn signed it.  It's dated August 4th at the top but that
15  looks like maybe a 6 where he signed this notice where he
16  got his money orders back.
17     Q.  So do you know whether it was Glenn Thompson,
18  Senior or Junior who was there, or both?
19     A.  It appears that definitely Glenn Thompson, Senior
20  signed, and there's another name below that I can't make out
21  at all, the signature.
22     Q.  There's a second name.
23     And so the reason you're not sure whether it was the 4th
24  or the 6th is the handwriting is not clear?
25     A.  That is correct.

8  (Pages 26 to 29)

**EXHIBIT 7 - PAGE 8 OF 13**

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

## Page 30

1    Q.  Other than that meeting that you're referring to
2  that was either August 4 or August 6, do you know if there
3  were any further or in-person or face-to-face or telephonic
4  communications between the Thompsons and Club Palisades?
5    A.  I do not.
6    Q.  Could you please turn to Page 9 of that exhibit.
7  We're looking at a document that has, it says On-Site in the
8  upper left-hand corner and below that, lease summary.  Is
9  that what you see?
10    A.  Yes.
11    Q.  Could you look this over and tell me if this is
12  something that you recognize, or this form.  Is it a type of
13  document that you have seen before?
14    A.  Yes.
15    Q.  And what do you recognize this as being?
16    A.  The summary kind of page we would see in the
17  computer.
18    Q.  Would this be something like in the On-Site website
19  or the Yardi system?
20    A.  On-Site.
21    Q.  If we look along the right-hand corner in the
22  middle there's a heading that says Comments.  Do you see
23  that?
24    A.  Yes.
25    Q.  Do you know whether the comments that are entered

## Page 31

1  on that, in that area would be comments entered by -- well,
2  first of all, it looks like FPI staff are able to add
3  comments.  Is that correct?
4    A.  Yes.
5    Q.  Because we know Andre Johnson works for FPI and
6  there's one comment from Andre Johnson?
7    A.  Yes.
8    Q.  Do you know whether On-Site personnel can enter
9  comments there?
10    A.  I believe it's just our On-Site staff can.
11    Q.  So --
12    A.  Our site staff.  I apologize.  The property's site
13  staff.
14    Q.  So any comments in that are likely to be from --
15    A.  Employees.
16    Q.  Of FPI?
17    A.  Yes.
18    Q.  Are there any other people besides FPI employees
19  who we would expect to see comments in there from?
20    A.  No.
21    Q.  Do you know whether comments that are entered there
22  are visible to anyone outside of FPI Management?
23    A.  I would think On-Site, if they needed to, could get
24  in and look, but I believe it's just FPI.
25    Q.  When you say On-Site could get in and look --

## Page 32

1    A.  On-Site company.  Like I think if -- I mean, it's
2  their software.  But I don't know.
3    Q.  What I think you're saying is On-Site may have the
4  technological ability to access those comments?
5    A.  They may.
6    Q.  But they wouldn't necessarily have any reason to
7  look at them?
8    A.  Correct.
9    Q.  I think you said earlier that you didn't recognize
10  the name of Robert Robinson.  But because there is a comment
11  from someone named Robert Robinson in here, do you think
12  it's more likely than not that Robert Robinson works for FPI
13  or worked for FPI at that time?
14    A.  Yes.  I mean, looking at Crystel and Megan and
15  Robert, like I said, it's a large staff.  We have a lot of
16  turnover in this business.  And being that I don't go to the
17  sites regularly, that I don't know all the employees.
18    Q.  And the comments from Robert Robinson, do you see
19  they're dated 7/28/2015?  It says, Please look at Landlord
20  Tenant Act charge, that is not the applicant's name.
21    A.  Yes.
22    Q.  Do you know what that comment is referring to?
23    A.  What I would guess would be that maybe something
24  was input wrong and a different screen came up initially.  I
25  don't know.  There's nothing on the report I have that shows

## Page 33

1  an adverse tenant screening.
2    Q.  It sounds like you've reviewed FPI Management's
3  records related to the Thompsons' application?
4    A.  I've reviewed -- yes, I reviewed their screening
5  reports and the adverse action notice.
6    Q.  And you didn't see anything related to an unlawful
7  detainer case?
8    A.  No.
9    Q.  Do you know whether On-Site Manager ever notified
10  Club Palisades that an unlawful detainer record had been
11  removed or that a report had been updated or fixed after
12  July 28th, 2015?
13    A.  I'm not aware.
14    Q.  You didn't see any records that would reflect
15  that?
16    A.  No, I did not.
17    Q.  Do you know whether part of the recommendation
18  information that you get from On-Site would include
19  something called a rental score?
20    A.  It's changed over the years, so yes, it could
21  have.
22    Q.  You're not sure whether it included that in 2015?
23    A.  I don't believe we had credit scores in 2015,
24  screening scores.
25    Q.  Do you know whether FPI Management was ever

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

EXHIBIT 7 - PAGE 9 OF 13

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 34

1  informed that the Thompsons had disputed information to
2  On-Site on August 18th, 2015?
3      A.  No.  The only reason I know is based off the legal
4  notices we were given to appear today.  I see that they
5  dispute it but I don't see anything in our file on that.
6      Q.  That makes sense.  Thank you.
7          Would you turn to Page 6 of the exhibit, please.  I
8  believe you said before that these are the settings that the
9  portfolio manager enters in for Club Palisades to reflect
10 basically the admission criteria.  Is that accurate?
11     A.  Yes.  The setup --  these settings are set up once
12 basically when the property, when FPI took on the Club
13 Palisades, went in and set up this criteria.
14         Now the only reason it would get changed or updated is
15 if our client needed, wanted a change made to it.
16     Q.  Do you know --
17     A.  So it's not something that's done daily or weekly
18 by the staff.
19     Q.  Do you know whether any changes have been made to
20 the settings since July of 2015?
21     A.  Let me look at something.
22         Yes, on July -- I apologize.
23         Well, in July it looks like we increased that we would
24 allow collections of up to $2,000 versus $1,000 to increase
25 our applicant pool.

Page 35

1      Q.  You said July of 2015 or '16?
2      A.  '15.
3      Q.  Do you know if any other changes have been made
4  since then?
5      A.  No, they have not.
6      Q.  If we turn to Page 7 of the exhibit, about --  I'm
7  not sure how to describe these, the dark-shaded rows.  The
8  second one down is marked Credit History.  Do you see where
9  I'm looking?
10     A.  Yes.
11     Q.  And then toward, right above where it says
12 Bankruptcy Permitted, it says, Maximum balance of unpaid
13 collections includes past due accounts.  Do you see that?
14     A.  Yes.
15     Q.  Look across, it says $2,000?
16     A.  Correct.
17     Q.  So this information would have been, would have
18 reflected the change you just described?
19     A.  That is correct.
20     Q.  Let's stay on Page 7.  In that same box, the next,
21 information next to the $2,000 it says, Very, and that's
22 under the importance of the criteria.  Is that what you're
23 seeing?
24     A.  Yes.
25     Q.  Do you know what it means for one of the criteria

Page 36

1  to be very important?
2      A.  It has a higher weight with the scoring.
3      Q.  And I notice some of these items are marked
4  pass/fail?
5      A.  Correct.
6      Q.  Do you know what it means if it's pass/fail?
7      A.  Yes.  A fail would be an unlawful detainer.  If an
8  unlawful detainer came up it would be an automatic fail.
9      Q.  If it's a fail, what does that mean for the
10 application?
11     A.  Denied.
12     Q.  If it's very important and the person fails the
13 criteria, does that also mean that it will automatically be
14 denied or not necessarily?
15     A.  Not necessarily with a very.
16     Q.  If we go under the credit history settings, the
17 first one it says, Maximum percentage of past due accounts.
18 Do you see that?
19     A.  Yes.
20     Q.  And under the importance for that criteria we see
21 the word moderately.  Do you see that?
22     A.  Uh-huh.
23     Q.  Do you know what it means if the report is set at
24 moderately?
25     A.  It doesn't have as high of a factor.

Page 37

1      Q.  So is it fair to say that if it's, if the
2  importance is set at very, then there's a higher likelihood
3  that that would cause someone to be denied than if it's
4  moderately?
5      A.  In that category, yes.
6      Q.  And then if the importance is set at very and the
7  person fails -- excuse me, if the criteria is set at
8  pass/fail -- forget that question.  I think we get the
9  point of that.  Sorry.
10         I want to turn back to Page 6 again.  Do you see about
11 halfway down it says there's -- a shaded area where it says
12 income and then there's some checked boxes?
13     A.  Yes.
14     Q.  The first one is marked, Evaluate income-to-rent
15 ratio based on overall application income.  And that box is
16 checked.  Is that what you see?
17     A.  Yes.
18     Q.  Do you know what that language basically means?
19         I guess I'm wondering, if someone applies and says,
20 here's the income that we have, I mean, are there different
21 ways of, I guess, of factoring that into the income-to-rent
22 ratio?
23         I was just wondering if you could explain what this
24 criteria means, if you're able to do that?
25     A.  Well, so they must make at least two and a half

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

**EXHIBIT 7 - PAGE 10 OF 13**

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 38

1    times the monthly rent in income, and the asterisk there is
2    because we verify with pay stubs, not just what the
3    applicant puts on their application as their monthly
4    income.
5        Q.  Okay.  So if someone had, say they claimed a higher
6    income than they could verify, then you have the choice of
7    either using the full monthly claim or using the month it
8    verified?
9        A.  We only use what's verified.
10       Q.  I guess I'm wondering if you're able to explain
11   what the difference is in terms of having this box checked
12   and not checked.
13       A.  Not -- some of our properties do not have On-Site
14   verify income.  They may have the actual site staff verify
15   income with pay stubs.  It costs more money to FPI to run
16   the application having On-Site company verify income.
17       Q.  I understand.
18       And then the third box, third line under Income says,
19   Allow entry of housing allocation income which will offset
20   the rent.  And that box is checked.
21       In this case the Thompsons had intended to use a housing
22   voucher.  Does this mean that the housing voucher would be
23   calculated or would be somehow included in the calculation
24   or is that not what it means?
25       A.  Yes, that is what it means.

Page 39

1        Q.  I notice at the bottom under Application Types,
2    there's another box that says, Allow rental subsidies, which
3    is not checked.
4        Just because the box in the bottom is not checked that
5    does not mean that rental subsidies are not accepted, or is
6    it?
7        A.  No, if they, if they qualify our criteria and still
8    have a rental subsidy, they would be approved.  But if they
9    didn't meet our qualifications they would not be approved.
10       Q.  Then under the Credit line, which is the next
11   shaded area down on Page 7, it says, Credit, and the first
12   thing is, Don't consider student loans.
13       A.  You're still on 6?
14       Q.  Sorry, Page 6.  I'm looking in the middle of the
15   page, the shaded area that says Credit.  And the first item
16   is, Don't consider student loans.  Do you see where I'm
17   looking?
18       A.  Yes.
19       Q.  And this one looks straightforward to me.  This
20   means that student loans are just not taken into
21   consideration in any of the application, it's not a factor
22   in producing the recommendations.  Am I reading that
23   correctly?
24       A.  Yes.
25       Q.  The next box down says, Don't consider medical

Page 40

1    accounts or collections.  Do you see that?
2        A.  Yes.
3        Q.  And then right next to it there's an asterisk
4    where, the word Collections.  Then it has an underlined,
5    looks like a hyperlink where it says, Do not consider
6    medical.  Do you see?
7        A.  Yes.
8        Q.  I notice that this item doesn't have a check box
9    next to it.
10       I'm wondering, is that --
11       A.  We do not consider medical collections in any of
12   our properties.
13       Q.  So it doesn't need to be checked, it's just part of
14   the --
15       A.  It's standard.
16       Q.  So is that -- there's a number of other items
17   listed under credit and none of those have check boxes
18   either.  So is it fair to say that those are just --
19       A.  Those are standard in place.
20       Q.  So there doesn't need to be a check box, it's
21   just --
22       A.  Correct.
23       Q.  Now I understand.
24       Would you go back to Page 7 again.  I'm looking in the
25   middle of the page, under the shaded area that says

Page 41

1    Residency History?
2        A.  Correct.
3        Q.  The first item is, No Landlord Tenant Court Records
4    or Unpaid Landlord Collections.  Do you see where I'm
5    looking?
6        A.  Yes.
7        Q.  And then the first box is Any Number, and the
8    second box Ever, and then Pass/Fail.
9        So as I read that, that means that if an applicant has
10   any number of landlord tenant court records ever or unpaid
11   landlord collections, then their application automatically
12   fails.  Am I reading that correctly?
13       A.  Yes.
14       Q.  And Unpaid Landlord Collection would be, I guess, a
15   claim that's a rental property or someone previously was
16   owed money by the applicant.  Is that --
17       A.  Correct.
18       Q.  Then there's a check box where it says, Ignore
19   dismissed or satisfied records, and that's not checked.  Do
20   you see that?
21       A.  Yes.
22       Q.  So because that box is not checked that means that
23   even if the case had been dismissed it would still cause an
24   automatic decline?
25       A.  It would.  That would be a situation where it could

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

**EXHIBIT 7 - PAGE 11 OF 13**

f51fa243-5535-40bf-b135-1e03934ba6e9

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 42

1  be taken up the seniority level to get an override.
2      Q.  And if someone wanted to take it up, seek an
3  override, how would they go about that?
4      A.  The applicant would notify Club Palisades or the
5  property whoever they're working with.  The manager of the
6  property would notify their portfolio manager, who would
7  then submit a ticket in our software system to get this
8  reviewed from our training department.
9      Q.  Let's say hypothetically that somebody had applied
10 and they had been, had an unlawful detainer case filed
11 against them and it showed on the On-Site report and they
12 were denied, and the person brought in a, say a certified
13 copy of an order dismissing that case.  They could present
14 that to, say, the Club Palisades staff and then it would go
15 up the chain you just described?
16     MR. BILANKO:  Object to form.
17     A.  It would -- if the resident supplied proof that the
18 unlawful detainer, which is different than a collection, has
19 been satisfied or dismissed, they could provide that
20 documentation to On-Site screening to recalculate.
21     Q.  I guess what's confusing me is that, as I read the
22 settings, On-Site would not do anything differently if an
23 unlawful detainer had been dismissed versus that a judgment
24 had been entered against the tenant.  Am I reading that
25 correctly?

Page 43

1      MR. BILANKO:  Object to form.
2      A.  Yes.  I mean, we would consider something that had
3  been dismissed.
4      Q.  FPI Management would consider admitting an
5  applicant whose unlawful detainer case had been dismissed,
6  is what you're saying?
7      A.  Yes.
8      Q.  Is there a person from FPI Management who would, I
9  guess, make the decision whether to admit the applicant or
10 not based on that type of scenario?
11     A.  That is where, if -- first off, if there's
12 documentation that it's been dismissed, the site staff would
13 submit that to On-Site to recalculate.  If On-Site's
14 recommendation still was declined, at that point it would go
15 to our ticketing system with FPI where our director of
16 training could make the recommendation and override.
17     Q.  And do you know who the director of training is?
18     A.  Johanna Gillespie.
19     Q.  G-i-l-l-e-s-p-i-e?
20     A.  Yeah.
21     Q.  And is Johanna Gillespie, does she work in
22 Washington?
23     A.  California.
24     Q.  So that would be something that she does for all or
25 at least a large swath of FPI Properties then?

Page 44

1      A.  She could -- yes.
2      Q.  Thank you.
3      MR. DUNN:  I think I'm through all my questions.
4  I'm going to look over my notes.  I may have one or two
5  followups at the end but in the meantime I'm going to
6  stop asking questions, and if the other lawyers have
7  questions for you, they can go ahead.
8      MR. BILANKO:  Let's take a quick break.
9      (Recess.)
10     MR. BILANKO:  Back on the record.
11
12         EXAMINATION
13 BY MR. BILANKO:
14     Q.  I introduced myself to you off the record.  My name
15 is Jeff Bilanko.  I'm here representing On-Site Manager,
16 Inc.  I only have a couple questions for you.
17 Were any landlord court -- any landlord-tenant court
18 records used as a factor in denying Mr. Thompson, Junior or
19 Mr. Thompson, Senior residency at Club Palisades?
20     A.  No.
21     Q.  Can you tell me why they were denied residency at
22 Club Palisades?
23     A.  The amount of collection accounts and they did not
24 meet the income qualifications.
25     MR. BILANKO:  That's all I have.  Thank you.

Page 45

1      MR. DUNN:  That's it.  We're done.
2      (The deposition adjourned at 3:05 p.m.)
3      (Signature reserved.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

12  (Pages 42 to 45)

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

**EXHIBIT 7 - PAGE 12 OF 13**

DEPOSITION OF SHANNON DUSTIN, 8/24/16

Page 46

1        C O R R E C T I O N S
2
3      PLEASE MAKE ALL CORRECTIONS, CHANGES OR CLARIFICATIONS TO
       YOUR TESTIMONY ON THIS SHEET, NOT IN THE TRANSCRIPT ITSELF,
4      SHOWING PAGE AND LINE NUMBER AND THE NATURE OF THE CHANGE.
       IF THERE ARE NO CHANGES, WRITE "NONE" ACROSS THE PAGE.
5      PLEASE SIGN THIS SHEET AND RETURN WITHIN 30 DAYS TO THE
       ATTENTION OF ERIC DUNN, ESQ., AT 401 SECOND AVENUE SOUTH,
6      SUITE 407, SEATTLE, WA 98104 FOR FILING WITH THE ORIGINAL
       TRANSCRIPT.
7
       PAGE    LINE     CORRECTION AND REASON
8
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24
25        _____
          SHANNON DUSTIN

Page 47

1            REPORTER'S CERTIFICATE
2
3      STATE OF WASHINGTON      )
                                )  ss.
4      COUNTY OF KING           )
5
6          I, MARLIS J. DeJONGH, CCR, RPR, a Notary Public in
7      and for the State of Washington, do hereby certify:
8      That prior to being examined, the witness named in the
9      foregoing deposition was duly sworn to testify the truth,
10     the whole truth and nothing but the truth;
11         That said deposition was taken down by me in
12     shorthand at the time and place therein named and thereafter
13     transcribed by means of computer-aided transcription, and
14     that the foregoing transcript contains a full, true and
15     verbatim record of the said deposition;
16         I further certify that I have no interest in the
17     event of the action.
18         WITNESS my hand and seal this 30th day of August,
19     2016.
20
21
              Notary Public in and for the State
22            of Washington, residing in Seattle.
              My commission expires 01/15/2020.
23            Lic. No. DE-JO-NM-J498K9
24
25

13 (Pages 46 to 47)

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

**EXHIBIT 7 - PAGE 13 OF 13**

f51fa243-5535-40bf-b135-1e03934ba6e9

Rental Report for Glenn Thompson, 6/25/2015 for P101 at Lodge at Peasley Canyon

# Rental Report for Glenn Thompson

## Overall Recommendation

| **DECLINE** | This application does not meet one or more of your requirements that is set to "Pass/Fail". This recommendation has been automatically set to Decline. The Overall Recommendation was derived solely from your community's leasing criteria. On-Site makes no independent assessment of an applicant's qualifications. |
| --- | --- |
| | **Application Rejected by Emily Foster on 7/13/2015.** |

## Score for Glenn Thompson: DECLINE

| | Importance | Pass | Fail |
| --- | --- | --- | --- |
| Total monthly income to rent ratio exceeds 2.8 | Pass/Fail | | ✔ |
| Gross monthly income after rent and estimated debt exceeds 25.0% of the monthly income | Extremely | ✔ | |
| Maximum percentage of past due negative accounts is less than 25.0% | Extremely | | ✔ |
| Unpaid collections and grossly delinquent past due balances do not exceed $2,000.00 | Extremely | ✔ | |
| May have been through a bankruptcy | Pass/Fail | ✔ | |
| No Landlord Tenant Court records or unpaid landlord collections | Pass/Fail | ✔ | |
| Has not had any misdemeanor convictions in the last 3 years | Pass/Fail | ✔ | |
| Has not had any felony convictions in the last 7 years | Pass/Fail | ✔ | |
| Is not a registered sex offender | Pass/Fail | ✔ | |

**This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An applicant who is the subject of this report may obtain a free copy at any time by contacting On-Site Renter Relations.**
*El solicitante que es objeto de este informe puede obtener una copia gratuita por contactar On-Site Renter Relations.*

## WARNINGS

**The Contents Of This Report Are Being Disputed**
The contents of the credit section of this report are currently being reviewed for accuracy. This warning will be removed once this dispute has been resolved. For a status update, you may call On-Site.com's Renter Relations department at (877) 222-0384.

**APPLICANT: Inquiry/On-File Current Address Conflict (Experian)**
The applicant's address does not match the address on record with the credit bureau. This could indicate fraudulent activity; you should verify that the address supplied is valid. Before proceeding you must verify that the information in the report relates to the actual applicant in question as required under FCRA Section 605(h). Review our bulletin for information on compliance.

**SPECIAL CONDITION: income to rent ratio**
On-Site.com identified an income to rent ratio that failed on this report. This recommendation has been automatically set to Decline.

## Lease Notebook

| Date | User | Note |
| --- | --- | --- |
| 6/25/2015 | | Glenn Thompson (glenda_redditt@yahoo.com) was sent a copy of their Rental Report. |
| 6/25/2015 | | Glenn Thompson Jr. (glennthompson_20@yahoo.com) was sent a copy of their Rental Report. |





OSMT000045

**EXHIBIT 8 - PAGE 1 OF 4**

Rental Report for Glenn Thompson, 6/25/2015 for P101 at Lodge at Peasley Canyon

| Credit Quick Summary | |
| --- | --- |
| **Custom scoring for this report:** | |
| Medical collections not considered | Do not consider foreclosures. |

| | |
| --- | --- |
| Total monthly income (reported by Applicant) | $850.00 |
| Total monthly income to rent ratio | 1.62 (based on rent of $1,262.00) |
| Estimated monthly debt and rent payments | $706.40 (83% of monthly income) |
| Total number of accounts | 1 |
| Accounts with no late payments | 1 (0 unpaid past due) |
| Accounts paid 30-59 days past due | 0 (0 unpaid past due) |
| Accounts paid 60-89 days past due | 0 (0 unpaid past due) |
| Accounts paid more than 90 days past due | 0 (0 unpaid past due) |
| Total outstanding balance | $0.00 ($0.00 past due) |
| Outstanding revolving debt | $0.00 (0% of limit) ($0.00 past due) |
| Outstanding loan balance | $0.00 ($0.00 past due) |
| Bankruptcies, foreclosures, and legal items | 1 |
| Collection total balance (includes past due) | $1,752.00 |
| Landlord tenant court records found | 0 |

| Identity | From Application | From Experian |
| --- | --- | --- |
| Name: | Glenn Thompson | GLENN THOMPSON<br>PATRICK THOMPSON |
| SSN: | ████ | ████ |
| Birth Date: | ███1961 | ██/1961 |
| Driver's License #: | ████████ / WA | |

| Addresses | From Application | From Experian |
| --- | --- | --- |
| | 9681 54th Ave S<br>Seattle, WA 98118 - US | 6105 S 124TH ST.<br>SEATTLE, WA 98178-3543 (Applicant)<br>Reported 5/2010<br><br>59TH AVE S<br>SEATTLE, WA 98178 (Applicant)<br>Reported 11/2006<br><br>11273 59TH AVE S<br>SEATTLE, WA 98178-2943 (Applicant)<br>Reported 3/2006 |

| Employment | From Application | From Experian |
| --- | --- | --- |
| Applicant: | $0.00/Yr. Total monthly Income: $850.00 | T I ENTERPRISE |

| Criminal History | | | | |
| --- | --- | --- | --- | --- |
| **From On-Site.com** | | | | |
| Requested For | Location Searched (Insight America) | Period Searched | Requested | Returned |
| Glenn Thompson | Multi-State: AK, AL, AR, AZ, CA, CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY | 6/25/2008 - 6/25/2015 | 6/25/2015 | 6/25/2015 |
| **Results** | | | | |
| *No Records Found* | | | | |

OSMT000046

**EXHIBIT 8 - PAGE 2 OF 4**

Rental Report for Glenn Thompson, 6/25/2015 for P101 at Lodge at Peasley Canyon

## National Sex Offender Registry History

### From On-Site.com

| Requested For | Date Requested | Date Returned |
|---|---|---|
| Glenn Thompson | 6/25/2015 | 6/25/2015 |

| Results |
|---|
| No Records Found |

## Landlord Tenant Court Records

### From On-Site.com

| There were no previous Landlord Tenant Court records found. |
|---|

## OFAC SDN/Terrorist Watchlist Search

### From On-Site.com

| Requested For | Results | Returned |
|---|---|---|
| Glenn Thompson | No records found | 6/25/2015 |

## Collections

### From Experian

| Client Name | Date | Last Active | Orig. Amount | Balance |
|---|---|---|---|---|
| AT T (Applicant) Collection Agency - ENHANCED RECOVERY CO L 8014 BAYBERRY RD, JACKSONVILLE, FL 32256 (800) 496-8941 | 11/2014 | | $958.00 | $527.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| TMOBILE (Applicant) Collection Agency - ENHANCED RECOVERY CO L 8014 BAYBERRY RD, JACKSONVILLE, FL 32256 (800) 496-8941 | 3/2014 | | $301.00 | $301.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| CENTURYLINK QWEST CORPORATION (Applicant) Collection Agency - EOS CCA PO BOX 981008, BOSTON, MA 02298 | 10/2014 | | $216.00 | $216.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| KENT (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 8/2013 | | $209.00 | $209.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |
| SEATTLE (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 5/2010 | | $130.00 | $130.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |





OSMT000047

**EXHIBIT 8 - PAGE 3 OF 4**

Rental Report for Glenn Thompson, 6/25/2015 for P101 at Lodge at Peasley Canyon

| Client Name | Date | Last Active | Orig. Amount | Balance |
|---|---|---|---|---|
| SEATTLE (Applicant) Collection Agency - ALLIANCEONE RECEIVABLE 6565 KIMBALL DR, GIG HARBOR, WA 98335 (800) 456-8838 | 5/2009 | | $74.00 | $74.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |

| Client Name | Date | Last Active | Orig. Amount | Balance |
|---|---|---|---|---|
| COAST NATIONAL INSURANCE COM (Applicant) Collection Agency - LAMONT HANLEY & ASSOCI 1138 ELM ST, MANCHESTER, NH 03101 (603) 625-5547 | 9/2011 | | $51.00 | $51.00 |
| | **Comments** ACCOUNT ASSIGNED TO COLLECTIONS | | | |

## Legal Items

### From Experian

| Plaintiff | Date | Case Number | Comments | Satisfied | Amount |
|---|---|---|---|---|---|
| STATE OF WASHINGTON (Applicant) KING SUPERIOR CT-SEATT 516 3RD AVE STE E609, SEATTLE, WA 98104 By mail only | 7/2013 | 132250225 | Judgment | | $244.00 |

## Credit Accounts

### From Experian

| Account Name | Opened | Last Active | 30-59 | 60-89 | 90+ | Past Due | Balance |
|---|---|---|---|---|---|---|---|
| DSHS/DCS OLYMPIA (Applicant) DSHS/DCS OLYMPIA PO BOX 11520, TACOMA, WA 98411 | 3/1993 | 8/2014 | 0 | 0 | 0 | $0.00 | $0.00 |
| | **Monthly Payment** | **High Credit** | **Type** INSTALLMENT | **Comments** FAMILY SUPPORT | | | |

**Payment History**

| - | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/14 | | 8/14 | | 6/14 | | 4/14 | | 2/14 | | 12/13 | | 10/13 | | 8/13 | | 6/13 | | 4/13 | | 2/13 | 12/12 |

*CR45903494*
Glenn Thompson, 6/25/2015

Rental Report for Glenn Thompson Jr., 6/25/2015 for P101 at Lodge at Peasley Canyon

# Rental Report for Glenn Thompson Jr.

### Overall Recommendation

**DECLINE**

This application does not meet one or more of your requirements that is set to "Pass/Fail". This recommendation has been automatically set to Decline. The Overall Recommendation was derived solely from your community's leasing criteria. On-Site makes no independent assessment of an applicant's qualifications.

**Application Rejected by Emily Foster on 7/13/2015.**

### Score for Glenn Thompson Jr.: DECLINE

| | Importance | Pass | Fail |
|---|---|---|---|
| Total monthly income to rent ratio exceeds 2.8 | Pass/Fail | | ✔ |
| Gross monthly income after rent and estimated debt exceeds 25.0% of the monthly income | Extremely | ✔ | |
| Maximum percentage of past due negative accounts is less than 25.0% | Extremely | | ✔ |
| Unpaid collections and grossly delinquent past due balances do not exceed $2,000.00 | Extremely | | ✔ |
| May have been through a bankruptcy | Pass/Fail | ✔ | |
| No Landlord Tenant Court records or unpaid landlord collections | Pass/Fail | ✔ | |
| Has not had any misdemeanor convictions in the last 3 years | Pass/Fail | ✔ | |
| Has not had any felony convictions in the last 7 years | Pass/Fail | ✔ | |
| Is not a registered sex offender | Pass/Fail | ✔ | |

**This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An applicant who is the subject of this report may obtain a free copy at any time by contacting On-Site Renter Relations.**
*El solicitante que es objeto de este informe puede obtener una copia gratuita por contactar On-Site Renter Relations.*

### WARNINGS

**APPLICANT: Submitted Address Not In Records - ACTION REQUIRED (Experian)**
The bureau reports that the address supplied is invalid. This could indicate fraudulent activity; you should verify that the address supplied is valid. Before proceeding you must verify that the information in the report relates to the actual applicant in question as required by law under FCRA Section 605(h). Review our bulletin for information on compliance.

**APPLICANT: Inquiry/On-File Current Address Conflict (Experian)**
The applicant's address does not match the address on record with the credit bureau. This could indicate fraudulent activity; you should verify that the address supplied is valid. Before proceeding you must verify that the information in the report relates to the actual applicant in question as required under FCRA Section 605(h). Review our bulletin for information on compliance.

**APPLICANT: no matching birth date found**
The name and DOB for the primary applicant does not match any records on file. Please check if you entered the name accurately and re-run the report if necessary. This warning means that the applicant fraudulently submitted incorrect information or that the record on file is incorrect. You should carefully verify the information on the application before proceeding.

**SPECIAL CONDITION: income to rent ratio**
On-Site.com identified an income to rent ratio that failed on this report. This recommendation has been automatically set to Decline.

### Lease Notebook

| Date | User | Note |
|---|---|---|
| 6/25/2015 | | Glenn Thompson (glenda_redditt@yahoo.com) was sent a copy of their Rental Report. |
| 6/25/2015 | | Glenn Thompson Jr. (glennthompson_20@yahoo.com) was sent a copy of their Rental Report. |





OSMT000038

**EXHIBIT 9 - PAGE 1 OF 3**

Rental Report for Glenn Thompson Jr., 6/25/2015 for P101 at Lodge at Peasley Canyon

### Credit Quick Summary

**Custom scoring for this report:**

| | |
|---|---|
| Medical collections not considered | Do not consider foreclosures. |

| | | |
|---|---|---|
| Total monthly income (reported by Applicant) | $1,200.00 | |
| Total monthly income to rent ratio | 1.62 (based on rent of $1,262.00) | |
| Estimated monthly debt and rent payments | $631.00 (53% of monthly income) | |
| Total number of accounts | 0 | |
| Accounts with no late payments | 0 (0 unpaid past due) | |
| Accounts paid 30-59 days past due | 0 (0 unpaid past due) | |
| Accounts paid 60-89 days past due | 0 (0 unpaid past due) | *This applicant has no credit accounts on file* |
| Accounts paid more than 90 days past due | 0 (0 unpaid past due) | |
| Total outstanding balance | $0.00 ($0.00 past due) | |
| Outstanding revolving debt | $0.00 (0% of limit) ($0.00 past due) | |
| Outstanding loan balance | $0.00 ($0.00 past due) | |
| Bankruptcies, foreclosures, and legal items | 1 | |
| Collection total balance (includes past due) | $4,532.00 | |
| Landlord tenant court records found | 0 | |

### Identity

| Identity | From Application | From Experian |
|---|---|---|
| Name: | Glenn Thompson Jr. | GLENN PATRICK THOMPSON, JR<br>GLENN THOMPSON |
| SSN: | ■■■■■ | ■■■■■ |
| Birth Date: | ■■ 1988 | |
| Driver's License #: | ■■■■■■ / WA | |

### Addresses

| Addresses | From Application | From Experian |
|---|---|---|
| | 9681 54th Ave S<br>Seattle, WA 98118 - US | 6105 S 124TH ST.<br>SEATTLE, WA 98178-3543 (Applicant)<br>Reported 7/2012<br><br>11273 29TH AVE SW<br>SEATTLE, WA 98146-3458 (Applicant)<br>Reported 10/2010<br><br>11273 59TH AVE S<br>SEATTLE, WA 98178-2943 (Applicant)<br>Reported 9/2008 |

### Employment

| Employment | From Application | From Experian |
|---|---|---|
| Applicant: | Security<br>Golden Nugget Casino<br>$14,400.00/Yr. Total monthly income: $1,200.00 | |

### Criminal History

**From On-Site.com**

| Requested For | Location Searched (Insight America) | Period Searched | Requested | Returned |
|---|---|---|---|---|
| Glenn Thompson Jr. | Multi-State: AK, AL, AR, AZ, CA, CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY | 6/25/2008 - 6/25/2015 | 6/25/2015 | 6/25/2015 |

**Results**

*No Records Found*

*CR45903495*
Glenn Thompson Jr., 6/25/2015

OSMT000039

**EXHIBIT 9 - PAGE 2 OF 3**

Rental Report for Glenn Thompson Jr., 6/25/2015 for P101 at Lodge at Peasley Canyon

## National Sex Offender Registry History

### From On-Site.com

| Requested For | Date Requested | Date Returned |
|---|---|---|
| Glenn Thompson Jr. | 6/25/2015 | 6/25/2015 |

| Results |
|---|
| No Records Found |

## Landlord Tenant Court Records

### From On-Site.com

| There were no previous Landlord Tenant Court records found. |
|---|

## OFAC SDN/Terrorist Watchlist Search

### From On-Site.com

| Requested For | Results | Returned |
|---|---|---|
| Glenn Thompson Jr. | No records found | 6/25/2015 |

## Legal Items

### From Experian

| Plaintiff | Date | Case Number | Comments | Satisfied | Amount |
|---|---|---|---|---|---|
| RAY KLEIN INC (Applicant) KING DIST CT -RENTON 3407 NE 2ND ST, RENTON, WA 98056 By mail only | 8/2013 | 13411086 | Judgment | | $4,532.00 |



Page 3 of 3



OSMT000040

**EXHIBIT 9 - PAGE 3 OF 3**

# In The Matter Of:

*Glenn Thompson, Jr., et al. v.*
*On-Site Manager, Inc.*

---

*Joseph Davidson*
*September 30, 2016*

---

*CRS Inc.*
*Certified Court Reporters and Videographers*
*111 N. Market St., Suite 930*
*San Jose, CA  95113*
*408.298.3376   Toll Free 877.298.3376*



EXHIBIT 10 - PAGE 1 OF 30

Glenn Thompson, Jr., et al. v.
On-Site Manager, Inc.

Joseph Davidson
September 30, 2016

## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF WASHINGTON
 3                       AT SEATTLE
 4                       ---oOo---
 5
   GLENN THOMPSON JR., and      )
 6 GLENN THOMPSON SR.           )
                                )
 7            Plaintiffs   )     NO. 2:15-cv-01596-TSZ
 8         vs.                   )
                                )
 9 ON-SITE MANAGER, INC.,       )
                                )
10            Defendant.        )
11
12
13
14          DEPOSITION OF JOSEPH DAVIDSON
15 Date:        Thursday, September 30, 2016
               9:55 a.m. - 1:44 p.m.
16
   Place:       ON-SITE MANAGEMENT
17              307 Orchard City Drive, Suite 110
                Campbell, CA  95008
18
   Reported by:    Sarah K. Maksim  C.S.R.
19                 License No. 14053
20
21
22                   CRS, INC.
           Certified Court Reporters and Video
23             111 N. Market St., Suite 930
                 San Jose, CA  95113
24  (408) 298-3376 (DEPO)    Toll Free (877) 298-3376
                depos@crscourtreporters.com
25
```

## Page 2

```
 1 Appeared telephonically for the Plaintiffs:
 2     Leticia Camacho, Attorney at Law
       Eric Dunn, Attorney at Law
 3     Allyson O'Malley Jones, Attorney at Law
       NORTHWEST JUSTICE PROJECT
 4     401 Second Avenue S, Suite 407
       Seattle, Washington 98104
 5     (206) 464-1519
       leticiac@nwjustice.org.
 6
 7 For the Defendant:
 8     Jeffrey Bilanko, Attorney at Law
       GORDON & REES, LLP
 9     701 5th Avenue, Suite 2100
       Seattle, Washington 98104
10     (206) 695-5100
       jbilanko@gordonrees.com.
11
   For the Defendant:
12
       Michael J. Saltz, Attorney at Law.
13     JACONSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE,.
       LLP
14     1880 Century Park East, Suite 900.
       Los Angeles, California 90067
15     (310)446-9900
       msaltz@jrsnd.com
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2              INDEX OF EXAMINATION
 3
 4   BY MS. CAMACHO.........................4
 5
 6              INDEX OF EXHIBITS
 7                                      PAGE
 8   1   60-Page On-Site Document Packet.......4
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1          JOSEPH DAVISON,
 2 being first duly sworn by the Certified Shorthand
 3 Reporter to tell the truth, the whole truth and nothing
 4 but the truth, testified as follows:
 5      (Exhibit 1 was marked for identification.)
 6          EXAMINATION BY MS. CAMACHO
 7 BY MS. CAMACHO:
 8   Q.  All right.  So for the record, what is your
 9 full name?
10   A.  My full name is Joseph Eric Davidson.
11   Q.  And, Mr. Davidson, have you had a deposition
12 before?
13   A.  Yes.
14   Q.  Okay.  So you understand that I'm asking you
15 some questions to find out what you know about the facts
16 of the case?
17   A.  Yes.
18   Q.  And if you do not understand a question, let me
19 know, and I will rephrase it.
20      Do you understand that?
21   A.  Yes.
22   Q.  Now, if you answer a question, I'll assume that
23 you heard it and understood it.
24      Do you understand that?
25   A.  Yes.
```

Page 5

1    Q. And we're starting late.  I apologize for the
2  delay, but if at any point you want to take a break or
3  need a break or need to counsel with Mr. Bilanko, please
4  let me know.
5      Do you understand that?
6    A. Yes.
7    Q. Okay.  And I'm not -- I wasn't there to witness
8  it, but I just heard that you have taken an oath to tell
9  the truth; is that correct?
10   A. Yes.
11   Q. Okay.  Mr. Davidson; is that correct?
12   A. Yes.
13   Q. Okay.  So you were named by On-Site to
14 participate in this 36(b) deposition.  How long have you
15 worked at On-Site?
16   A. Since January 2015.
17   Q. Okay.  And what is your current title?
18   A. I'm the director of screening services.
19   Q. Okay.  And, Mr. Davidson, what do you do in
20 that capacity?
21   A. As the director of screening services, I am the
22 vendor liaison for our data providers since we are a
23 reseller.  I'm in change of the renter relations
24 department, which is tasked with working with applicants
25 or consumers if there are any questions or disputes.

Page 6

1    Q. Okay.  And you understand that I'll be asking
2  you questions that you need to answer on behalf of
3  On-Site manager?
4    A. Yes.
5    Q. Did you receive a copy of the 30(b)(6)?
6    A. I did.
7    Q. Did you have a chance to review it?
8    A. I have.
9    Q. And you understand that I will be asking you
10 questions related to all the topics that are listed in
11 that 30(b)(6) deposition notice?
12   A. I do.
13   Q. Now, Mr. Davidson, generally, does On-Site
14 provide screening services to property managers on
15 networks to help them with screening potential tenants?
16   A. We do.
17   Q. And do these services include, like, the use of
18 On-Site's screening technology?
19   A. It does.
20   Q. And do these services include a computer tool
21 that says customizable rental criteria settings?
22   A. It does.
23   Q. And do these services include providing a
24 rental report to the property managers about those
25 prospective tenants?

Page 7

1    A. It does.
2    Q. And do these reports include details on credit,
3  criminal, and civil records?
4    A. They may.
5    Q. Okay.  Do you have the exhibits in front of
6  you?
7    A. I do.
8    Q. All right.  And please take a look -- we'll
9  start by looking at -- actually let me -- let me confirm
10 that we're on the same page.  We have exhibits that are
11 numbered at the top right corner with a second
12 handwriting.
13     Do you see that?
14   A. I do.
15   Q. Okay.  And they're numbered 1 through 60?
16   A. Yes.
17   Q. Is that what you're looking at?
18   A. It is.
19   Q. Okay.  We'll -- we'll start by looking at -- at
20 the first three pages.  Please take a moment to look at
21 those three pages.
22   A. Okay.
23   Q. Okay.  So, Mr. Davidson, does it look to you
24 from these three pages, 1 to 3, that GreyStar Properties
25 or GreyStar property management has a service agreement

Page 8

1  with On-Site to provide tenant screening services to it?
2    A. It does.
3    Q. Okay.  And would you agree from looking at
4  these three pages, 1 through 3, that GreyStar uses your
5  screening services for a property known as the Lodge at
6  Peasley Cannon in Federal Way, Washington?
7    A. Yes.
8    Q. Okay.  Now, looking at -- let's see, looking at
9  page 3, do you see where it says "screening criteria"?
10   A. Are you referring to the top tab where it says,
11 "screening criteria"; and to it's right, it says,
12 "documents," and to it's right it says, "lease
13 policies"?
14   Q. I'm -- I'm are you looking at page 3?
15   A. I am indeed.
16   Q. Okay.  So you see the top -- sort of towards
17 the top, it says, "Support, marketing, guest cards,
18 screening criteria"?
19   A. Yes.
20   Q. Okay.  And then below that, there are some
21 headers that include, auto-decline, income, credit,
22 recommendation overrides, and applications types.
23     Do you see that?
24   A. Yes.
25   Q. Okay.  Are these considered rental criteria

Page 9

1    factors?
2        A. They would.
3        Q. Okay. And are these factors based on what the
4    landlord determined is important to them?
5        A. It is.
6        Q. And are these factors then used by On-Site to
7    give the last rental report about prospective tenants?
8        A. Can you restate that?
9        Q. Yes. These factors, are these used by On-Site
10   to give the Lodge a rental report about prospective
11   tenants?
12       A. Depending how the question is worded, these
13   settings wouldn't specifically change the report.
14   Although, it may impact the clients -- the clients'
15   criteria may impact the recommendation, their
16   recommendation.
17       Q. Okay. So still on page 3, under -- looking,
18   for example, at income, where it says -- there are --
19   there are a couple of check marks.
20          Do you see that?
21       A. Yes.
22       Q. And one of them is, "Evaluate income-to-rent
23   ratio based on overall application income."
24          Do you see that?
25       A. Yes.

Page 10

1        Q. And then there's another -- also under
2    "income," it says, "Allow entry of housing allocation
3    income which will offset the rent."
4          Do you see that?
5        A. Yes.
6        Q. So looking at this particular page, page 3, and
7    that particular section under "income" under those two
8    check marks, would you agree that these are two factors
9    or criteria that the Lodge, once On-Site screen to -- to
10   consider when evaluating a prospective tenant?
11       A. Yes.
12       Q. Now, under "application types," at the bottom
13   of it, page 3, there's a check mark under "Allow rental
14   subsidies."
15          Do you see that?
16       A. Yes.
17       Q. Okay. So would you agree that the Lodge wanted
18   On-Site to allow for rental subsidies as it prepared a
19   rental report for the Lodge?
20       A. This check mark allows the Lodge's employees to
21   enter rental subsidies. And if those rental subsidies
22   are so entered and supplied to us, then, yes, it would
23   be considered.
24       Q. Well, then let me ask you about that,
25   Mr. Davidson. Is there anything that On-Site does at

Page 11

1    all when it is providing a rental report that allows
2    rental subsidies? Is there anything that you're screen
3    tool -- or your personnel do who consider the rental
4    subsidy?
5        A. There is nothing our personnel do. However,
6    the screening tool -- again, if so configured, and it is
7    for the Lodge -- if the leasing agent at the property
8    enters that information, our calculator will take that
9    information into account.
10       Q. So your calculator does take it into account?
11       A. If it is entered.
12       Q. Okay. Now, still on page 3, Mr. Davidson,
13   there are various categories or lines that have -- for
14   example, "Don't consider medical accounts or
15   collections." At the end it says, "Do not consider
16   medical."
17          Do you see that?
18       A. I do.
19       Q. And all the lines under credit have what looks
20   like an answer. For example, "Consider this many months
21   of credit history. All credit," and so on.
22          Do you see that?
23       A. I do.
24       Q. Okay. So are these additional considerations
25   that you're screening tool is supposed to calculate or

Page 12

1    look at what is making its calculations or its rental
2    report?
3        A. It does.
4        Q. Okay. Now, let's go back to page 1.
5        A. Okay.
6        Q. And, again, on page 1, we're looking at the
7    screening criteria. Is that correct, these are
8    additional criteria?
9        A. Yes.
10       Q. Okay. So, for example, there's, like,
11   headlines there as well like "Ability to pay rent,
12   credit history, residency history, criminal history."
13          Do you see that?
14       A. I do.
15       Q. Okay. So looking at under, "Ability to pay
16   rent," where it says, "Minimum monthly gross
17   income-to-rent ratio." And there's a factor of 2.8, and
18   then under "importance," it says, "pass, fail."
19          Do you see that?
20       A. I do.
21       Q. Okay. So is this -- is this ratio calculated
22   by computer, or are there rental specialists at On-Site
23   making those calculations to see whether the prospective
24   tenant missed that income-to-rent ratio?
25       A. This is done by computer.

Page 13

1    Q.  Okay.  So looking at the number 3, the --
2  excuse me, not 3, but page -- page 2.
3    Are you on page 2?
4    A.  I am.
5    Q.  Okay.  So at the -- at the bottom of the page,
6  there's one of the -- one of the headlines is called,
7  "Range and recommendation."
8    Do you see that?
9    A.  At that time bottom of page 2?  Yes.
10    Q.  Okay.  And there's -- under -- under that
11  section, it says -- one of the lines says, "5 to 5.9,
12  decline."  And then the next one says, "6 to 6.9, except
13  with a set deposit or a certain amount of $500."
14    Do you see that?
15    A.  I do.
16    Q.  Okay.  And when you look at this overall
17  document, just pages 1 and 2 in particular, it shows
18  that for every one of those lines or every one of those
19  categories or criteria, there's a degree of importance
20  either pass, fail, or extremely -- or not considered.
21    Do you see that?
22    A.  I do.
23    Q.  So if a tenant needs the -- or you're looking
24  at a prospective tenant, how does On-Site decide how
25  many points to give to a pass, for example, in ability

Page 14

1  to pay?
2    A.  Well, On-Site doesn't decide; the client does
3  by utilizing --
4    Q.  Then -- I'm sorry.  Go ahead.
5    A.  That's all.
6    Q.  And when you say that the client decides, what
7  do you mean by that?
8    A.  They decide when they enter the criteria in
9  these three pages, how they want things weighted.
10    Q.  So they will tell you specifically, give these
11  number of points to income-to-rent ratio or residential
12  history or criminal history; is that correct?
13    MR. SALTZ: Objection.  Vague and ambiguous as to
14  the term "you."
15    Go ahead and answer.
16    THE WITNESS: Yeah.  The client will determine
17  which of these criterion are important or more
18  important.  And then they will set its weighting and
19  that will impact how the calculator works and looks at
20  different aspects of the reports.
21  BY MS. CAMACHO:
22    Q.  So when you enter into a service agreement in
23  this case, for example, the Lodge, they tell you this is
24  the factor on an income-to-rent ratio, and in order to
25  get -- if you get a pass, this is how many points to

Page 15

1  give it.  And then you use that and -- to your formula,
2  you put into your screen tool; is that correct?  Am I
3  understanding that correctly?
4    MR. SALTZ: I'm going to instruct him not to
5  answer that.  It misstates his testimony.  And you've
6  said "You, you, you, and your," throughout the whole
7  thing.
8    If you want to rephrase that question, he's
9  already told you On-Site doesn't enter these numbers.
10  And your question begins with, "When you enter these
11  numbers."  So I'll let you re-ask that question in
12  another way.
13  BY MS. CAMACHO:
14    Q.  Well, let me -- I'll rephrase it.
15    MR. SALTZ: Thank you.
16  BY MS. CAMACHO:
17    Q.  When you read the service agreement with -- in
18  this case the last -- and they agree to use your
19  screening tool --
20    (Reporter clarification.)
21  BY MS. CAMACHO:
22    Q.  And they agree to use your screening tool,
23  that's --
24    MS. CAMACHO: Actually can we take a five-minute
25  break?

Page 16

1    MR. BILANKO: Sure.
2    MS. CAMACHO: Give us five minutes.
3    (Off-the-record discussion.)
4  BY MS. CAMACHO:
5    Q.  Mr. Davidson, let me go back.  We were looking
6  at the documents on pages 1 and 2.  And I guess one
7  thing that I can ask you is, looking at those categories
8  and the -- the importance that is given to them, that's
9  the -- does the importance of these categories related,
10  to the score?
11    A.  It does.
12    Q.  Okay.  So for example, if it is a pass, how
13  much does that affect the score?
14    A.  A pass/fail option is essentially binary.  So
15  looking at this first example with income to rent, if
16  the applicant's income does not meet that 2.8 as the
17  Lodge at Peasley has set, it will simply result in a
18  fail.  So in effect, it's not a score at all; it's just
19  a fail.
20    Q.  Okay.  And so if it is a pass, then that person
21  will not have a problem with that category?
22    A.  That is correct.
23    Q.  Okay.  And what about, "extremely," how much
24  does that affect the score?
25    A.  Significantly.

Page 17

1    Q.  Okay.  And if the importance is not considered,
2  what does that mean to you?
3    A.  It would then mean it's not considered in the
4  score.
5    Q.  Okay.  And looking on the first page on page 1,
6  at the bottom of the page, there's also a scored range.
7  And this appears to be for individual applicants.
8    Am I understanding that correct?
9    A.  Can you restate that?
10   Q.  Yes.  Are you looking at page 1?
11   A.  I am.
12   Q.  And are you looking at the bottom of the page
13  where it says, "score range and recommendations"?
14   A.  I am.
15   Q.  Okay.  What's -- what's the minimum score that
16  you need if you're a prospective tenant to be accepted
17  in this section?
18   MR. BILANKO:  I'll object to the scope that it's
19  -- object to the extent that that seems to be outside
20  the scope of this particular witness's testimony and
21  probably calls for speculation.
22   But I'm taking your question, Ms. Camacho, to mean
23  that what -- well, you know, I'll just stand on the
24  objection.
25   Sorry.  Go ahead.

Page 18

1    THE WITNESS:  Can you read back the question.
2    (Whereupon the record was read.)
3    THE WITNESS:  Looking at Document 1, it looks like
4  the Lodge at Peasley Cannon will essentially accept
5  anyone that does not fail one of the pass/fail criteria
6  with -- you know, based on a multiple of rent or
7  additional deposit.
8  BY MS. CAMACHO:
9    Q.  Okay.  And let me ask you before I forget, what
10  is this document, this -- these two pages?  What is this
11  a print-out of?  This -- where did this come from?
12   A.  This appears to be print screens of the Lodge
13  at Peasley Cannon's criteria.
14   Q.  Okay.  And these -- are these -- what -- let me
15  rephrase that.  This -- does the Lodge have an account
16  with On-Site?
17   A.  They do.
18   Q.  And is the only way for them to access that
19  account is if they log onto On-Site?
20   A.  Yes.
21   Q.  Now, the way I -- I understand your program --
22  correct me if I'm wrong -- in terms of your relationship
23  with the Lodge -- so personnel of the Lodge have access
24  to an On-Site account that was created for GreyStar that
25  they can use when a prospective tenant applies for an

Page 19

1  apartment; is that correct?
2    A.  Specific personnel, whomever the account holder
3  the Lodge or GreyStar has identified, yes.
4    Q.  Okay.  And whomever the Lodge identified to
5  access that accounts, they enter information and -- that
6  is given to them by that prospective tenants; is that
7  correct?
8    A.  That is correct.
9    Q.  Now, does the Lodge have -- excuse me, does
10  On-Site have access to these particular documents
11  normally, pages 1 and 2?
12   A.  Specific personnel for technical support
13  issues, yes.
14   Q.  Okay.  So On-Star uses the information in this
15  document or in the Lodge's account to create a rental
16  report; correct?
17   A.  Correct.
18   Q.  Now, if a prospective tenant to the Lodge calls
19  and disputes information in the rental report, at that
20  point, does On-Site have access to the Lodge's account
21  -- or I'm not sure how you call it.  Was it -- is it a
22  site?  How do you call it?  What do you call it?
23   A.  Account.
24   Q.  Account.  Okay.  So does On-site have access to
25  the Lodge's account at that point?

Page 20

1    A.  No.  They do not.
2    Q.  Okay.  If I understand and -- I mean, correct
3  me if I'm wrong -- if a prospective tenant to the Lodge
4  calls and speaks with one of On-Site rental relations
5  staff, On-Site at that point would log that information
6  in your salesforce.com program; is that correct?
7    A.  Yes.
8    Q.  And I understand that in addition to the
9  salesforce.com program, On-site's rental relations staff
10  can generate a report which they can review while
11  they're on the telephone discussing that prospective
12  tenant's report or while they're investigating a
13  dispute; is that correct?
14   A.  Yes.
15   Q.  Okay.  And I understand that On-Site's rental
16  relations staff have the ability to correct an error if
17  they agree that a correction should be made.
18   Am I understanding that correctly?
19    (Reporter clarification.)
20   MR. BILANKO:  Object to the form.  Sorry.
21    (Reporter clarification.)
22  BY MS. CAMACHO:
23   Q.  Okay.  Let me ask again.  Does On-Site have the
24  ability to correct an error on a tenant's rental report
25  -- prospective tenant report or not?

Page 21

1      MR. BILANKO: I'll restate my objection to form.
2      THE WITNESS: We have -- as a reseller, we don't
3  maintain any files. But we are able to suppress certain
4  information or redact certain information from the
5  report.
6  BY MS. CAMACHO:
7      Q. Okay. So if On-Site is able to suppress or
8  redact information about a particular tenant, does
9  On-Site send that information about that redaction to
10  anybody?
11      A. We will depending on the type of redaction.
12      Q. Okay. So can you explain that?
13      A. Can you repeat that?
14      Q. Right. I said, you will send the correction or
15  redaction information to somebody depending on the type
16  of redaction. So my question is: What type of
17  redactions allow you, or as a policy you decide to send
18  information or the redaction to somebody else?
19      MR. BILANKO: Object to the form.
20      MR. SALTZ: Vague and ambiguous as to the word
21  "somebody." And incomplete hypothetical.
22      You can answer if you understand.
23      THE WITNESS: We will, in cases, for example, in
24  cases where a case -- where a disposition may have been
25  updated or if a case, there has been an order to seal.

Page 22

1  We will certainly provide that back to our vendor.
2  BY MS. CAMACHO:
3      Q. Okay. And by -- by vendor, what do you mean
4  being? Can you tell me about that?
5      A. The vendor would be the company that provided
6  the specific information.
7      Q. Okay. So -- but if you redacted or suppressed
8  information about a prospective tenant that wasn't in a
9  renter report, do you send that information to the
10  landlords that originally had received that report, that
11  information about the tenant?
12      A. We will.
13      Q. And do you send information to the prospective
14  tenant about that redaction or suppression of
15  information?
16      MR. SALTZ: Objection. Incomplete hypothetical.
17      MR. BILANKO: Form.
18      THE WITNESS: The answer is yes. And how it
19  happens would be dependent on how the applicant reached
20  out to us.
21  BY MS. CAMACHO:
22      Q. And is this in -- well, actually let me ask you
23  about that. Did you -- did I understand you to say that
24  you will send information to the prospective tenant
25  depending on -- on how that person reached out to you;

Page 23

1  is that correct?
2      MR. SALTZ: Objection. Incomplete hypothetical.
3      THE WITNESS: That is.
4  BY MS. CAMACHO:
5      Q. And so what do you mean by that, Mr. Davidson?
6  What do you -- what -- if a person calls you, do you --
7  what do you do if a tenant called you and said, "I am
8  disputing this particular information" and then you
9  redact that information. What do you do? Do you call
10  that tenant back? Do you write them a letter? What do
11  you do?
12      MR. BILANKO: Object to the form. Incomplete
13  hypothetical.
14      Go ahead and answer the question.
15      MR. SALTZ: If you can.
16      THE WITNESS: If an applicant calls in with an
17  inquiry or a dispute, we will ask them if they want to
18  handle it over the telephone, which I would say
19  virtually all of them do. If they're willing to handle
20  it verbally over the telephone, we will ask what the
21  issue is, where their concern is. We will work through
22  that issue oftentimes when they're waiting on the line.
23  And we will then explain to them the changes that we are
24  making. If they have some sort of desire to receive
25  this by US mail or e-mail, we will go ahead and push the

Page 24

1  completed report back to them with the revisions. We
2  will obviously just tell them the changes that -- that
3  we've made, we're removing this, we're updating that.
4  And that, we will automatically submit back to the
5  client that requested this information to begin the
6  whole process. But we will also, if the applicant
7  requests, we will pass that information back to anyone
8  else who has received it in the past six months, as I
9  believe, but it may be longer.
10  BY MS. CAMACHO:
11      Q. So in relation to passing that information
12  forward, do you save that information about the
13  suppression or redaction anywhere?
14      A. Again, depending on the particular issue, yes.
15      Q. So what -- what sorts of data redactions do you
16  consider should be -- should be saved?
17      A. What sort of redactions? Can you possibly
18  rephrase that?
19      Q. Do you have a list of data that you save if
20  this particular item is suppressed or redacted? This
21  has to be saved?
22      A. Yes.
23      Q. That's a -- yes?
24      A. I'm sorry. Yes. While we don't maintain any
25  files, per se, because we are a reseller, we do maintain

Page 25

1  what you might call a redaction file that will consist
2  of specific key elements -- social security number being
3  an excellent example since it's really the only unique
4  identifier for a consumer -- as well as any specific
5  details about the case that needs to be redacted.  For
6  example, a case number or court would be an excellent
7  example of those elements.
8      Q.  And where do you save that information if that
9  -- does that information go on salesforce.com or where
10  does that -- that -- where is that information saved,
11  that redaction file?
12     A.  The redaction file is saved on a server, which
13  is then utilized moving forward, when that consumer
14  comes back through -- if that consumer comes back
15  through our system.  We will hit up against that
16  redaction file prior to issuing a report.
17     Q.  Do you -- do you check every prospective tenant
18  that comes in with that redaction file?
19     A.  We do.
20     Q.  Is any of that information that goes
21  straight to the redaction file saved on the
22  salesforce.com record?
23     A.  It is not.
24     Q.  What -- can you tell me what goes on to the
25  salesforce.com records?

Page 26

1      A.  The salesforce.com records are the interactions
2  between applicants and renter relations department.
3      Q.  And if it appears that any time there's
4  interactions between an applicant and a renter and
5  relations specialist, that interaction will go into your
6  salesforce.com records?
7      A.  That is our policy.  Yes.
8      Q.  Is there any reason why there aren't any
9  salesforce.com records for the Thompson's?
10         (Reporter interruption.)
11     MS. CAMACHO: For the Thompson's in this case --
12  the plaintiffs in this case.
13     MR. BILANKO: I didn't hear the question.
14     MR. SALTZ: I don't understand the question
15  either.
16     MR. BILANKO: Can you repeat what you got of the
17  question, madam court reporter?
18         (Whereupon the record was read.)
19  BY MS. CAMACHO:
20     Q.  For the Thompson's, the plaintiffs in this
21  case?
22     MR. SALTZ: Are you asking a double negative?  Are
23  you asking for him to assume facts not in evidence?  Go
24  -- you can -- objection.  Assumes facts not in evidence.
25     Go ahead and answer.

Page 27

1      THE WITNESS: If that is the case, and I don't
2  know that it is, it is possible that, based on when we
3  looked for this information, Salesforce had been purged.
4  We don't maintain everything forever.  You know, that --
5  that would be one hypothesis.
6  BY MS. CAMACHO:
7      Q.  How long do you maintain records in Salesforce
8  account?
9      A.  For renter relations, usually nine months.
10     Q.  Now, looking at the exhibits, please take a
11  look at -- at the report that starts on page 4 and goes
12  pages 4 through 10.
13     Do you have that in front of you, Mr. Davidson?
14     A.  I'm looking at it right now.
15     Q.  Okay.
16     A.  Okay.
17     Q.  Was this document prepared by On-Site?
18     A.  It was.
19     Q.  And was it prepared for the Lodge?
20     A.  I am looking.
21     MR. SALTZ: I'm sorry.  Are we talking about
22  document number 5, Latisha?
23     MS. CAMACHO: I'm looking at pages 4 through 10.
24     MR. SALTZ: That's not a report.  Okay.
25     THE WITNESS: Can you restate --

Page 28

1  BY MS. CAMACHO:
2      Q.  Mr. --
3      A.  Yes.  Can you read back the question?
4      Q.  Yes.  The question is whether these documents,
5  pages 4 through 10, was prepared for the Lodge.
6      A.  This contains a report prepared before the
7  lodge, but it is also inclusive of internal notes.
8      Q.  Okay.  And if you look at page 4, at the -- at
9  the top of the page on the left-hand corner, it says,
10  "On-Site.com - detailed screening Glenn Thompson."
11     A.  Yes.
12     Q.  And then if you look at the bottom, on the
13  bottom right, it says page 1 of 7.
14     Do you see that?
15     A.  Yes.
16     Q.  Okay.  So is this document saved on On-Site's
17  tenant screening program?
18     A.  Sorry.  Can you repeat that?  Is it saved on
19  what program?
20     Q.  On On-Site's tenants' screening program?
21     MR. SALTZ: Huh?
22         (Reporter interruption.)
23     MR. SALTZ: Vague and ambiguous as to, "On-Sites
24  tenants' screening program."  If you know -- if On-Site
25  has the stuff in a tenant screening program, you can

Page 29

1    answer.
2        THE WITNESS: Yes.
3    BY MS. CAMACHO:
4        Q.  Mr. Davidson, was that you?
5        A.  Yes.
6        Q.  And is the answer yes?
7        A.  Yes.
8        Q.  Does the Lodge have full access to this
9    document in this format?
10       A.  It does not.
11       Q.  Okay.  And is this -- document is -- details
12   screening prepared before every prospective tenants that
13   calls on On-Site about their rental report?
14       A.  No.
15       Q.  So when is it prepared?
16       A.  I'm a bit confused.
17       Q.  Under what circumstances is this type of
18   detailed screening document prepared?
19       MR. SALTZ:  Okay.  This is not a -- I think
20   there's confusion because you're not looking at a
21   tenant screening report that is prepared in a tenant
22   screening program.  If I -- I'm going to ask the witness
23   to explain to you what this document is to avoid seven
24   hours of questions, because you're not looking at a
25   tenant's screening report.

Page 30

1        Joe, can you tell her what this document is?
2        THE WITNESS:  Yes.
3        MR. SALTZ:  Thank you.
4        THE WITNESS:  This document, while it does include
5    the tenant screening report, it also includes internal
6    notes, internal comments, things -- a lease notebook
7    that you can see on page 6, which is not available to
8    the applicant nor to the client, so...
9        MR. SALTZ:  So this is not produced by your tenant
10   screening program?
11       THE WITNESS:  No -- not, no.
12       MR. SALTZ:  Thank you.
13       These are your internal notes?
14       THE WITNESS:  Correct.
15       MR. SALTZ:  As to what's happened here?
16       THE WITNESS:  Correct.
17       MR. SALTZ:  Thank you.
18       Does that help?
19       MS. CAMACHO:  That's -- yes.  Thank you.
20       MR. SALTZ:  All right.  Thank you.
21   BY MS. CAMACHO:
22       Q.  Let me ask you to look at page 5, please.
23       A.  Okay.
24       Q.  See how at the -- sort of at the top -- towards
25   the top of the page, there's a heading called

Page 31

1    "disputes."
2        Do you see that?
3        A.  I do.
4        Q.  And then right below it, it says, "7-9-2015
5    credit resolved."
6        Do you see that?
7        A.  Yes.
8        Q.  And then below that, there's -- there's a
9    section called "warnings," and right below it, there's a
10   section called "renter relations disputes."
11       Do you see that?
12       A.  I do.
13       Q.  And then below -- under rental relations
14   disputes, it says, "This tenant has not submitted any
15   disputes."
16       Do you see that?
17       A.  I do.
18       Q.  So what -- isn't that wrong?  I mean, at the
19   top, it says, "7-9-15."  There's a dispute that was
20   resolved and then it says this tenant has not submitted
21   any disputes which -- I mean, which is it?
22       A.  When was this document created?
23       Q.  You -- you tell me, Mr. Davidson, when was this
24   document?
25       A.  When did we submit this document?  Is this the

Page 32

1    one -- yesterday?
2        Starting in June 2016, we underwent an initiative
3    to make the dispute process more streamlined and easier
4    for applicants.  So this is something that would have
5    only started to appear since June 2016.
6        Q.  Which part of it?
7        A.  Just that block that says, "Renter relations
8    dispute, this tenant has not submitted any disputes,
9    open dispute."
10       Q.  Okay.  That part was added in June -- since
11   June 2016?
12       A.  Correct.
13       Q.  Okay.  Well, let me ask you:  What constitutes
14   a dispute for On-Site?
15       (Reporter interruption.)
16   BY MS. CAMACHO:
17       Q.  What constitutes a dispute for On-Site?
18       MR. BILANKO:  Object to form.  "What constitutes a
19   dispute for On-Site," I think was the...
20       MR. SALTZ:  You mean, what grievances does On-Site
21   have with the world?  I don't understand the question.
22   Does On-Site have --
23   BY MS. CAMACHO:
24       Q.  If a prospective tenant calls On-Site, how do
25   you determine that that particular conversation is or is

Page 33

1 not a dispute?
2    MR. SALTZ: Objection.  Vague and ambiguous as to
3 the term "you."
4    THE WITNESS: Answer?
5 BY MS. CAMACHO:
6    Q.  Mr. Davidson?
7    MR. SALTZ: Mr. Davidson, how do you -- I guess
8 she's asking you, not in your capacity as On-Site.  She
9 didn't ask what On-site.  So she asked what you --
10    MS. CAMACHO: Mr. Saltz, let --
11 BY MS. CAMACHO:
12    Q.  Let me jump in.  Mr. Davidson, you're here
13 today as a deponent speaking on behalf of On-Site;
14 correct?
15    A.  Correct.
16    Q.  And so when I say "you," I mean, On-Site.
17    Do you understand that?
18    MR. SALTZ: I object to that instruction because
19 you asked him if he had read the documents and you
20 obviously meant him when you use the word "you."  If he
21 had read the deposition notice.  You had asked him about
22 him personally and his qualifications.
23    So let's just instead of using the word "you,"
24 let's use the word "On-Site."  It's not that difficult
25 if you want to know what On-Site would do rather than

Page 34

1 what Joe Davidson, as an individual, would do; or else I
2 have to keep objecting to the fact that you have then,
3 in the same deposition, used the word "you," to have two
4 different meanings.
5 BY MS. CAMACHO:
6    Q.  Mr. Davidson, do you need the court reporter to
7 repeat the question --
8    A.  I do.
9    Q.  -- from the transcript?
10    MS. CAMACHO: Court reporter, please?
11    (Off-the-record discussion.)
12 BY MS. CAMACHO:
13    Q.  Mr. Davidson, when someone calls -- when a
14 prospective tenant calls On-Site, what does that
15 prospective tenant have to do for On-Site -- what
16 particular information is considered a dispute by
17 On-Site?
18    MR. BILANKO: Object to the form.
19    Go ahead.
20    THE WITNESS: Any time an applicant calls in and
21 states that something is incorrect on the report,
22 obviously, our first question is whether they have seen
23 a copy of the report.  If they have not seen a copy, we
24 will provide them a copy assuming they have seen a copy,
25 we will then ask them -- if they don't clearly

Page 35

1 articulate, we will ask them where the inaccuracy may
2 lie.
3 BY MS. CAMACHO:
4    Q.  So if a prospective tenant is discussing an
5 inaccuracy in their report with On-Site.  What types of
6 inaccuracies does On-Site consider to be disputes?
7    MR. SALTZ: Huh?
8    MR. BILANKO: Object to the form.  What -- I don't
9 know.
10    MR. SALTZ: Is the question, what type of
11 inaccuracies does On-Site consider a dispute?
12    MR. BILANKO: Inaccuracy.
13    MR. SALTZ: Inaccuracies.  Sorry.  Is that -- is
14 that the question, Latisha?
15 BY MS. CAMACHO:
16    Q.  Mr. Davidson?
17    A.  Can you rephrase the question?
18    Q.  Yes.  You stated that prospective tenants may
19 call your On-Site renters relations staff and may -- may
20 report inaccuracies in the rent report prepared by
21 On-Site; is that correct?
22    A.  Yes.
23    Q.  So what -- if a prospective tenant is reporting
24 what they consider inaccurate or an inaccuracy in their
25 report, at what point does On-Site determine that the

Page 36

1 prospective tenant is disputing something in the report?
2    MR. SALTZ: Hold on.  Can you read back that
3 question?
4    (Whereupon the record was read.)
5    MR. SALTZ: You can answer that if there's a...
6    THE WITNESS: Once an applicant has -- understand
7 that it -- it's not infrequent for applicants to call
8 up, you know, essentially just disputing whatever
9 decision a property has made.  So that would not be a
10 dispute, if you would, for us.
11    If they point out a specific inaccuracy, for
12 example, this case was not -- you know, this case is
13 still pending or this case was dismissed, if they pull
14 out a specific inaccuracy, we will consider that a
15 dispute.
16    MS. CAMACHO: Let's take a five-minute break.  Is
17 that okay?
18    MR. BILANKO: Yes.  Great.
19    (Off-the-record discussion.)
20 BY MS. CAMACHO:
21    Q.  Okay.  Mr. Davidson, do you have the exhibits
22 in front of you?
23    (Reporter clarification.)
24    MS. CAMACHO: We're on the record.
25    THE WITNESS: Yes.

Page 37

1   BY MS. CAMACHO:
2   Q.   Okay.  So let's continue looking at the
3   documents we were discussing right before the -- right
4   before the break.  And earlier I think you said that
5   sometimes On-Site receives calls from applicants that
6   are denied admission to rental properties; is that
7   correct?
8   A.   Yes.
9   Q.   And do these applicants say they were given a
10  reason -- or do some of these applicants say they were
11  given a reason for the denial by the property?
12      (Reporter interruption.)
13  BY MS. CAMACHO:
14  Q.   Yes.  When these applicants or these
15  prospective tenants call, do they say they were given a
16  reason for the denial by the -- the property management?
17      MR. SALTZ: Calls for speculation.  Object to
18  form.
19      THE WITNESS: They should have already received a
20  copy of an adverse action letter listing the reasons for
21  the denial from the property.
22  BY MS. CAMACHO:
23  Q.   Okay.  So when they call, they do have a reason
24  -- the reason for the denial when they call On-Site?
25  A.   They should, yes.

Page 38

1   Q.   Okay.  So for example, looking at page 4, do
2   applicants sometimes say that they're turned down
3   because of their criminal record?
4   A.   Yes.
5   Q.   And they -- and they -- and they -- do they --
6   and they deny that they have a criminal record?
7       MR. SALTZ: I'm sorry.  Is the question, has any
8   applicant ever denied that they have a criminal record?
9       MS. CAMACHO: Yes.
10      MR. SALTZ: I'm going to instruct him not to
11  answer that question.  It's beyond the scope of this
12  case and deposition.  There's no criminal records
13  involved.
14  BY MS. CAMACHO:
15  Q.   Mr. Davidson, if a -- if an applicant calls on
16  On-Site and says, "I was turned down because of a
17  criminal record," and I deny, would you treat that as a
18  dispute?  "You" meaning On-Site?
19      MR. BILANKO: Again, relevance on this one.
20      MR. DUNN: Well, relevance is not a permissible
21  basis in which to instruct the witness not to answer a
22  question.
23      MR. BILANKO: I did --
24      MR. DUNN: Are you really going to instruct him
25  not to answer this question?

Page 39

1       MR. BILANKO: Did you hear me instruct him not to
2   answer the questions, Mr. Eric Dunn, who is not taking
3   the deposition?
4       MR. DUNN: Yes.  I did hear, and that's a blatant
5   violation of the discovery rules.  So I would ask you to
6   reconsider that.
7       MR. SALTZ: If you would like me to have the court
8   reporter repeat everything that had just transpired in
9   the last two questions, I am more than happy to have her
10  do that so you will hear that I did not instruct him to
11  answer the last question.
12      The first question, when you were talking about
13  criminal records, I did instruct him not to answer.
14  It's beyond the scope; it's harassing.  It's not part of
15  the deposition notice, nor is it part of this case.
16  This case does not have any criminal aspect to it
17  whatsoever.  That is the definition of a fishing
18  expedition.
19      And if you ask, I'll let him answer this one
20  question.  But if you ask another question about
21  criminal records, I'm telling him not to answer and you
22  can take this up before Judge Zilly and let him know why
23  your notice says nothing about criminal records and the
24  case has nothing about criminal records --
25      MR. DUNN: Okay.

Page 40

1       MR. SALTZ: -- and you're wasting our time --
2       So go ahead.
3       (Unintelligible colloquy.)
4   BY MS. CAMACHO:
5   Q.   Mr. Davidson?
6       THE WITNESS: Can you please read back the
7   question?
8       (Whereupon the record was read.)
9       THE WITNESS: Yes.
10  BY MS. CAMACHO:
11  Q.   Would you investigate?
12      MR. BILANKO: "You," meaning On-Site?
13      MS. CAMACHO: Yes.
14      THE WITNESS: It's On-Site's policy to do so.
15  BY MS. CAMACHO:
16  Q.   And would you -- let me move to a different
17  question.  What about if an applicant called and said,
18  "I was turned down because of a landlord/tenant record
19  denying -- deny -- had denied that this is my record."
20  Would you treat that as a dispute?
21  A.   Yes.  It is our policy.
22  Q.   And do you reinvestigate?
23  A.   We do.
24  Q.   And if a prospective tenant -- how -- how would
25  you reinvestigate?

Page 41

1      MR. BILANKO: Object to the form.
2      THE WITNESS: It would be highly --
3    BY MS. CAMACHO:
4      Q. Let me --
5      A. Go ahead.
6      Q. Go ahead, Mr. Davidson.
7      A. It would vary based on the nature of the
8    dispute.
9      Q. So in a -- in a case, for example, involving a
10   landlord/tenant of record, what would you do to
11   reinvestigate?
12         (Reporter interruption.)
13      MR. BILANKO: Landlord/tenant record.
14      MR. SALTZ: Objection. Vague and ambiguous as to
15   the term "you."
16      THE WITNESS: It's On-Site's policy to work with
17   the vendor who provided that information. But since
18   that can take time, and our goal is to assist applicants
19   as quickly as possible, we will utilize whatever tools
20   we may have at our disposal.
21      For example, if someone claimed a disposition was
22   incorrect and that Court was available online, we would
23   certainly go online and see if we could determine that,
24   yes, indeed the disposition was different; so that we
25   can go ahead and quickly expedite the applicant's

Page 42

1    dispute.
2    BY MS. CAMACHO:
3      Q. And when you say that you quickly expedite the
4    dispute, I mean, if you learn that -- that information
5    was incorrect on the original report, what -- what else
6    do you do once you find out that the information wasn't
7    correct?
8      MR. BILANKO: Object to the form. She said "you,"
9    twice.
10      THE WITNESS: It's On-Site's policy to modify the
11   report as well as send that modification to the vendor
12   who provided that information as well as to reissue
13   reports to the client as well as make available a copy
14   of that report that modified report to the applicant.
15   BY MS. CAMACHO:
16      Q. And if a prospective tenant called and said
17   they were -- he or she was turned down because of a --
18   unpaid collections and they deny the information of
19   either report about those unpaid collections, would you
20   also treat that as a dispute?
21      A. We would.
22      Q. And would you also reinvestigate that dispute?
23      MR. BILANKO: Object to the form.
24      THE WITNESS: It is On-Site's policy to do so.
25   BY MS. CAMACHO:

Page 43

1      Q. And in that case, what would you do to
2    reinvestigate?
3      A. We would -- again, it's variable based on the
4    specifics. But it's On-Site's policy to see, again, the
5    goal is to expedite these as quickly as possible if the
6    applicant is willing and able to provide some sort of
7    valid documentation that can show something, a
8    collections account has been paid, we will take that
9    document. We will validate that document for, say, in
10   this example, with the collections agency. And we will
11   go ahead and update that item as well as provide a copy
12   back to the collections agents to modify their records
13   if they have not already done so.
14      Q. A moment ago, you -- you said that On-Site
15   would reinvestigate a dispute the landlord/tenant
16   records. So what method would On-site use to
17   reinvestigate a landlord/tenant court record if the
18   applicant claimed he was misidentified as the defendants
19   in the eviction action?
20      MR. BILANKO: Object to the form. And asked and
21   answered.
22      MR. SALTZ: Incomplete hypothetical.
23      THE WITNESS: Again, based on the specifics, it
24   would be On-Site's policy. If it's something that they
25   can quickly validate and verify, they would go ahead and

Page 44

1    remove that record from the report.
2    BY MS. CAMACHO:
3      Q. And what if -- what if that couldn't be done
4    quickly? What would -- what steps would On-site take?
5      A. If it --
6      MR. BILANKO: Object to the form.
7      THE WITNESS: I'm not sure I understood. Did you
8    say "could" or "couldn't"?
9    BY MS. CAMACHO:
10      Q. Could not.
11      A. If it could not be done quickly? We would --
12      Q. Right.
13      A. We would notify the applicant that is something
14   that required further resolution. If that applicant were
15   willing to provide us a copy of their e-mail address, we
16   would notify them that once we have made a
17   determination, that they will receive an updated copy of
18   their report through an e-mail address.
19      If they were unwilling or did not have an e-mail
20   address, we would notify that they are free to call in
21   to check in the status. Or if they so chose, we could
22   send a copy of that report to their address by US mail.
23      Q. Now, the -- the document that we have been
24   looking at, pages 4 through 10, includes comments. And
25   there's a section on page 2, that says, "Screening

Glenn Thompson, Jr., et al. v.
On-Site Manager, Inc.

Joseph Davidson
September 30, 2016

Page 45

1   report comments."
2       Do you see that -- excuse me, on page 5?
3   A.  I do see that.
4   Q.  Okay.  And do the people making these notes, do
5   they work for On-Site, or do they work for the Lodge?
6   A.  They work for On-Site.
7   Q.  Okay.  Now, looking at page 6.
8   A.  Yes.
9   Q.  At -- at -- Mr. Davidson, at the top of page 6,
10  there are two notes including -- or two comments
11  including one that's dated 6-25-2015 by Ty Ospring.
12      Do you see that?
13  A.  I do.
14  Q.  Okay.  And it says, 2:49: "Glen called.  I
15  removed LL filing as false positive (wrong name and no
16  matching address).
17      Do you see that?
18  A.  I do.
19  Q.  Was that considered a dispute?
20  A.  It was.
21  Q.  And the next sentence in the comments, it says,
22  "Advised to contact property to report all Section
23  8/Supplemental income to property."
24      Do you see that?
25  A.  I do.

Page 46

1   Q.  Was that considered a dispute?
2   A.  That is not.
3   Q.  And can you tell me why that's not a dispute?
4   A.  Because that has to do with the client's
5   criteria that they have set and that they control and
6   does not have to do with the data elements that we
7   provided back.
8   Q.  And it is the -- it is the -- the landlord or
9   the property management that controls that criteria
10  about income; is that correct?
11  A.  Yes.
12  Q.  So does On-Site ever correct that
13  income-to-rent ratio if it knows the tenant is a Section
14  8 voucher?
15  A.  We do not.
16      (Reporter interruption.)
17  BY MS. CAMACHO:
18  Q.  Yes.  Does On-Site ever correct that income to
19  rent ration if it knows the tenants have a Section 8
20  voucher?
21      Does --
22  MS. CAMACHO:  Are you ready court reporter?
23      (Reporter clarification.)
24  BY MS. CAMACHO:
25  Q.  And Mr. Davidson?

Page 47

1   A.  Yes.
2   Q.  Does -- let me ask you this.  Does On-Site have
3   any procedures for incorporating information about a
4   subsidy into that report if it knows there's a subsidy?
5   MR. BILANKO: Object to the form.  Asked and
6   answered.
7       THE WITNESS: We do not.
8   BY MS. CAMACHO:
9   Q.  Just give me one moment of looking at my notes.
10      On page 5, Mr. Davidson, at the bottom, in the
11  section under, "Screening report comments," there is
12  also an -- a comment from someone named Elizabeth
13  Hernandez, that is dated 7-10-2015.
14      Do you see that?
15  A.  I do.
16  Q.  And it says, "Advised applicant we do not used
17  income, property would need to edit."
18      Do you see that?
19  A.  I do.
20  Q.  What is this notation about?
21  A.  I would have to speculate on that.  But
22  ostensibly since -- based on the 6-25 note from Ty
23  Opsring where he noted that he advised the applicant to
24  contract the property report Section 8 income.  I
25  presume that the applicant Mr. Glenn Thompson must have

Page 48

1   called again on 710 asking about the same issue to which
2   we, again, notified him that we did not handle that and
3   that had to go through the property.
4   Q.  Let me go back to something for a moment.
5   Please take a look at page 11.
6   A.  Page 11?
7   Q.  Yes.
8   A.  Okay.
9   Q.  And it's a document called charges report.  And
10  there are several names and in the middle of -- of that
11  list of names, dated six -- there's a date, 6-25-2015,
12  for all of them.  But in the middle there's a -- the
13  names of Glenn Thompson Jr., and Glenn Thompson.
14      Do you see that?
15  A.  I do.
16  Q.  And it looks like both Glenn Thompson and Glenn
17  Thompson Jr., paid $24; correct?
18  A.  No.
19  Q.  What are those $24's for?
20  A.  That is what On-Site charged the Lodge.
21  Q.  Okay.  So On-Site charged the Lodge for -- and
22  then there's a description of -- of this a credit check,
23  E-signatures and so on.
24      Do you see that?
25  A.  I do.

Page 49

1    Q. You know the document that we were just looking
2  at, pages 4 through 10, are at least a detailed
3  screening for Mr. Thompson Sr.
4    Why isn't there this type of report for
5  Mr. Thompson, Jr?
6    A. Hmm?  Is there not?
7    MR. BILANKO: I'm sorry.  What's the question?
8    MR. SALTZ: What report are you referring to?
9    MS. CAMACHO: We were provided this document,
10  pages 4 through 10 yesterday for Thompson Sr., but not
11  for Thompson Jr.
12  BY MS. CAMACHO:
13    Q. And I'm asking you, Mr. -- Mr. Davidson, would
14  there be a similar report for Thompson Jr., on your
15  records?
16    A. No.
17    Q. And why not?
18    A. My understanding is Thompson Jr. did not call
19  with a dispute.
20    Q. Now, looking at -- looking at the report that
21  starts on pages -- on page 13 -- pages 13 through 16,
22  and there's a rental report for Glenn Thompson.
23    Please take a look at that.
24    (Off-the-record discussion.)
25    THE WITNESS: Okay.

Page 50

1  BY MS. CAMACHO:
2    Q. Is this a copy of the rental report that was
3  for Glenn Thompson Sr., that was prepared by On-Site?
4    A. It is.
5    Q. Now, at the top of page 13, there's a sentence
6  that says, "Rental report for Glenn Thompson," and it's
7  dated 6-25-2015.
8    Do you see that?
9    A. I do.
10    Q. And then under overall recommendation, which is
11  the very first section on that report on page 13, at the
12  bottom of that section, it says, "Application rejected
13  by Emily Foster on 7-13-2015."
14    Do you see that?
15    A. I do.
16    Q. Do you agree that these reports not have been
17  printed prior to 7-13-2015?
18    A. I do.
19    Q. Now, also, on -- still on page 13, there's a --
20  there's a section that says, "Score for Glenn Thompson,
21  declined," and then it has a number of categories.
22    Do you see that?
23    A. I do.
24    Q. And the first line under that -- under that
25  score, there's a -- a -- the total monthly

Page 51

1  income-to-rent ratio.  It says it exceeds 2.8.  And then
2  under, "report," it says "fail."
3    Do you see that?
4    A. I do.
5    Q. And then there's -- toward the bottom of the
6  page, there's a warning section with -- with three
7  separate sections.  And the last one at the bottom of it
8  -- of the warning section, "Special condition income to
9  ratio."
10    Do you see that?
11    A. I do.
12    Q. And it says that that recommendation has been
13  automatically set to decline.
14    Do you see that?
15    A. I do.
16    Q. And if I understood you correctly, from what
17  you stated earlier, if a person did not meet that 2.8
18  income-to-rent ratio, then they would automatically
19  fail; is that -- is that correct?
20    A. It is.
21    Q. And in this case, is this recommendation set by
22  the -- was it set by the Lodge or by On-Site?
23    A. It's set by the Lodge.
24    MR. BILANKO: Object to the form.
25  BY MS. CAMACHO:

Page 52

1    Q. Now, looking at page 12.
2    A. Page 12, okay.  All right.
3    Q. Which is -- appears to be a lease summary.  It
4  says, "Lease - leasing summary," on the -- towards the
5  top of left-hand corner.
6    Do you see that?
7    A. I do.
8    Q. And then under resident, there's a section
9  called resident on the right corner and it has Glenn
10  Thompson and Glenn Thompson Jr.
11    Do you see that?
12    A. I do.
13    Q. And then under "rent," as you -- as you go
14  further down on the right side, there's a lease
15  agreement.  And then it says -- first, it says,
16  "Community Lodge at Peasley Cannon."  And then there's a
17  rent, 1262.
18    Do you see that?
19    A. I do.
20    Q. Now, just give me one second.  I need to find
21  the right page.  Going back to the documents we were
22  looking at earlier, pages 5 through 10 -- and, in
23  particular, looking at page 6.  I'll give you a moment.
24    A. Okay.
25    Q. Are you on page 6?

Glenn Thompson, Jr., et al. v.
On-Site Manager, Inc.

Joseph Davidson
September 30, 2016

Page 53

1    A. I am.
2    Q. Okay. So there's a -- a section that covers
3  most of that page, that says, "Quick summary."
4      Do you see that?
5    A. I do.
6    Q. And then below it, it says, "Total monthly
7  income, 850."
8    A. Yes.
9    Q. And then it says, "Total monthly income-to-rent
10  ratio," and it says, "1.62 based on rent of 1,262."
11      Do you see that?
12    A. I do.
13    Q. So what -- what calculations did On-Site make
14  to reach that 1.62?
15      MR. BILANKO: Object to the form.
16      THE WITNESS: We would have divided the -- well, I
17  guess -- we simply did the ratio using 850 against 1262.
18  BY MS. CAMACHO:
19    Q. And so the calculations did not include
20  Mr. Thompson Jr.'s income?
21    A. I have no idea.
22    Q. And do you know if the calculations included
23  the Section 8 voucher?
24    A. From this page, I have no idea.
25    Q. Do you know if the payment standard was

Page 54

1  factored in?
2      MR. SALTZ: "A payment standard?" Is that what
3  you said?
4      MS. CAMACHO: Yes. Payment standard for Section 8
5  voucher.
6      MR. BILANKO: Asked and answered. Object to the
7  form.
8      THE WITNESS: From this page, I have no idea.
9  BY MS. CAMACHO:
10    Q. Okay. Is there ever a -- a point or is there
11  ever a case where On-Site consider -- considers the
12  voucher in its calculations?
13    A. It's -- it's not our consideration. It's the
14  client's consideration. We don't consider anything.
15  But from this page, I do not know if a voucher or
16  voucher information was added to this.
17    Q. Okay. Now, please take a look at rental report
18  for Mr. Thompson Jr., that is on pages 17 to 19.
19    A. Okay.
20    Q. If you look at -- first of all, let me ask you,
21  is this a copy of a rental report that was prepared for
22  the Lodge about Mr. Thompson Jr.?
23    A. This is a copy of a report prepared for a Glenn
24  Thompson Jr., yes.
25    Q. Now, looking at the section for the score and

Page 55

1  the 4th category there, it says, "Unpaid collections and
2  grossly delinquent past due balances do not exceed
3  $2,000."
4      Do you see that?
5    A. I do.
6    Q. And then it is said that -- the importance,
7  extremely. And it is -- there's a check mark on "fail."
8      Do you see that?
9    A. I do.
10    Q. Now, if you look at the next page, page 18,
11  there's a credit quick summary section at the top. And
12  the first line or one of the -- the -- the second line
13  after -- well, let me rephrase it.
14      Is the first line under the section, "Custom
15  scoring for this report."
16      Do you see that section?
17    A. I do.
18    Q. And it says, "Medical collections not
19  considered."
20      Do you see that?
21    A. I do.
22    Q. And then if you go further down that summary,
23  the second to last line on that summary says,
24  "Collections total balance, includes past due." And
25  then there's an amount next to it of $4,532.

Page 56

1      Do you see that?
2    A. I do.
3    Q. Now, look at the next page, page 19, under the
4  category "legal items."
5      Are you there?
6    A. I am.
7    Q. Are you near that section?
8    A. Yes.
9    Q. Okay. Now, Mr. Davidson, there's one -- one
10  account there, there's one item, and it says, "Ray
11  Klein, Incorporated."
12      And then at the end of that, there's a -- a square
13  highlighted in yellow, and it's marked $4,532.
14      Do you see that?
15    A. I do.
16    Q. How does On-Site determine whether a debt or a
17  judgment is a result of medical collections?
18      MR. BILANKO: Object to the form.
19      THE WITNESS: On-Site doesn't make that
20  determination. We get that determination from the
21  vendor.
22  BY MS. CAMACHO:
23    Q. So does On-Site ever look at -- or -- at
24  reports and investigate whether that particular judgment
25  is a medical collection or not?

CRS Court Reporters and Videographers
depos@crscourtreporters.com  408.298.3376

EXHIBIT 10 - PAGE 15 OF 30

Page 57

1    A. It would be our policy that if an applicant or
2  -- or a consumer called in and questioned this and made
3  us aware that they felt it was a medical debt, we would
4  then trigger an investigation, yes.
5    Q. So do you -- do I understand correctly that you
6  -- when you -- when you prepare that rental report, you
7  rely entirely on the vendor to tell you whether the --
8  the debts or legal item or judgments is a medical
9  collection?
10   Did I understand that correctly?  Is that what you
11 said a few moments ago?
12   MR. SALTZ: No. Miss- -- objection.  Misstates the
13 testimony.
14   Do you want to tell her what you mean by "trigger"
15 an investigation?
16   THE WITNESS: If an applicant called in and
17 disputed this specific line item, we would ask the
18 applicant the nature of the dispute.  Of course, go
19 through our entire formal process.  And if they felt
20 something was inaccurate on the report, we would
21 reinvestigate it.
22 BY MS. CAMACHO:
23   Q. Right.  But that's to the point of the
24 investigation when a prospective tenant calls you;
25 correct?

Page 58

1    A. Can you restate that.
2    Q. Right.  So what you just said is at the point
3  where a prospective tenant has called you and said this
4  item on my -- on my rent- -- rental report is not --
5  it's -- it's a -- a medical debt.  It's not a -- it's
6  not a -- a regular judgment; is that correct?
7    A. Yes.  Again, our policy is to attempt to assist
8  applicants to expedite the reinvestigation.  So if
9  they're able to provide something, perhaps a copy of the
10 case or something that would allow us to make the
11 determination, we would go ahead and do that and pass
12 that information along to the vendor.
13   Q. But when you originally run -- when you first
14 run that rental report, before you hear from the
15 prospective tenants, before the prospective tenants even
16 know of it, you rely on the vendor to tell you whether a
17 judgment is in medical collections or not; is that
18 correct?
19   A. Me or On-Site?
20   Q. You're here today testifying on behalf of
21 On-Site.  Everything I asked you is about On-Site.  It's
22 not about you personally.
23   MR. SALTZ: That's not true.
24   MR. BILANKO: Yeah.
25   MR. SALTZ: I object to that.  And we've gone

Page 59

1  through this.
2    Go ahead and answer the question as she asked it.
3    THE WITNESS: Yes.  I would rely upon on the
4  vendor.
5  BY MS. CAMACHO:
6    Q. In this case -- in the case of Mr. Thompson
7  Jr., you obtained the Ray Klein judgment that -- that
8  information from -- was it Experian?
9    (Reporter interruption.)
10 BY MS. CAMACHO:
11   Q. Yes.  In the case of Mr. Thompson Jr., looking
12 at the -- looking at page 19, at the -- under "legal
13 items," it looks like you obtained that information
14 about the Ray -- the Klein judgement from Experian; is
15 that correct?
16   A. Yes, On-Site did.
17   Q. And so when Experian reports accounts for -- to
18 you, do they separate accounts into medical and
19 nonmedical?
20   A. That -- that's a vague question.  There is a
21 flag that indicates whether it is medical or not
22 medical, but it's, in no way, separated in the XML that
23 we receive back from Experian.
24   Q. But they will flag it for you?
25   A. Correct.

Page 60

1    THE WITNESS: Can we take a bathroom break?
2    MS. CAMACHO: Yes.  Yes.  Shall we say five
3  minutes?
4    MR. BILANKO: Sure.  Great.
5    (Off-the-record discussion.)
6    MS. CAMACHO: We're back on the record, Court
7  reporter, are you ready?
8    (Reporter interruption.)
9    MS. CAMACHO: Okay.
10 BY MS. CAMACHO:
11   Q. Let me -- let me ask you to go back a moment.
12 Let me find the document.  Give me one second, please.
13 Let's go back to page 6, please, Mr. Davidson.
14   A. Okay.
15   Q. And looking at that summary, that quick summary
16 section on that page, what was the income-to-rent ratio
17 that On-Site calculated for Mr. Thompson Sr?
18   A. 1.62.
19   Q. And did On-Site screening tool determine
20 whether Mr. Thompson Sr's rent-to-income ratio was
21 efficient for admission to the Lodge?
22   A. No.
23   Q. So the -- that determination was that that
24 ratio was too low for admission; correct?
25   MR. BILANKO: Object to the form.

Page 61

1    MR. SALTZ: Calls for speculation.
2    THE WITNESS: Yes.  The Lodge determined that this
3  applicant, Glenn Thompson, did not qualify based on rent
4  to income.
5  BY MS. CAMACHO:
6    Q.  And this report gave a recommendation of
7  decline to the Lodge; correct?
8       (Reporter interruption.)
9  BY MS. CAMACHO:
10   Q.  Yes.  That report given to the Lodge was a
11 recommendation of decline based on this rent-to-income
12 ratio; is that right?
13   MR. SALTZ: Objection.  Vague and ambiguous as to
14 "from whom."
15   THE WITNESS: The Lodge determined that the
16 applicant did not meet their criteria.
17 BY MS. CAMACHO:
18   Q.  Now, looking at page 12, which is a lease
19 summary.
20   A.  Okay.
21   Q.  And in the space on the application above
22 Mr. Glenn Thompson and Glenn Thompson Jr. both of their
23 names appear under "resident," at the top right side of
24 that page.
25      Do you see that?

Page 62

1    A.  I do.
2    Q.  And for this document from GreyStar's account
3  or generally staff have access to --
4       (Reporter interruption.)
5  BY MS. CAMACHO:
6    Q.  Yes.  This lease summary, which is this one --
7  one page, is this from -- is this a screen from
8  GreyStar's account?
9    A.  It is.
10   Q.  At the -- on the left side of the page under
11 lead status, rejected, there's a name.  It says by Emily
12 Foster on 7-13-2015.
13      Do you see that?
14   A.  I do.
15   Q.  And do you know if Ms. Foster works for the
16 Lodge or On-Site?
17   A.  I know she does not work for On-Site.
18   Q.  Okay.  And then at -- at the top of -- at the
19 top right corner of the page, there's a line that says,
20 "Eric Basart as Nikki -- and I'm not sure how to
21 pronounce it, "Paepule."
22      Do you see that?
23   A.  I do.
24   Q.  Does Mr. Basart work for On-Site or for the
25 Lodge?

Page 63

1    A.  He works for On-Site.
2    Q.  And do you know who -- do you know whether Ms.-
3  -- Ms.- -- I'm not sure if it's a man or a woman --
4  whether Nikki Paepule worked for the Lodge or On-Site?
5    A.  She does not work for On-Site.
6    Q.  Okay.  Now, at the -- so this is the account
7  that only certain people at -- personnel at GreyStar
8  have access to; is that correct?
9    A.  Correct.
10   Q.  Now, under -- there's a section on the
11 right-hand corner toward the bottom.  It's called,
12 "comments."
13      Do you see that?
14   A.  I do.
15   Q.  And there's a date 6-25-2015, 5:10.  And then
16 the first line there says, "Glenn Thompson Jr.," and
17 then there's an e-mail address, "Was sent a copy of the
18 rental report."
19      Do you see that?
20   A.  I do.
21   Q.  The last e-mail report to Mr. Thompson Jr.;
22 right?
23   A.  Huh?
24   Q.  Wasn't the last -- that e-mail, that copied to
25 Mr. Thompson Jr.?

Page 64

1    A.  It went through the Lodge account, yes.
2    Q.  And what about the line below for Mr. Glenn
3  Thompson Sr?  It says -- it also always says that --
4  there's an e-mail address there, and it "Was sent a copy
5  of the rental report."  It was the Lodge that was sent a
6  copy to Mr. Thompson Jr.; correct?
7    A.  It was through the Lodge account, yes.
8    Q.  Please look at page 11.
9    A.  Okay.
10   Q.  I think we already talked about this, but I
11 have a question about the -- what's called a charges
12 report.  And then there's a -- on the description
13 section, a description of a search for both Glenn
14 Thompson Jr. and Glenn Thompson.
15      Do you see that?
16   A.  I do.
17   Q.  And, Mr. Davidson, what does O-F-A-C-M-V-N
18 search mean?  What is that?
19   A.  The OFAC-SDN search stands for --
20   Q.  Yes.
21   A.  -- the -- okay.  Go ahead.
22   Q.  I'm waiting.
23   A.  Okay.  The OFAC-SDN search stands for Office of
24 Foreign Asset Control, specially designated national.
25 That is a database maintained by the US Treasury

Glenn Thompson, Jr., et al. v.
On-Site Manager, Inc.

Joseph Davidson
September 30, 2016

Page 65

1   Department that consists of -- of people, mostly, that
2   have been identified as someone US companies should not
3   be doing business with.
4       Q.  Let's go back to page 13, please.
5       A.  Okay.
6       Q.  And again, this is the rental report for
7   Mr. Thompson Sr.
8       And stated on that -- on that page -- on page 13,
9   at the score -- in the score section, with those
10  categories, looking at -- at that particular score
11  section, do you agree -- do you agree that the only
12  other criterion that Mr. Thompson Sr., failed besides
13  the income-to-rent ratio was the maximum percentage of
14  past due negative accounts?
15      A.  I do.
16      Q.  And do you agree, staying on that line on the
17  maximum percent of past due negative accounts, that the
18  criteria is set to "extremely," under importance?  It's
19  not a pass/failed criterion?
20      A.  Correct.
21      Q.  And would you agree -- would you agree that,
22  Mr. Davidson -- Mr. Thompson Sr., would not have been
23  recommended for -- denied admission into the Lodge based
24  on the -- on the maximum percentage of past due accounts
25  criterion alone?

Page 66

1       MR. SALTZ:  Objection to form.
2       THE WITNESS:  I'm sorry.  Can you restate that?
3   BY MS. CAMACHO:
4       Q.  Yeah.  Would you agree, looking at the -- that
5   criteria, that -- excuse me, looking at that score, that
6   if the only -- excuse me -- that if Mr.- --
7   Mr. Thompson Sr., has -- had been -- let me rephrase
8   that.
9       Would you agree that Mr. Thompson Sr., Would not
10  have been recommended for -- denied for -- denied
11  admission to the Lodge based just on that third criteria
12  alone?
13      MR. BILANKO:  I'll object to the form, because I
14  don't know I totally understood the question.
15      If you understood it.
16      THE WITNESS:  I don't -- I don't know that I
17  followed the question.  I'm sorry.
18  BY MS. CAMACHO:
19      Q.  Okay.  Let me see if I can rephrase it.  If Mr.
20  Thompson Sr., had a pass instead of a fail, under the
21  income-to-rent ratio category so that the only -- the
22  only fail was the maximum percent, a past due negative
23  account.  If that was the case, would you agree that
24  that score for Mr. Thompson would not have been a
25  decline, based on the importance given to that category?

Page 67

1       MR. BILANKO:  Objection.  Calls for speculation.
2       THE WITNESS:  The algorithm is -- is pretty
3   complex.  And I can't pretend to know the exact
4   weighting on every detail.  So my answer is, I don't
5   know.
6   BY MS. CAMACHO:
7       Q.  So let me -- let me -- let's go back to --
8   let's go back to page 1.
9       A.  Page 1?
10      MR. SALTZ:  One?
11      MS. CAMACHO:  Yes, page 1.
12  BY MS. CAMACHO:
13      Q.  Are you on page 1, Mr. Davidson?
14      A.  Yes, I am.
15      Q.  Okay.  So looking at the bottom of that page
16  where you have the score range and recommendations.
17      A.  Yes.
18      Q.  Okay.  So if the only category checked was
19  failed for Thompson -- Mr. Thompson Jr., on page 13 was
20  that third line about the maximum percentage of past due
21  negative accounts, where would he have fallen in this
22  scoring range?
23      MR. BILANKO:  Calls for speculation.
24      THE WITNESS:  As I said, the algorithm that
25  generates the score is extremely complex.  And I cannot

Page 68

1   pretend to know exactly how every bit is weighted.  So I
2   don't know.
3   BY MS. CAMACHO:
4       Q.  And who sets the algorithm?
5       A.  It's our calculator; it's their variables.
6       Q.  Now, let me point you to the document that
7   starts on page 20.  It's pages 20 to 22.
8       MR. BILANKO:  Starts on page 22, counsel?
9       MS. CAMACHO:  Yes.  It's pages 20, 21, and 22.
10  It's a 3-page document.
11      A.  Okay.  I'm on page 22.
12      Q.  All right.  And so --
13      MR. SALTZ:  Wait.  Counsel, do you want him on
14  page 20 or page 22?
15      MS. CAMACHO:  Page 20.
16      THE WITNESS:  Oh, 20.  I am not on page 20.
17      Okay.
18  BY MS. CAMACHO:
19      Q.  All right.  It's a two page -- two-page
20  document, 20 and 21, and then 22 appears to be a
21  separate window.  But looking at -- for now, 20 and 21,
22  would you agree that this document shows the screening
23  criteria for Club Palisades Apartment?
24      A.  I do.
25      Q.  And still looking on page 20, one of the first

CRS Court Reporters and Videographers
depos@crscourtreporters.com  408.298.3376

EXHIBIT 10 - PAGE 18 OF 30

Page 69

1    criteria for individuals is ability to pay rent.
2        Do you see that section?
3    A.  I do.
4        Q.  And the first -- the first line under that --
5    that section is minimum monthly gross income-to-rent
6    ratio, and there's a factor of 2.5 and importance of
7    pass/fail.
8        Do you see that?
9    A.  I do.
10       Q.  Give me one second to find the right page.
11   Now, if you look at page 23.
12   A.  Okay.
13       Q.  Which is the application signed by
14   Mr. Thompson Jr. and Sr.  It looks like the rent for
15   this particular unit was 1288.
16       Do you see that?
17   A.  I do.
18       Q.  And there's -- there's a line describing the
19   term.  And towards the top of the page that says "term,"
20   and then it says "lease term."  There's a date, and then
21   it says for two persons.
22       Do you see that?
23   A.  I do.
24       Q.  Now, going back to page -- this time to page
25   22.  Would you first agree that this is part of the

Page 70

1    screening criteria for Club Palisades?
2    A.  I would agree that page 22 was part of Club
3    Palisades screening criteria; correct.
4        Q.  Okay.  And there's a section for income, which
5    has a couple of check marks.
6        Do you see that?
7    A.  I do.
8        Q.  And one of the check marks is, "Allow entry of
9    housing-allocation income, which will offset the rent."
10       Do you see that?
11   A.  I do.
12       Q.  Now, looking at the report for Mr. Thompson
13   Sr., which is on pages 24 to 28.
14   A.  Okay.
15       Q.  And on page 24 of the renter report for
16   Mr. Thompson, Sr, there's also a section called "score"
17   for Mr. Thompson Sr., and then it has the categories in
18   there as well.
19       Do you see that?
20   A.  I do.
21       Q.  And the -- it also has a warning towards the
22   middle of the page with the -- a couple of items, and
23   one of them is a special condition income-to-rent ratio,
24   which says that this "recommendation has been
25   automatically set to decline."

Page 71

1        Do you see that?
2    A.  I do.
3        Q.  Now, going to page 25, there's a section called
4    credit quick summary.
5        Are you on that page?
6    A.  I am.
7        Q.  Okay.  And at the -- it has -- the section has
8    a number of -- of lines or categories.  And it says,
9    total -- at the top of that section, it says:  Total
10   monthly income, $920.
11       Do you see that?
12   A.  I do.
13       Q.  And it says -- next to it, it says:  Total
14   monthly income-to-rent ratio, 207.
15       Do you see that?
16   A.  I do.
17       Q.  And the same -- there's also reports for
18   Mr. Thompson Jr. that starts on page -- page 31.  It
19   goes -- pages 31 through 34.
20       Could you take a look at that?
21   A.  Okay.
22       Q.  And Mr. Thompson Jr.'s report also has that
23   score and both categories that include a total monthly
24   income-to-rent ratio, which here says exceeds 2.5 and
25   it's set to "fail."

Page 72

1        Do you see that?
2    A.  I do.
3        Q.  And it also has the same -- there's also a
4    section for warnings towards the bottom -- and at the
5    bottom of the section, the warnings.  There's also the
6    special condition income-to-rent ratio, which has been
7    automatically set to "decline."
8        Do you see that?
9    A.  I do.
10       Q.  And if you look at page -- page 32 of
11   Mr. Thompson Jr.'s report, there is the credit quick
12   summary at the top; and it has, again, a lineup;
13   criteria starting with total monthly income.
14       Do you see that?
15   A.  I do.
16       Q.  And it shows that total monthly income for
17   Mr. Thompson Jr.'s for -- for Mr. Thompson Jr., excuse
18   me, was $1700 -- excuse me, 1749.84.
19       Do you see that?
20   A.  I do.
21       Q.  And there's also total monthly income-to-rent
22   ratio, which is at 207 for Mr. Thompson Jr.
23       Do you see that?
24   A.  I do.
25       Q.  And now let's turn back to page 24 to

EXHIBIT 10 - PAGE 19 OF 30

Page 73

1  Mr. Thompson Sr.
2     A.  Okay.
3     Q.  So what calculations did On-Site screening tool
4  use to reach the 207 income that is on -- excuse me, on
5  page 25?
6     A.  On page 25?
7     MR. BILANKO: 25 or --
8     MS. CAMACHO: Yes.
9     MR. BILANKO: -- 35?  25.
10    MS. CAMACHO: 25.
11    MR. BILANKO: 2.07?
12    THE WITNESS: Yes.
13    It would have taken -- apparently, these
14  applicants applied together.  So it could have taken the
15  income found on page 32, which, I guess, is for Glenn
16  Thompson Jr. as well as the income found on page 25,
17  which is for Glenn Thompson Sr.
18    It would have added those two together and then
19  multiplied it and looked at -- at the amount of rent
20  that was required, in this case, 1288, and determined
21  that their combined income was 2.57 times the monthly
22  rent.
23  BY MS. CAMACHO:
24    Q.  These calculations include Mr. Thompson Sr.'s,
25  Section 8 voucher?

Page 74

1     A.  From these pages?  I do not know.
2     Q.  And do you know how the voucher subsidy was
3  factored in at all?
4        (Reporter interruption.)
5  BY MS. CAMACHO:
6     Q.  Do you know how the vouchers subsidy was
7  factored in at all?
8     A.  From these pages?  I do not.
9     Q.  Do you know how the payment standard was -- for
10  the subsidy was factored in at all?
11    A.  I do know that the client is configured; but
12  whether that information was entered, you would have to
13  ask Club Palisades in this case.
14    Q.  So On-Site did not look at the payment standard
15  for the King County Housing-Authority during that time
16  period?
17    A.  I don't...
18    MR. SALTZ: The question's been asked and answered
19  at least twice now.  But...
20    THE WITNESS: I didn't understand the question, so
21  can you please rephrase?
22  BY MS. CAMACHO:
23    Q.  So my -- my understanding is that On-site did
24  not have -- On-Site's staff did not have looked up the
25  payment standard for the King County Housing-Authority

Page 75

1  in the time period?
2        (Reporter interruption.)
3     MR. SALTZ: The payment standard?
4     MS. CAMACHO: Right.
5     Court reporter, did you get the question?
6        (Reporter clarification.)
7     MS. CAMACHO: Well, can you read what you have?
8        (Whereupon the record was read.)
9  BY MS. CAMACHO:
10    Q.  -- for the King County Housing-Authority during
11  that time period?
12    A.  For a housing authority?
13    Q.  For a King County Housing Authority?
14    MR. BILANKO: I'll object as to the form of the
15  question.  But it's to whether it has any relevance or
16  -- or included in the scope of his testimony.
17    THE WITNESS: Is Club Palisades part of the
18  housing authority?
19    MR. SALTZ: Is it -- is this part of the consumer
20  report?
21    THE WITNESS: All I can tell you is that On-Site
22  personnel have absolutely nothing to do with entering,
23  verifying, or validating any type of subsidy or anything
24  to that effect.
25    MS. CAMACHO: Can you actually give me a couple of

Page 76

1  minutes?  I'm going to put you on mute for a couple of
2  minutes.
3        (Off-the-record discussion.)
4  BY MS. CAMACHO:
5     Q.  Mr. Davidson, still looking at page 25, on the
6  section for the credit quick summary where there's the
7  -- the list criteria, including the total monthly
8  income.  It says 920.
9     Do you see that?
10    A.  I do.
11    Q.  And then next to it, there's a line that says:
12  Total verified monthly income.
13    Do you see that?
14    A.  I do.
15    Q.  So what does On-Site do to verify income?
16    A.  We don't do anything; that would be on the
17  client's side.
18    Q.  You don't do anything at all to verify --
19    MR. BILANKO: Asked and answered.
20    MR. SALTZ: Would you like him to explain so we
21  can kind of get through this line of questioning fairly
22  quickly?  Because it seems like you're very confused as
23  to what this income ratio is.
24    MS. CAMACHO: Let me -- yes, please.
25    MR. SALTZ: All right.  Mr. Davidson?

Page 77

1    THE WITNESS: We -- we don't do anything with
2 income; we don't do anything to verify income.  We don't
3 do anything with vouchers.  We do not use that
4 information as part of our consumer report.  We allow
5 our clients to enter that information and verify that
6 information as they please to utilize in our calculator
7 to see if it meets their standards.  It's not apart of
8 the consumer report.  We don't transmit it to our
9 vendors who help us create these consumer reports.  It's
10 simply allowing them to set a criteria.  Allowing them
11 to enter these elements and determine whether the
12 information they have entered meets their own criteria.
13    MR. SALTZ: Do -- where do they get the information
14 from?
15    THE WITNESS: I have no idea.  Where our clients
16 get that information, I have no idea.  Ostensibly, there
17 would be an application.
18    MR. SALTZ: Okay.
19 BY MS. CAMACHO:
20    Q. So, Mr. Davidson, if -- if a prospective tenant
21 calls one of your renter relations specialists and
22 notifies them that he has a Section 8 voucher, that's --
23 does On-Site do anything other than to tell them to call
24 the landlord and give him that information?
25    A. We do not.

Page 78

1    Q. Now, let me ask you, a moment ago, you said
2 that the client was configured.  What did you mean by
3 that?
4    A. One of the sheets in here somewhere had a check
5 box that allowed the client to enter that information.
6 But I would be lying if I could tell you I could get my
7 fingers on it immediately.
8    Q. Well, take your time, please.
9    MR. SALTZ: Okay.  You want to go through every
10 single page?
11    THE WITNESS: This is Club Palisades.
12    (Off-the-record discussion.)
13    THE WITNESS: If you refer to page 22.
14 BY MS. CAMACHO:
15    Q. I have it in front of me.
16    A. Do you see the box that says "income"?
17    Q. Yes.
18    A. The third line down that says, "Allow entry of
19 housing-allocation income which will offset the rent."
20    Q. Yes.
21    A. That creates a box that the client can enter
22 any type of offsetting information, whether that is
23 Section 8 information -- basically, Section 8
24 information.
25    MR. SALTZ: You will have to ask them if they

Page 79

1 consider it.
2 BY MS. CAMACHO:
3    Q. And do you know how that's factored in, whether
4 the amount of the voucher added to the income or
5 subtracted from the rent?
6    Do you know what -- what it does?
7    MR. SALTZ: Objection to form.  Beyond the scope
8 of this deposition.  Beyond the scope of the categories.
9 Beyond the scope of the complaint.
10    If you know --
11 BY MS. CAMACHO:
12    Q. Mr. Davidson?
13    MR. SALTZ: -- go ahead and be helpful.
14    THE WITNESS: I do know that it will -- in this
15 case, it will offset the rent.
16 BY MS. CAMACHO:
17    Q. Okay.  Let me point you now to an exhibit that
18 starts on page 51, and it goes through page 55.
19    (Off-the-record discussion.)
20 BY MS. CAMACHO:
21    Q. Do you have that in front of you, Mr. Davidson?
22    A. I do not.  I am getting there.
23    Q. Okay.  Let me know when you're ready.
24    A. I am looking at them.
25    (Off-the-record-discussion.)

Page 80

1 BY MS. CAMACHO:
2    Q. Now, on page 52, there's a letter from Eric
3 Dunn at Northwest Justice Project.
4    Do you see that?
5    A. I do.
6    Q. And the letter starts saying, "This is a
7 dispute," and then the third paragraph, it states, "Your
8 reports also listed a collection judgment for $4,532."
9    Do you see that?
10    A. I do.
11    Q. And it says that the report is incomplete and
12 it is related to a medical debt.
13    Do you see that?
14    A. I do.
15    Q. Okay.  Can you tell me what procedures that
16 On-Site follows when it gets subsidy disputes?
17    MR. SALTZ: Are you asking about this dispute in
18 particular?  Are you asking about disputes --
19    MR. BILANKO: From attorneys?
20    MR. SALTZ: -- from attorneys?  I mean, this --
21 that's -- that's a compound question because there's
22 multiple disputes here.  There's a dispute from an
23 attorney.
24    What does "such a dispute" mean?
25 BY MS. CAMACHO:

Page 81

1    Q.  Well, let me ask you this, Mr. Davidson:  What
2  did On-Site do in this case when it got this letter?
3    A.  Well, in this case, we looked at the Northwest
4  Justice Project authorization to release confidential
5  information found on pages 53 and 54.
6    Do you see those?
7    Q.  Yes.
8    A.  And since these documents were lacking social
9  security number, which its own document requires.  It is
10  not a dated document.  It is not a notarized document.
11  One of the documents on page 54, at the very bottom, the
12  signature for what I believe is Glenn Thompson Jr.
13    Do you see that on the bottom left?
14    Q.  Yes.
15    A.  That is in the incorrect location.
16    MR. SALTZ: So it's not even signed --
17    THE WITNESS: So it's not appropriately signed.
18  So we looked at these.  We looked at the copies of the
19  ID's.  But the copies are -- and that's -- I'm sorry;
20  that is on page 55.
21    Do you see page 55?
22  BY MS. CAMACHO:
23    Q.  I do.  I have it in front of me.
24    A.  Okay.  Assuming your copy looks like our copy
25  here that I'm looking at, they're completely illegible.

Page 82

1  And since we are unable to do any type of confirmation
2  that these authorizations are legitimate, in this case,
3  since there has been a history between On-Site and the
4  Northwest Justice Project and Eric Dunn, we reached out
5  to the office of the Northwest Justice Project and left
6  a voice mail asking for clearer copies so that we could
7  help authorize, since in the past there had been some
8  concern on the side of the Northwest Justice Project
9  that our response time had been too slow.
10    According to my notes, we did not receive a return
11  call, nor did we receive more legible identifications.
12  We could not move forward to start --
13    Q.  And --
14    A.  -- any type of dispute.
15    Q.  And who did you leave the voice mail with?
16    MR. BILANKO: Object to the form.  I don't think
17  he said he did it.
18    MR. SALTZ: Right.
19  BY MS. CAMACHO:
20    Q.  The question is "who"?
21    MR. SALTZ: No.  You said "you."
22    MS. CAMACHO: No.  I said, "who."
23    MR. BILANKO: Right.  You said, "Who did you leave
24  the voice mail with?"
25    MR. SALTZ: Yeah.  I don't think he testified that

Page 83

1  he was the one who made the phone --
2    MR. BILANKO: You --
3  BY MS. CAMACHO:
4    Q.  And we've already gone through this,
5  Mr. Davidson.  You're not testifying on behalf of
6  yourself personally.  You're testifying on behalf of
7  On-Site.
8    Who did On-site leave a voice message with?
9    A.  The phone number -- can I look at a note?
10    MR. SALTZ: Yeah.  You can look -- the exhibit is,
11  what?  Page 5?
12    THE WITNESS: Oh.  Oh.  That -- yeah.  That could
13  be.
14    (Off-the-record discussion.)
15    MS. CAMACHO: Let me know when you're ready.
16    MR. BILANKO: We're pulling the document for you.
17    MS. CAMACHO: Okay.
18    MR. SALTZ: Well, the number that's listed on the
19  exhibit is the main line for the Northwest Justice
20  Project.  That's -- that's simply what he's trying to
21  find.
22    MR. BILANKO: I got it.
23    THE WITNESS: Yes.  We got it.
24    (Off-the-record discussion.)
25    THE WITNESS: I will tell you, as Jeff looks

Page 84

1  through some of the supply documentation, there was a
2  notation.  And once we can pull it up in a legible
3  format, that we called the main number on 8-19, On-Site
4  called the main number on 8-19 and left a voice mail.
5    MR. SALTZ: The number of what?
6  BY MS. CAMACHO:
7    Q.  Are you -- are you referring to -- page 45,
8  there's a -- there are a couple of notations on page 42.
9    Can you look at that?
10    A.  I am.  Or I will, I should say.
11    MR. SALTZ: Yeah.  There it is.
12    THE WITNESS: There it is?  Yeah.  There it is.
13  Yup, exactly.  Page 42 under the "screening reports
14  comments internal use" by Merby Sanchez.
15  BY MS. CAMACHO:
16    Q.  Okay.  And who did -- I mean, that's the number
17  that Merby Sanchez called.  But I don't know, is it a he
18  or a she, Merby Sanchez Williams?
19    A.  That is a he.
20    Q.  Okay.  Who did -- which person did he leave a
21  voice message with?
22    A.  I don't know.
23    Q.  So let me ask you, say you had a situation --
24  well, let me ask you -- and once -- let me -- excuse me.
25  Let me rephrase.

Page 85

1     I believe a moment ago you said that On-Site left
2   a message at this number, 206-464-1519.
3     (Reporter interruption.)
4     MS. CAMACHO: 206-464-1519.
5     MR. SALTZ: Which the record should reflect is the
6   phone number for the Northwest Justice Project.
7   BY MS. CAMACHO:
8     Q. And when you didn't hear anything back, when
9   you didn't get a call back or a letter back, what did
10  you do?  By "you," I mean, On-Site.
11    A. We did not move forward with an investigation.
12    Q. And so what are your procedures when you have a
13  situation like this, where you have -- you -- you -- you
14  received a -- you received a -- a letter from -- in this
15  case, an attorney and you're not -- you're not able to
16  proceed.
17    What are your procedures for responding to that
18  type of situation?
19    MR. BILANKO: Object to the form.
20    THE WITNESS: If we are unable to proceed based
21  on, you know, incomplete authorization, invalid
22  authorizations, we will, as we did here, attempt to
23  communicate with the attorney.
24  BY MS. CAMACHO:
25    Q. And did you attempt to communicate in writing

Page 86

1   in this case?
2     A. Not to my knowledge.
3     Q. And your procedures, do they specify how you
4   should communicate in a situation like this?
5     A. Normally, we would use the US post office.  But
6   again, as I've stated, On-Site has had a history with
7   the Northwest Justice Project, and they have articulated
8   some frustrations with the use of the United States Post
9   Office.  So in this case, we picked up the telephone and
10  called.
11    Q. Well, when you're on page 42 -- I'm hoping you
12  still have it in front of you.
13    A. I do.
14    Q. Looking at those comments, there's a -- a
15  comment below, Mr. Sanchez comments, and this comment is
16  dated 7-30-2015 by Catherine Duncan.
17    Do you see that?
18    A. I do.
19    Q. And it says, next to it, 929.  I don't know if
20  it's an "I," or a "1," removed a f/p filing.
21    Do you see that?
22    A. I do.
23    Q. What -- what does 929 -- what does 929 I or 929
24  1, what's that?
25    A. It's -- 929 is -- well, hold on.  Let me get

Page 87

1   back to 42 here.  That's the time.
2     Q. Okay.
3     A. So 9:29 a.m. "I," ostensibly being Catherine
4   Duncan, removed a failure to pay filing.
5     Q. Okay.  Just give me one second.
6     MR. SALTZ: How long do you have on the
7   deposition?
8     MS. CAMACHO: I don't know.  Do you need a break?
9     MR. SALTZ: Well it's after lunch, but if you only
10  have like an hour left, we can plow through.  But if you
11  have four hours left, then we probably should take a
12  break.
13    MS. CAMACHO: I don't think I have four hours
14  left.  I'm hoping no more than an hour.  But, again, it
15  depends on how quickly we can get through the questions.
16  But I don't think we'll be here all day; that's not my
17  plan.
18    MR. SALTZ: Okay.  Well, then, I think if we try
19  to push forward for an hour, because the deponent -- if
20  we -- basically, we'll take a lunch break at 2:00 if
21  we're not going to finish.  If we finish before 2:00,
22  then -- my fear is at 2:00, then we'll have, like,
23  another hour.
24    MR. BILANKO: You know it doesn't matter at that
25  point.  There are no -- because there are no flights to

Page 88

1   the east coast, for you to catch at -- after 2 o'clock,
2   so it won't matter.
3     So you want to go for another hour and see if
4   you're done, and if not, we'll take a lunch.
5     MS. CAMACHO: Right.  If we're still going, we can
6   take a lunch break at the time.
7     Let's see what we can do.
8     MR. BILANKO: Okay.
9     MS. CAMACHO: But give me a second, I'm trying to
10  find the right page here.
11    (Off-the-record discussion.)
12  BY MS. CAMACHO:
13    Q. Mr. Davidson, what sources does On-Site use to
14  get landlord/tenant records in Washington State?
15    A. LexisNexis.
16    Q. And is that the only source?
17    A. Correct.
18    Q. And is LexisNexis checked by a computer program
19  automatically, or is it done by staff at On-Site?
20    A. It's a computer program.
21    Q. Okay.  So what steps does On-Site take for
22  records in the State of Washington to ensure that it is
23  accurately matching eviction records to the prospective
24  tenants?
25    MR. BILANKO: Object to the form.

Page 89

1      THE WITNESS: On-Site does have frequent
2  conversations with the vendor.  We do run comparisons to
3  verify.  But Lexix not only, of course, has one of the
4  best names in the industry, but also has the widest
5  coverage, which is obviously attractive to us.  So over
6  and above that, we rely heavily upon Lexix.
7  BY MS. CAMACHO:
8      Q.  And so, how do you do it?  Do you -- do you
9  rely on a partial name match or a complete match?  How
10  does it work?
11      MR. BILANKO: Object to the form.  They rely on
12  Lexix, I think is what his testimony was.
13      But go ahead.  If you guys rely on something...
14      THE WITNESS: Correct.  We will take the
15  information that was supplied to us from the client, and
16  we will do a very basic level of validation, and by
17  validation, I just mean we're checking to make sure
18  there are numerics or dashes or -- you know, periods or
19  anything like that.  So we'll do some basic filtering,
20  pass it to Lexix and they will pass back the appropriate
21  information.
22  BY MS. CAMACHO:
23      Q.  And so, you don't -- and what -- what filters
24  do you give to LexisNexix?
25      A.  We don't give any filters to LexisNexix.

Page 90

1      Q.  What information do you give the LexisNexix?
2      A.  We provide the name and address.
3      Q.  And when you mentioned a moment ago that you
4  have frequent conversations with LexisNexix about this
5  issue --
6      A.  No.  I did not say about this issue.
7      Q.  Okay.  So do you have any conversations at all
8  with LexisNexix about the accuracy of landlord/tenant
9  records?
10      A.  In a general level, yes.
11      Q.  And do you discuss with LexisNexix whether they
12  need to check, whether it has to be a complete name
13  match or a partial name match is sufficient?
14      A.  No, we do not have those conversations.
15      Q.  So you don't -- you don't tell LexisNexis the
16  gender has to be the right gender or the date of birth
17  has to be exact?
18      A.  Just as a point of clarification, I don't know
19  that we ever see gender and date of birth on a civil
20  filing.
21      Q.  Well, but you do see names; correct?
22      A.  Yes.
23      Q.  Okay.  So did you have -- ever have a
24  conversation with LexisNexix that says it has to be a
25  complete name match or a middle -- the middle name match

Page 91

1  has to match as well?
2      A.  No.
3      Q.  Before a renter report on a prospective tenant
4  is released to the client at On-site -- in other words,
5  after you received a report from LexisNexix, do you have
6  a rental relations specialist review that report to
7  double-check for accuracy?
8      A.  We do not.
9      Q.  Please take a look at -- I'm trying to find the
10  right document.  So this is a document that starts on
11  page 37 -- it goes to pages 37 to 40.
12      A.  Okay.
13      Q.  And if you look at page 38, right at the
14  bottom, there's a section that says, "Comments from
15  On-Site.com."
16      Do you see that?
17      A.  I do.
18      Q.  And at -- the very last line, which is dated
19  7-29, and then there's a date and then in parenthesis
20  (RB) and then it says, "Please note landlord/tenant
21  court record, housing-court lawsuit, or landlord
22  collection found."
23      Do you see that?
24      A.  I do.
25      Q.  And are -- do you know what (RB) stands for?

Page 92

1      A.  (RB) is an automated -- it means this note was
2  generated automatically.
3      Q.  Okay.  So at that point, when you have that
4  notation, that you have a record found -- so someone
5  from your renter relations program -- look at -- look at
6  a line like that and make a change or verify for
7  accuracy?
8      A.  No.
9      Q.  Now, please take a look at page 50.
10      A.  50?
11      Q.  Yes, 50.  Let me know when you're ready.
12      A.  I'm ready.
13      Q.  So this appears to be a lease; is that correct?
14      A.  You broke up a little bit.  This appears to be
15  what?
16      Q.  A lease -- a lease summary?
17      A.  Yes.
18      Q.  And is this going from the Camp Palisades
19  account, or is this from On-Site?
20      A.  No.  This is from the client.
21      Q.  Okay.  And there's a section for comments on
22  the right-hand side.  Are the comments made by Camp
23  Palisades employees or by On-Site employees?
24      A.  Those are made by Camp Palisades employees.
25      Q.  Okay.  And that notation -- there's a notation

Glenn Thompson, Jr., et al. v.
On-Site Manager, Inc.

Joseph Davidson
September 30, 2016

Page 93

1  that says -- that's dated 7-28-2015.  And it says,
2  Robert Robinson, please look at landlord/tenant account
3  charge.  That is not the applicant's name.
4      Do you see that?
5      A.  I do.
6      Q.  And, first of all, does Mr. Robertson work for
7  On-Site or Camp Palisades?
8      A.  He does not work for On-site.
9      Q.  And the -- On-Site have access to this screen
10  at the time?
11      A.  Only certain technical personnel would have
12  access to this screen for troubleshooting purposes.
13      Q.  Okay.  So that notation that says, "please look
14  at landlord/tenant charge," do you know what that might
15  be directed at?
16      A.  I would have to speculate, but I presume it
17  would be for their own internal personnel.
18      Q.  Okay.  Now, I understand -- and correct me if
19  I'm wrong -- that On-Site has some kind of a tool that
20  uses the Social Security to match the potential tenant
21  to -- to the right record; is that correct?  Or is my
22  understanding incorrect?
23      A.  That is incorrect.
24      Q.  So you don't have anything that relies on the
25  Social Security?

Page 94

1      MR. BILANKO: Object to the form.
2      THE WITNESS: That's very vague.  Can you maybe
3  rephrase that?
4  BY MS. CAMACHO:
5      Q.  You don't have a -- a Social Security tool --
6  screening tool to help you with the accuracy of the
7  rental reports that you're providing to your clients?
8      A.  We do have a tool that will allow us to; and I
9  believe I testified about this earlier.  This tool
10  allows us to associate; or, perhaps, more specifically,
11  disassociate specific social security numbers from
12  specific landlord/tenant records.
13      Q.  And so can you tell me how that tool works?
14      A.  Yes.  So when a record has been identified as
15  not belonging to a consumer, a very specific consumer,
16  that we have validated or we have worked with
17  LexisNexis, rather, to validate that the case is
18  legitimate, we will then create a negative entry, if you
19  will, or a table that contains consumer social security
20  numbers and key pieces of the landlord/tenant record,
21  usually the case number and the court location.
22      So when we move forward, if that applicant comes
23  through our system again, we do not -- or, we do not
24  send that request to Lexix and Lexix will, therefore,
25  not associate that previously-identified filing with

Page 95

1  that same consumer.
2      Q.  And so am I understanding correctly that you
3  save that information?
4      A.  We save --
5      MR. BILANKO: Object to the form.  Misstates his
6  testimony.
7      THE WITNESS: We save the social security number
8  as well as the case number and county location of that
9  landlord/tenant filing.
10  BY MS. CAMACHO:
11      Q.  Okay.  And when you're using or matching that
12  social security number, in order to -- I'm assuming that
13  in order to filter the correct social security number,
14  is that -- am I understanding that correctly?
15      A.  It is utilized to filter out results we have
16  received from our vendor.
17      Q.  And does the -- does it -- does it have to be
18  an exact match in order to -- to figure out the results?
19      A.  It does.
20      Q.  And is this a computer program - or, I mean, do
21  you rely on renter relations staff or other staff to
22  produce this -- this tool?
23      A.  The filtering is all done programatically.
24      Q.  Okay.  So if you -- if you get a -- if you get
25  information from LexisNexis that you determine is wrong

Page 96

1  and you use this tool and you save this information from
2  when LexisNexis sends this information again, at that
3  point, what happens?  How do you -- if an algorithm to
4  -- to pick up this information so that you're able to
5  match it and you -- you know you're talking about the
6  same person?
7      A.  At a high level, yes.
8      Q.  Let me put you to page 67.
9      A.  Is that 57?
10      Q.  Yes, 57.
11      A.  Okay.
12      Q.  Do you know where this document comes from?
13      A.  This appears to be a print screen of the
14  information entered by our client for Glenn Thompson.
15      Q.  And for which client is that, Mr. Davidson?
16      A.  Just looking at this page, I don't know.
17      Q.  And you have the ability to go back and look at
18  information that was entered in all of your accounts?
19      A.  Only for -- well, can you rephrase that?
20      Q.  Yes.  If this was entered by one of your
21  clients, my question is:  Do you have the ability to go
22  back at all of your accounts and look at the information
23  that was entered about a particular person --
24  prospective tenants?
25      A.  No.

CRS Court Reporters and Videographers
depos@crscourtreporters.com  408.298.3376

EXHIBIT 10 - PAGE 25 OF 30

Page 97

1    Q. So when do you have -- when are you able to --
2    what accounts are you able to go into, and which are you
3    not able to go into?
4       MR. BILANKO: I'm going to object to the extent
5    that it's beyond the scope of his designated testimony
6    here today.
7    BY MS. CAMACHO:
8       Q. Mr. Davidson?
9       THE WITNESS: So am I answering?
10      MR. BILANKO: Well, I don't recall that being any
11   -- any portion of what he was called here to testify
12   about. If he can recall today every single client that
13   On-Site has that for which he can go through and see
14   whether the information that was inputted
15   electronically, then, of course, I want him to answer
16   it. That just seems like something that might be beyond
17   the scope of what he was called here to provide
18   information about, so...
19   BY MS. CAMACHO:
20      Q. Mr. Davidson?
21      MR. BILANKO: So I apologize. I apologize, Joe.
22   If you do know that information, please answer.
23      THE WITNESS: So at a very high level, some of our
24   clients submit this information. And when I say "this
25   information," I mean, the applicant information. They

Page 99

1    believe, six months.
2    BY MS. CAMACHO:
3       Q. Okay. And can you tell me what On-Site
4    employee or staff or renter relation specialist or
5    whatever you call them enter social security numbers
6    into that tool?
7       A. That would be -- in the tool? That would be
8    handled by the renter relations team only.
9       Q. And would that information be noted in your
10   salesforce.com records?
11      MR. SALTZ: Only Salesforce?
12      THE WITNESS: It -- it would, given the extent of
13   how far back we maintain those records.
14   BY MS. CAMACHO:
15      Q. And if you enter a social security number into
16   this tool to associate a landlord/tenant court record
17   with a specific person, what record is created that's
18   been done?
19      A. Can you restate that, please.
20      Q. Right. If you're using this -- this tool where
21   you're relying on this social security number and you're
22   doing this because you're aware that a particular
23   landlord/tenant court record doesn't match that
24   particular -- that particular person and so you're
25   trying to note that and -- what record is created of

Page 98

1    submit it through a different type of property
2    management software. In those cases, we do not have any
3    record of them. In addition to that, we maintain only a
4    limited number of months of this information for, you
5    know, review or technical support purposes.
6    BY MS. CAMACHO:
7       Q. And how many months do you keep that
8    information for? For this review?
9       MR. BILANKO: I'll object -- I'll object to the
10   extent it's outside the scope of his designated
11   testimony.
12      David, if you know how to answer that.
13      THE WITNESS: I don't know for sure. I believe it
14   is six months, but I don't know for sure.
15   BY MS. CAMACHO:
16      Q. And please excuse my ignorance about
17   technology. But when you say at a very high level what
18   do you mean?
19      A. Well, what I mean is some of the question is a
20   little vague as to what's stored, what's not stored. So
21   like the information that you see here this applicant
22   information, in those scenarios, we would maintain, but
23   again, we would not maintain anything that comes through
24   a software provider, a property management software
25   provider, nor would we maintain records beyond, I

Page 100

1    that being done?
2       A. When the tool is used, there is an absolute
3    record created on a server, again, to maintain that
4    social security number along with the specific details
5    of the landlord/tenant case, namely: The case number
6    and the location. That is a definite record. Once you
7    use that tool, it creates that entry. It does not
8    create an entry in the Salesforce. That would need to
9    be, essentially, double-keyed, if you will, or record of
10   that would have to be doubled-keyed into salesforce by
11   the renter relations team.
12      Q. Just give me one second. I need to find the
13   right page.
14      Looking at -- looking at page 58.
15      A. Okay.
16      Q. Is this what On-Site charged Club Palisades for
17   the renter reports for Mr. Thompson Jr. and Senior?
18      A. It is.
19      Q. And is this reporting, to an exhaustive report,
20   a list of what On-Site was required to, based on those
21   records?
22      A. Hmm?
23      MR. SALTZ: I'm sorry. I didn't understand the
24   question. Can you re- --
25      THE WITNESS: Can you rephrase that?

Page 101

1   BY MS. CAMACHO:
2       Q.  Yeah.  Is this -- you know, there's a -- this
3   -- on the description, there's a list of credit check,
4   E-signatures, and so on.
5       Does that description include everything that
6   On-Site was required to do, based on this -- on those
7   charges?
8       MR. SALTZ:  Objection as far as the term
9   "everything."
10      THE WITNESS:  This is what the client has
11  contracted us to do; and, therefore, this would reflect
12  that.
13  BY MS. CAMACHO:
14      Q.  And then please take a look at pages 59 and 60.
15      A.  Okay.
16      Q.  Are these -- we're looking at 59.  Is this a
17  receipt that was given to Mr. Thompson Jr., for the
18  rental report or the application fee?
19      A.  I don't know if it was given to Mr. Thompson
20  Jr.  I have no way to know that.
21      Q.  Okay.
22      A.  It was generated.
23      Q.  On the bottom, there's a list of itemized
24  property expenses.  Do you see the second to last line
25  where it says verification for Glenn Thompson Jr. and

Page 102

1   it's $2.10.
2       Do you see that?
3       A.  No.  I do see where it says $10.
4       Q.  Oh, excuse me.  I'm looking -- yes.  Thank you
5   for correcting me.
6       So what was On-Site.com required to do to verify
7   -- to do this verification?
8       A.  The verification is an applicant's prior
9   leasing history.  And when I mean that -- and when I say
10  that, I mean, an applicant may put down, I used to live
11  at X-property.  So we will do our best to contact that
12  property and determine whether the applicant moved out
13  on good terms, left owing money -- On-Site would.
14      Q.  Just give me one moment.  I need to find the
15  right page.
16      Now, looking at the rental report that's for
17  Mr. Thompson Jr., that starts on pages 45 to 46.
18      A.  Okay.
19      Q.  And then there's a report for Mr. Thompson Sr.,
20  and that's pages 47 through 49.
21      A.  Okay.
22      Q.  Have you had a chance to look at it -- at the
23  reports?
24      A.  Yes.
25      Q.  Is this the format -- does On-Site use the same

Page 103

1   format for all rental reports that go out to prospective
2   tenants requesting a free copy?
3       A.  Yes.
4       Q.  And is this the -- that format?  Pages 45 to 46
5   for Junior and 47 through 49 -- is this what a
6   prospective -- the form of a prospective tenant normally
7   would get?
8       A.  Yes.
9       Q.  Now, looking at -- just give me one second.
10  Looking at that report that starts on pages 24 to 28 for
11  Thompson Sr.
12      MR. BILANKO:  24?
13      THE WITNESS:  24.  Okay.
14      MS. CAMACHO:  24 to 28.
15          (Off-the-record discussion.)
16      THE WITNESS:  Okay.
17  BY MS. CAMACHO:
18      Q.  Does On-Site ever send -- looking at page 24, a
19  rental report that has that information that's listed on
20  page 24?
21      MR. BILANKO:  Object to the form.
22      MR. SALTZ:  There's a lot of information.  What
23  specific information are you looking at?  Because if
24  not, you're calling for a narrative.
25  BY MS. CAMACHO:

Page 104

1       Q.  Well, my question, Mr. Davidson, is whether
2   this particular page -- or -- actually, let me rephrase
3   that:
4       This report has -- that first page, it has the
5   overall recommendation and a score.  And then the next
6   page has that credit quick summary.
7       Does On-Site ever send a rental report that
8   contains this format as it looks like on pages 24 and 25
9   with overall recommendation, the score, the warnings,
10  and then the credit quick summary?
11      MR. SALTZ:  Send to whom?
12  BY MS. CAMACHO:
13      Q.  To the -- to a prospective tenant who calls and
14  asks for the free reports?
15      A.  No.  It is not our policy to do so.
16  BY MS. CAMACHO:
17      Q.  Now, let me ask you about something else.  When
18  you have -- when you get a dispute from a prospective
19  tenant or what you consider a dispute, what is your
20  policy in terms of recording communications regarding
21  those disputes?
22      A.  We record all communication.
23      Q.  And in what format do you record that
24  communication?
25      A.  MP3.

Glenn Thompson, Jr., et al. v.
On-Site Manager, Inc.

Joseph Davidson
September 30, 2016

Page 105

1   Q. Is it s computer recording?  I mean, is it a --
2   a computer program?
3   A. Yes.
4   Q. Okay.  And what are your policies for
5   reinvestigating disputes?
6   MR. BILANKO: Object to the form of the question.
7   Was the question, what are -- what are the
8   policies for reinvestigation --
9   MS. CAMACHO: Right.
10   MR. BILANKO: -- dispute -- for reinvestigation
11   disputes?
12   BY MS. CAMACHO:
13   Q. Right.  Do you have any procedures for
14   reinvestigating disputes when you have a prospective
15   tenant who calls and has what you identify as a dispute?
16   A. We do.
17   Q. And what are those policies?
18   MR. SALTZ: Asked and answered, isn't it?  I think
19   it -- that was one of the first questions asked.
20   THE WITNESS: Well, of course, again, the response
21   is going to be highly variable based on the nature of
22   the dispute or the type of information.
23   But, again, just at a very high level, we will do
24   our best to address the dispute.  Again, if it's about
25   landlord/tenant, we will work with our data provider, in

Page 106

1   this case LexisNexix, to determine the results.  We will
2   work with the applicant.  We will push copies of the
3   report.  We will tell them what's been changed, what
4   hasn't been charged.  I -- I guess I'm having trouble
5   with the vague nature of the question.
6   BY MS. CAMACHO:
7   Q. Well, let me ask you this:  Do you have any
8   procedures about what notices you will send out after
9   you have completed a -- a reinvestigation of a dispute?
10   MR. BILANKO: Object to the form.
11   THE WITNESS: In -- in -- in what scenario?
12   BY MS. CAMACHO:
13   Q. If you have a prospective tenant that calls you
14   and you identify that that tenant has a dispute, and you
15   then investigate it and respond to that dispute, do
16   you -- once you have considered -- once you
17   reinvestigate it, do you send any notices about the --
18   the results of that investigation?
19   A. We would certainly offer to send notice of the
20   results of the reinvestigation.  If the applicant
21   requests it, we will offer it on the telephone.  Again,
22   you said this is triggered by a telephone call.
23   So we will verify that they are okay with
24   receiving the results of their investigation orally.
25   Assuming if they're interested in moving forward with

Page 107

1   that, and virtually all of them are, because time is
2   important, we will discuss the report; discuss the
3   nature of the report; discuss any items which they may
4   want to dispute.
5   We will describe the changes to them.  Again, a
6   lot of the times, this is done right with them on the
7   phone, and that is going to be variable on -- on the
8   nature of the issue, of course.  If they request, we
9   will tell them how we made our determination.  And we
10   will then finally end up with telling them that they
11   have a right to receive a copy of those results.  And if
12   they would like to do so.  We could ask them if they
13   would like it via e-mail.  If they will provide us an
14   e-mail address, we will do that by e-mail.  Otherwise,
15   we are open to doing it snail-mail.  US Postal mail.
16   I'm sorry.
17   Q. I understand.  Let me point you to another
18   document, another page.  This one is page 56.
19   A. Okay.
20   Q. And it's -- it's a one-page entitled
21   "importance of accurate data entry."
22   Do you see that?
23   A. I do.
24   Q. And it says a reminder for leasing staff.
25   Do you see that?

Page 108

1   A. I do.
2   Q. Who -- who gets this document?
3   A. This is provided to our clients.
4   Q. And does On-Site have documents like this, or a
5   menu that it distributes to its staff about what to do
6   in the event of a dispute, regardless of whatever form,
7   whether it comes by telephone or in writing?
8   A. It does.
9   Q. And does that menu include a list of procedures
10   for correcting information on rental reports?
11   A. Correcting information on the report?  Yes.
12   Q. Okay.  So what are those procedures for
13   correcting information on the report?
14   A. Well, again, we are a reseller, and we don't
15   maintain any of our own files.  So we will work with the
16   vendors who provide information, but we will also work
17   to assist the applicant if it is something that we can
18   make a determination on relatively easily.  At which
19   point, we are able to, for lack of a better term,
20   suppress information from the report; kind of an
21   electronic liquid paper, if you will, to assist that
22   applicant in getting in.
23   Q. So in -- in this case, Mr. Davidson, in
24   June 2015, when On-Site learned that Mr. Thompson Sr.,
25   was disputing their -- Patricia Thompson's admission

Page 109

1  records that were reported to the Lodge, what did
2  On-Site do with that information?
3      A.  On-Site compared the name on the report;
4  compared the name on the application or, rather, what
5  was sent to us by the client, the electronic version of
6  the application, if you will; determined that it was not
7  the same consumer suppressed that information by
8  utilizing the social security number tool, if you will,
9  and reissued the report; notified the applicant of the
10  correction; notified the property of the correction.
11      Q.  I'm sorry.  You said you notified the property
12  and who else?
13      A.  And the applicant.
14      Q.  And did you do this for both Mr. Thompson Sr.,
15  and Junior, or only for one of them?
16      A.  According to my notes, Mr. Thompson Jr., never
17  called in to initiate a dispute, so we did not
18  communicate with Mr. Thompson Jr.
19      Q.  And -- and so those were the only two groups
20  that you reported this information to:  Property manager
21  and Mr. Thompson, Sr?
22      A.  Correct.
23      Q.  And how did you communicate that information to
24  Mr. Thompson, Sr?
25      A.  I don't have that note in front of me.  To my

Page 110

1  recollection, it was verbally, but we also pushed the
2  report to his e-mail address.
3      Q.  And did On-Site use that Social Security tool
4  that you were describing earlier to ensure that that
5  information would not appear again if Mr. Thompson Sr.,
6  applied to another property, and his report was
7  generated again?
8      A.  We did.
9      Q.  And did you tell Mr. Thompson Sr., that
10  Mr. Thompson Jr.'s report would not be corrected?
11      A.  We are not authorized to talk about any other
12  adult's application or report without authorization.  So
13  we wouldn't have discussed Glenn Thompson Jr.'s, report
14  with Glenn Thompson Sr., at all.
15      MS. CAMACHO: Okay.  Give me a couple of -- just a
16  second, please, to look at my notes here.
17      I'm going to counsel with my colleagues for a
18  moment.  Let me put you on mute.
19      I'll go off the record for a moment.
20          (Off-the-record discussion.)
21  BY MS. CAMACHO:
22      Q.  Mr. Davidson, are you ready?
23      A.  Yes.
24      Q.  So let's take a look at page 46.
25      A.  46.  Okay.

Page 111

1      Q.  Now, 46 is the second page of the rental report
2  that was created on July 28th for Mr. Thompson Jr. and
3  in response to him applying at Club Palisades.  And if
4  you look at page 46, there is -- under landlord/tenant
5  court records, you see a record for Patricia Thompson.
6      Do you see that?
7      A.  I do.
8      Q.  And now, let me find the page.  Now, take a
9  look at -- at this report that starts on page 17 -- 17
10  through 19.  And that's a report that was created for
11  Mr. Thompson Jr.
12      Do you see that?
13      A.  I'm getting there.
14      I do.
15      Q.  And if you look at -- if you look at page 19,
16  the last page on the -- on the record.
17      When you look at landlord/tenant court records, it
18  looks like, at some point, On-Site took out the
19  landlord/tenant -- Patricia Thompson's eviction action
20  from Mr. Thompson Jr.'s record.
21      Do you see that?
22      A.  I do.
23      Q.  So when was this done?
24      A.  Looking at these pages?  I don't know.
25      Q.  Okay.  Well, let's look at the report --

Page 112

1  another report that was created by On-Site for
2  Mr. Thompson Jr., and that report starts on page 31 and
3  pages 31 through 34.
4      A.  Okay.
5      Q.  And if you look at page -- let me see.  Page
6  33.
7      A.  Yup.
8      Q.  At the bottom, under landlord/tenant court
9  records, the Patricia Thompson eviction record has been
10  removed from Mr. Thompson Jr.'s rental report after she
11  applied at Club Palisades.
12      Do you see that?
13      A.  I see that there is no landlord/tenant court
14  record reported, yes.
15      Q.  So what prompted you to make that change?
16          (Reporter interruption.)
17  BY MS. CAMACHO:
18      Q.  What prompted On-Site to make that change?
19      A.  I would speculate that when someone looked at
20  the case and saw the name difference -- well, wait a
21  minute.
22      THE WITNESS: Is this the one where --
23      MR. BILANKO: What's the date?
24      THE WITNESS: 7-28, right?  This is 7-28.
25      MR. BILANKO: This is the one.

Glenn Thompson, Jr., et al. v.
On-Site Manager, Inc.

Joseph Davidson
September 30, 2016

---

Page 113

1    THE WITNESS: And this is the one where there was
2  -- okay.  Perfect.
3    So, again, this is speculation based on some of
4  the other evidence in the documentation.  I would
5  suspect that Robert Robinson or someone from Club
6  Palisades may have called tech support and said
7  something to the effect that:  "Hey, can you take a look
8  at this?"  At which point, tech support would have
9  looked and seen a clear difference and would have
10  removed it.
11  BY MS. CAMACHO:
12    Q.  And did On-Site notify Mr. Thompson Jr., of
13  that?  Of the change?
14    A.  When a change is made, assuming we have an
15  e-mail address, which I believe we did for this
16  applicant, it would have been automatically pushed.
17    Q.  Did On-Site make any record of -- of that
18  correction?
19    A.  Any record of the correction?  Yes.  The report
20  is clearly not reflecting the landlord/tenant record.
21    Q.  It's separate -- separate from that report, do
22  you have any -- any comments or notes in salesforce.com
23  showing this -- that correction was made?
24    A.  No.  Since this was not a dispute initiated by
25  an applicant, our policy is -- it's not part of our

---

Page 114

1  policy to enter notes in Salesforce.
2    MR. CAMACHO: Mr. Davidson, I do not have any
3  other questions for you.
4    THE WITNESS: Okay.
5    MS. CAMACHO: Mr. Bilanko?
6    MR. BILANKO: Yes.
7    MS. CAMACHO: Do you have any questions?  Are you
8  asking any questions?
9    MR. BILANKO: I am not going to ask any questions,
10  but we are -- we are --
11    MS. CAMACHO: I'm sorry.  I didn't hear that.
12    MR. BILANKO: I'm not going to ask any questions,
13  so we can conclude the deposition.
14    MS. CAMACHO: Okay.  Thank you very much,
15  Mr. Davidson, for your time.
16    Thank you, Counsel, for your time.
17    Thank you, Court reporter.
18    Court reporter, we will be in touch.
19         (WHEREUPON, the deposition was
20           adjourned at 1:44 p.m.)
21  I certify under penalty of perjury under the laws of the
22  State of California, that the foregoing is true and
23  correct.
24
25  Date: _____, 2016 _____

---

Page 115

1  STATE OF CALIFORNIA          )
2  COUNTY OF SANTA CLARA        )
3
4    I, SARAH K. MAKSIM, Certified Shorthand Reporter
5  in and for the State of California, do hereby certify
6  that the witness in the foregoing deposition was by me
7  duly sworn to testify to the truth, the whole truth, and
8  nothing but the truth in the within-entitled cause, that
9  the foregoing is a full, complete and true record of
10  said testimony, and that the witness was given an
11  opportunity to read and correct said deposition and to
12  subscribe to the same.
13    I further certify that I am not interested in the
14  outcome of this action, nor connected with, nor related
15  to any of the parties in said action, nor to their
16  respective counsel.
17    Date:  October 13, 2016.
18
19
20    _____
21            Sarah K. Maksim
22        Certified Shorthand Reporter
23          License No. 14053
24
25

---

401 Second Ave S. Suite 407
Seattle, WA 98104
Tel. (206) 464-1519
Fax (206) 624-7501

# Northwest Justice Project

Toll Free 1-888-201-1012
www.nwjustice.org

César E. Torres
Executive Director

October 17, 2016

**VIA ELECTRONIC MAIL AND LEGAL MESSENGER**

Nicholas L. Jenkins
Floyd, Pluegger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA  98104

     Re:   <u>Thompson, Jr. and Thompson, Sr. v. On-Site Manager, Inc.,</u>
              <u>2:15-cv-01596-TSXZ</u>

Dear Mr. Jenkins:

I write in response to your letter, dated October 14, 2016, received by my office on late Friday afternoon.  First, I understand that you have no objections to Document Request No. 1 and 2 but that you object to Document No. 3 based on Subpoena Duces Tecum properly served to Greystar Management on October 6, 2016.

It is my understanding that you have already identified and are willing to produce all the documents identified in the second to last paragraph on page 2 of your letter which includes:

- Thompsons' rental applications and associated handwritten notes
- Notice of denial and associated paperwork, including FCRA disclosures and related Washington State addenda
- The Thompsons' Residential Ledger showing return of their security deposit and redecorating fees
- Screening reports received by Greystar from On-site in connection with Plaintiffs applications

If you provide the documents described in this letter—pursuant to Documents Request No. 1 an No. 2—by the end of business day today, consistent with the Subpoena Duces Tecum, I will agree to waive Greystar's obligation to comply with Document No. 3.

Second, with regard to your objections to the Greystar's Deposition scheduled for this Friday, October 21, 2016, Greystar was properly served—on August 16, 2016—with a Subpoena to Testify at a Deposition on August 24, 2016.  The deposition was delayed at your personal request when you informed my former colleague—Eric Dunn—that you would produce documents related to the Thompsons' application at The Lodge instead for him to review and determine whether a deposition was necessary.  However, as of this date, you



THE ALLIANCE
for a fight mind
MEMBER

LSC

**EXHIBIT 11 - PAGE 1 OF 2**

Nicholas E. Jenkins
October 17, 2016
Page 2

have failed to produce a single document despite repeated requests. Please be advised that compliance with the Subpoena Duces Tecum will not waive Greystar's requirement to appear at the Deposition on October 21, 2016.

In your letter, for the first time since August 16, 2016, you make the allegation that the Greystar employee who handled plaintiffs' applications no longer works for Greystar. However, neither the Subpoena served on August 16, 2016, nor the Amended Notice of Greystar Deposition calls for Greystar to produce a specific individual. Rather, the Subpoena and Amended Notice call for Greystar to determine who to designate to provide testimony on the matters for which Greystar has had notice since August 16, 2016. I expect Greystar to comply and to appear at the deposition on Friday, October 21, 2016, beginning at 9:30 a.m.

Thank you for your attention to this letter. I can be reached at (206) 464-1519, or at leticiac@nwjustice.org.

Sincerely,

Leticia Camacho
Staff Attorney

C:      Glen Thompson, Jr. and Glenn Thompson Sr.

**EXHIBIT 11 - PAGE 2 OF 2**